# EXHIBIT A

# INDEX OF CHANCERY COURT PLEADINGS

| Tab 1 | Complaint | Dkt. 1 |
|---|---|---|
| Tab 2 | Exhibits 1-5 | Dkt. 1-1 |
| Tab 3 | Exhibits 6-10 | Dkt. 1-2 |
| Tab 4 | Exhibits 11-15 | Dkt. 1-3 |
| Tab 5 | Verification to Complaint | Dkt. 1-4 |
| Tab 6 | Supplemental Information Statement | Dkt. 1-5 |
| Tab 7 | Summons Instruction Letter | Dkt. 1-6 |
| Tab 8 | Plaintiff's Motion for Temporary Restraining Order | Dkt. 2 |
| Tab 9 | Plaintiff's Opening Brief in Support of His Motion for Temporary Restraining Order | Dkt. 2-1 |
| Tab 10 | Exhibits 1-5 | Dkt. 2-2 |
| Tab 11 | Exhibits 6-10 | Dkt. 2-3 |
| Tab 12 | Exhibits 11-15 | Dkt. 2-4 |
| Tab 13 | Affidavit of Jeremy Brown | Dkt. 2-5 |
| Tab 14 | [Proposed] Order Granting Plaintiff's Motion for Temporary Restraining Order | Dkt. 2-6 |
| Tab 15 | Motion to Expedite Proceedings | Dkt. 3 |
| Tab 16 | Memorandum of Law in Support of Plaintiff's Motion to Expedite | Dkt. 3-1 |
| Tab 17 | [Proposed] Order to Motion to Expedite Proceedings | Dkt. 3-2 |
| Tab 18 | Motion for Preliminary Injunction | Dkt. 4 |
| Tab 19 | [Proposed] Order to Motion for Preliminary Injunction | Dkt. 4-1 |
| Tab 20 | Letter to Chancellor McCormick enclosing copies of pleadings and requesting prompt assignment of this case | Dkt. 5 |
| Tab 21 | Issuance of Summons | Dkt. 6 |
| Tab 22 | Letter to Counsel Scheduling Hearing on Motion to Expedite | Dkt. 7 |
| Tab 23 | Revised Verification to Complaint | Dkt. 8 |
| Tab 24 | Revised Affidavit to Opening Brief in Support of Plaintiff's Motion for Temporary Restraining Order | Dkt. 9 |

# TAB 1

EFiled:  Aug 21 2023 05:10PM EDT
Transaction ID 70683025
Case No. 2023-0859-

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

JEREMY BROWN,                        )
                                     )
                    Plaintiff,       )
                                     )
        v.                           )    C.A. No.
                                     )
MERCANTILE PROCESSING, INC., a       )
Delaware corporation, KYLE MORGAN,   )
and KATHRYN McMILLAN,                )
                                     )
                    Defendants.      )


## VERIFIED COMPLAINT

Through this Verified Complaint, Plaintiff Jeremy Brown seeks to enjoin his former employer and two of its officers from enforcing certain restrictive covenants, from continuing to prevent him from performing his contractual obligations upon which his future earnings are based, and from continuing to withhold his wages.  Mr. Brown also seeks declarations regarding his contractual obligations and, specifically, that he is not subject to any restrictive covenants with his former employer, Mercantile Processing, Inc. ("MPI").  Finally, Mr. Brown seeks to recover the full amount of the wages intentionally withheld by Defendants, plus the requisite liquidated damages, fees and costs in seeking this relief.

272902681.v1

## PARTIES

1.     Plaintiff Jeremy Brown is an individual 36 years of age residing in Millsboro, Delaware.

2.     Defendant Mercantile Processing Inc., is a Delaware corporation with its principal place of business in Millville, Delaware, and a second office in Havre de Grace, Maryland.

3.     MPI sells point-of-sale ("POS") systems, credit-card processing, payroll services, gift and loyalty cards, and ATM services.

4.     Individual Defendant Kyle Morgan is and, at all relevant times was, the Chief Executive Officer of Defendant MPI and is a resident of the State of Delaware.

5.     Individual Defendant Kathryn McMillian is, and at all relevant times was, the Chief Revenue Officer of Defendant MPI and is a resident of the State of Delaware.

## JURISDICTION

6.     This Court has personal jurisdiction over the defendants, a Delaware corporation and two Delaware residents.

7.     This Court has subject-matter jurisdiction over Counts I-III, which seek Declaratory Relief, pursuant to 10 *Del. C.* § 6501.

8.     This Court has subject-matter jurisdiction over Counts IV and V, which seek injunctive relief, pursuant to 10 *Del. C.* § 341.

9.     This Court has subject-matter jurisdiction over all remaining Counts under the clean-up doctrine.

10.     Venue is proper in this Court because all parties are Delaware residents and because the governing agreement (the 2018 EA), provides for venue in Delaware.

## FACTUAL ALLEGATIONS

11.     Mr. Brown was employed by MPI from 2015 until February 10, 2023.

12.     Mr. Brown was hired by MPI in 2015 as a sales agent.

13.     During his employment, the vast majority of Mr. Brown's accounts were from Maryland and Delaware.  He estimates that less than 30% of his accounts (based on total revenue) were in New Jersey and Pennsylvania, one (1) account in Texas, and a few small accounts in Virginia.

14.     MPI advertises itself as a "locally owned Delaware company" that is based in Sussex County with its "home office" in Frankford, Delaware.  *See* Exhibit 8 (MPI LinkedIn Page) (last visited Aug. 8, 2023).[1]

15.     Mr. Brown was paid as a W-2 employee each year from 2015 to 2022.

16.     Mr. Brown's relationship with MPI was subject to several agreements.

---

[1]     A Table of Exhibits is provided with the Exhibits for ease of reference.

## I.    THE 2015 AGREEMENTS

17.    When first hired by MPI, Mr. Brown executed two (2) agreements.

18.    First, on September 15, 2015, he executed a Bank Relationship Manager Employment Agreement, a copy of which is attached hereto as Exhibit 1 (the "2015 EA").

19.    Second, on September 25, 2015, he executed an Independent Agent Agreement, a copy of which is attached hereto as Exhibit 2 (the "2015 IAA, together with the 2015 EA, the "2015 Agreements").

## II.    THE 2018 EMPLOYMENT AGREEMENT

20.    On October 1, 2018, Mr. Brown and MPI terminated the 2015 Agreements in favor of a new agreement, titled "Head of Bank Partnerships Employment Agreement," a copy of which is attached hereto as Exhibit 3 (the "2018 EA").

## A.    MR. BROWN'S RIGHT TO RESIDUALS UNDER THE 2018 EA

21.    Section 2 of the 2018 EA, titled "Compensation and Benefits," provides for how Mr. Brown would be compensated:

### 2.    COMPENSATION AND BENEFITS

#### 2.1    Annual Salary

Head of Bank Partnerships[sic] compensation shall consist of an annual base salary (the ***"Salary"***) of $48,000 payable in semi-monthly installments in accordance with the payroll practices of the Company.  The salary is directly comparable with the Bank quota outlined in the attached

4

> link.   In addition to the salary the Head of Bank
> Partnerships shall be entitled to residuals on previous
> accounts obtained as a sales agent and 15% of net residual
> from subordinate employees and portfolio banks.  Head of
> Bank Partnerships may take residuals at 50% for direct
> sales per approval of Director of Sales.  [Exhibit 3 at § 2.1]

22.     Specifically, Section 2.1 provides that Mr. Brown would receive a

guaranteed annual salary of $48,000 and certain residual payments (the

"Residuals").

23.     Section 2.1 of the 2018 EA provides that Mr. Brown would continue

to receive the Residuals on accounts he boarded or managed while in his previous

role as a sales agent, plus "15% of net residuals from subordinate employees and

portfolio banks."  *Id.*

24.     Under this provision, Mr. Brown would earn a Residual equal to 15%

of the Residuals earned by the sales agents he supervised and 15% of net revenue

for "portfolio banks."

25.     One such bank was the Woodsboro Bank, which had more than 100

individual accounts for which Mr. Brown was responsible and for which he was to

be paid 15% of the net revenue of those accounts (the "Woodsboro Portfolio").

26.     The accounts within the Woodsboro Portfolio are located

approximately 150 miles away from Mr. Brown's home.

27.     Additionally, the 2018 EA provides that Mr. Brown was to earn

Residuals of "50% for direct sales per approval of Director of Sales."  *Id.*

5

28.     Section 5 of the 2018 EA, titled "Continuation of Payment," provides that Mr. Brown's Residuals will continue following the termination of the employment relationship:

> **Upon termination or resignation** of Head of Bank Partnerships, **Head of Bank Partnerships is entitled to ongoing residuals as outlined in Independent Agent Agreement and schedule A.** Upon termination or resignation Head of Bank Partnerships will not be entitled to any right or benefit that is outline[sic] in the employee handbook. Head of Bank Partnerships will become a subcontractor as outline[sic] in the Independent Agent Agreement.
>
> **Accounts boarded by agent will pay residuals for life of the account** as dictated in [sic] Independent agent agreement[sic]. **Accounts boards[sic] through bank partnerships will pay for 5 years after termination or resignation of agent will be paid a 36 times (based on monthly average) one time lump sum of bank partnerships value.** [*Id.* at § 5 (emphasis supplied)].

29.     Specifically, the 2018 EA provides that Mr. Brown will receive Residuals for the life of all accounts that he boarded during his employment.  *Id.*

30.     The 2018 EA also provides that, for all accounts boarded through a bank partnership, Mr. Brown would receive Residuals for five (5) years after the end of his employment *or* MPI could buyback the Residuals for a one-time lump sum payment equal to 36 times the "monthly average" of the account.  *Id.*

## B.     THE INVALID COVENANTS IN THE 2018 EA

31.     The 2018 EA purported to contain certain restrictive covenants (the "Covenants").  *See id*. at § 4, "Non-Solicitation, Non Compete, Non Disclosure."

6

32.    Section 4.1 of the 2018 EA, although titled "Non-Solicitation," actually is a noncompete covenant, as plainly stated in the first paragraph of the Section, which states, "The Head of Bank Partnerships further acknowledges that it is necessary to protect the interest of MPI and its merchant base by entering into the following covenant not to compete, as provided herein." *Id.* at § 4.1.

33.    The second paragraph of Section 4.1 provides:

> **The Head of Bank Partnerships covenants, represents, acknowledges and agrees that for a period of five (5) years following the termination of this agreement**, **neither the Head of Bank Partnerships, its successors or assigns,** nor its Associated Sales Personnel, either individually or through any other entity for which he, she, or it works or from which he, she, or it would receive financial remuneration for the placement of Merchant Client Accounts, **will not solicit company applications anywhere in the United States of America from Merchant Client Accounts and will not solicit bank partnerships for any competing entity**. [*Id.* at § 4.1 (emphasis supplied)].

34.    Like the 2015 IAA, the 2018 EA provides that, for five (5) years "following the termination of this agreement," Mr. Brown and his "successors" "will not solicit company applications anywhere in the United States of America from Merchant Client Accounts and will not solicit bank partnerships for any competing entity."

35.    Thus, as drafted, Mr. Brown *and his children* are prohibited from working in any capacity that involves the solicitation of *any* "Merchant Client

Account" (which is not defined in the 2018 EA) *anywhere in the U.S. for 5 years* from the date of the termination of the 2018 EA.

36.     Mr. Brown also is prohibited for those same 5 years, from soliciting "bank partnerships for any competing entity." *Id.*

37.     Despite being capitalized as if it were a defined term, "Merchant Client Account" is not defined in the 2018 EA.

38.     "Bank partnerships" and "competing entity" also are not defined in the 2018 EA.

39.     Section 4.2 of the 2018 EA, titled "Non Compete", is a mere single sentence:

> Head of Bank Partnerships Acknolwedges[sic] that MPI has a regional advantage and agrees that for the term of one year not to work for a competing entity within 100 miles of an MPI Office.  [Exhibit 3 at § 4.2].

40.     Thus, under Section 4.2 of the EA, Mr. Brown is prohibited, for a period for one year, from working for a "competing entity" within 100 miles from MPI's offices in Sussex County, Delaware, and Havre de Grace, Maryland.

41.     The "one year" term of this provision terminated on October 19, 2019, one year from the date of the 2018 EA.

42.     Thus, as written, this Covenant expired nearly *four years ago*.

## C.     THE INVALID FORFEITURE PROVISION IN THE 2018 EA

43.      Section 4 of the 2018 EA purports to provide for the "forfeiture" of Mr. Brown's wages if he violates any of the Covenants.  *Id*. at § 4.

44.     Specifically, Section 4 states that Mr. Brown "forfeits [his] rights to residuals or compensation" in the "case of any violation of section 4, during or after employment." *Id*.

## III.    THE 2019 AMENDMENT TO THE 2018 EA

45.     The 2018 EA was amended by the parties in writing on October 21, 2019 (the "2019 Amendment"), a copy of which is attached hereto as Exhibit 4.

46.     The 2019 Amendment expressly reaffirms that Mr. Brown would continue to receive the Residuals "in perpetuity".  Exhibit 4 at p.2.

## IV.    MPI REGULARY MADE UNLAWFUL DEDUCTIONS FROM MR. BROWN'S SALARY

47.     The 2018 EA provides for a guaranteed "base salary" per year but MPI regularly set off missed quotas against Mr. Brown's salary.

48.     Despite repeatedly and intentionally making deductions from Mr. Brown's pay, MPI classified Mr. Brown (and other sales agents) as exempt from the federal and state wage-and-hour laws.

49.     As a result of MPI's misclassification of Mr. Brown as an exempt employee, MPI did not maintain time records for Mr. Brown.

50.     Mr. Brown regularly worked hours significantly in excess of 40 in a workweek throughout his several years of employment with MPI.

51.     As a result of MPI's misclassification of Mr. Brown as an exempt employee, Mr. Brown was not paid overtime for time worked in excess of 40 in a workweek.

52.     In violation of the 2018 EA, MPI regularly failed to pay Mr. Brown his guaranteed base salary.

## V.     MPI WITHOLDS RESIDUALS FOR THE WOODSBORO PORTFOLIO AT THE DIRECTION OF DEFENDANT MCCMILLAN

53.     Mr. Brown boarded the Woodsboro Portfolio in approximately 2018 and had been receiving 15% Residuals for the account since then.

54.     In September 2022, MPI hired a new employee, Jake Vacura, as a Relationship Manager to take over the referral relationship with Woodsboro Bank.

55.     Mr. Brown would manage Mr. Vacura and would continue to receive Residuals of 15% of the Woodsboro Portfolio.

56.     After Mr. Vacura was hired, Individual Defendant McMillan sent Mr. Brown a document titled "Woodsboro Transition Plan and Timeline," a copy of which is attached hereto as Exhibit 5.

57.     According to the document, Mr. Brown had sixteen (16) working days, from September 19 to October 12, 2022, to make *in-person introductions* of

Mr. Vacura to *every one of the more than 100 accounts* in the portfolio, which were located approximately 150 miles away from Mr. Brown's home.

58.     The document stated that MPI would reduce Mr. Brown's Residuals on the account from 15% to 5% unless Mr. Brown made the introductions.

59.     Mr. Brown had (and has) a contractual right to receive 15% Residuals on this account pursuant to the 2018 EA.

60.     Mr. Brown responded to Defendant McMillan, agreeing to transition the new Relationship Manager to the Woodsboro Portfolio but objected to having his Residuals reduced as he had a contractual right to receive them.

61.     Individual Defendant McMillan responded on September 22, 2022, stating that Mr. Brown's "financial consequences remain the same whether you sign this document or not," meaning that MPI would unilaterally reduce his Residuals on the Woodsboro Portfolio from 15% to 5%, regardless of the 2018 EA's provisions.  *See* Exhibit 6.

62.     Defendant McMillan further claimed that she did not need Mr. Brown's consent to slash his contractually guaranteed Residuals.  *See* Exhibit 6.

63.     Defendant McMillan also acknowleged that Mr. Brown's Residuals on the Woodsboro Portfolio were approximately $25,000 per year, thereby recognizing that she was threatening to reduce his income by approximately $19,000 per year from that account alone.  *Id.*

11

64.     As a result of herculean efforts, Mr. Brown managed to make 98% of the introductions.

65.     In violation of the 2018 EA, MPI unilaterally reduced Mr. Brown's Residuals on the Woodsboro Portfolio from 15% to 5% beginning with the November Residuals, which were paid on December 15, 2022.

66.     When Mr. Brown received his pay on December 15, 2022, he immediately realized that it was approximately $2,000 less than it should have been.

67.     He alerted Defendant McMillan to the shortage, pointing out that the Woodsboro Portfolio had been paid at 5%, instead of the contractually required 15%.   A copy of that email is attached as Exhibit 7.

68.     Defendant McMillan responded that she had authorized the reduction and refused to issue payment for the wrongfully withheld Residuals.

69.     Mr. Brown continued to advocate for the return of the Woodsboro Residuals to the agreed-upon 15% and for the payment of the back wages due.

70.     On Friday, December 16, 2022, Mr. Brown met with the Individual Defendants to again request that they release the unpaid Woodsboro Residuals due from November 2022.

71.     Mr. Brown sent an email to the Individual Defendants on December 21, 2022, again imploring them to do the right thing and pay him the back wages

due and restore his proper (15%) Residual rate to the accounts in the Woodsboro Portfolio.

72.    Defendants did not do the right thing, though.  They continued to withhold the Woodsboro Residuals wrongfully withheld from his November and December pays.

73.     MPI hired a new Chief Operations Officer, Benjamin Gray, on or about January 2, 2023.

74.    Shortly after his hire, Mr. Gray approached Plaintiff about leading the company's sales team.

75.    Mr. Brown replied that he could not lead a sales force for a company that unilaterally changed Residual rates and withheld wages unlawfully.  Mr. Brown then explained to Mr. Graves that the company had been, at the direction of the Individual Defendants, withholding the Woodsboro Residuals since November.

76.    Mr. Gray appeared to be shocked by this information and assured Mr. Brown that the issue would be promptly resolved.

77.    Approximately two weeks later, Mr. Gray informed Mr. Brown by phone that MPI had made a "mistake" and that the unpaid Residuals from the Woodsboro Portfolio for November and December 2022 would be paid in full.

13

78.     Those Residuals, nearly $4,000 in total, were paid in February 2023. The Residuals should have been paid in December and January and were therefore paid two and three months late.

## VI.    MPI RETALIATES IN RESPONSE TO PLAINTIFF'S COMPLAINT REGARDING THE UNLAWFUL WITHHOLDING OF HIS RESIDUALS

79.     On January 27, 2023, Mr. Brown attended a meeting called by Mr. Gray and Defendant McMillan.

80.     Mr. Brown expected that the purpose of the meeting was to apologize in person for having withheld two months of 10% of the 15% Residuals owed for the Woodsboro Portfolio.

81.     At the start of the meeting, Individual Defendant McMillan presented Mr. Brown with a *performance improvement plan*, a copy of which is attached hereto as Exhibit 9.

82.     Defendant McMillan did not apologize for having directed MPI to withhold (unlawfully) the majority of Mr. Brown's wages for three months and, when Mr. Brown asked her why she thought it was acceptable to withhold an employee's wages, she responded coldly, "I thought I could."

83.     Mr. Brown pushed back in response to the proposed performance improvement plan.

84.     After several hours of negotiations and discussions, Mr. Gray proposed that Mr. Brown become a 1099 contractor instead of a W2 employee.

85.     Defendant McMillan insisted that this could not be done unless Mr. Brown had a separate entity that could be paid as the contractor instead of Mr. Brown directly.

86.     After further discussion, Mr. Brown agreed to this proposal and Mr. Gray and Defendant McMillan again left the room.

87.     When Mr. Gray returned, he told Mr. Brown that Defendant Morgan objected to the idea and wanted them to fire Mr. Brown and walk him to the door immediately.

88.     The only thing that had occurred to prompt Mr. Gray and Defendant McMillan to suggest Mr. Brown terminate his employment with MPI in favor of a contractual relationship through a new legal entity was that he had complained—repeatedly—about MPI's withholding of the Residuals for the Woodsboro Portfolio.

89.     Similarly, Defendant Morgan's demand that Mr. Gray terminate Mr. Brown was a result of Mr. Brown's complaints regarding his unpaid wages.

## VII.   MPI WITHHOLDS RESIDUALS AGAIN IN FEBURARY 2023 UNTIL MR. BROWN EXECUTES A NEW AGREEMENT

90.     After Mr. Brown tendered notice of his intent to resign his employment in favor of a 1099 relationship (which Mr. Brown agreed to do at Mr. Gray's suggestion with Defendant McMillan's endorsement), Defendant Morgan

15

notified Mr. Brown that MPI would not pay the owed Residuals unless Mr. Brown executed yet another new agreement.

91.     Individual Defendant Morgan made good on his threat and MPI began, again, to withhold Mr. Brown's Residuals.

92.     Thrown back into financial duress due to MPI's arbitrary and unlawful withholding of his wages, Mr. Brown signed the new agreement under protest on March 21, 2023, a copy of which is attached as Exhibit 10 (the "2023 IAA"), in order to get the Residuals released.

93.     Upon information and belief, after Mr. Brown executed the 2023 IAA, the Individual Defendants directed MPI to release some, but not all, of the Residuals owed to Mr. Brown.

94.     In an email dated March 22, 2023, Defendant Morgan admitted that MPI did not pay Mr. Brown his February 2023 Residuals because he had objected to entering into the 2023 IAA.

95.     In the same email sent on March 22, 2023, Defendant Morgan assured Mr. Brown that MPI would release his unpaid Residuals and that "[a]ll future residuals will be paid by the last business day of the month" because Mr. Brown had executed the 2023 IAA.  Exhibit 11.

96.     Mr. Brown received his full Residuals for April 2022, which were paid in May 2022 in the amount of $12,312.94.

97.    The 2023 IAA purports to reclassify Mr. Brown as an independent contractor as opposed to an employee.

98.    MPI failed to provide any valuable consideration in exchange for Mr. Brown's acceptance of the 2023 IAA.

99.    Despite having stopped being an employee with MPI (according to MPI) in February 2023, MPI failed to provide Mr. Brown with the required COBRA Notice at any time thereafter.

100.   More than six (6) months have passed since he left MPI's employment but no COBRA Notice has been provided to Mr. Brown.

101.   MPI at one point emailed Mr. Brown and inquired whether he had received a COBRA Notice.  Mr. Brown responded that he had not.  MPI said nothing further on the matter.

102.   Because Mr. Brown did receive the COBRA Notice, he was unaware of his rights relating to continued health insurance under COBRA.  As a result, Mr. Brown enrolled his family in a high-deductible health plan on the open exchange.

103.   Had Mr. Brown known of his rights under COBRA, he would have elected to enroll in continued coverage under MPI's plan at significant savings to his current plan.

## VIII.  MR. BROWN'S CONSULTING ENTITY, AMS

104.   As promised during his negotiations with Mr. Gray and Defendant McMillan, Mr. Brown formed Authentic Merchant Solutions, LLC ("AMS"), on January 19, 2023, for the sole purpose of continuing to manage his book of business with MPI and to sell merchant accounts under MPI's acquiring portfolio.

105.   AMS does not compete and has never competed with MPI.

106.   The only revenue AMS has ever received is from MPI when it tendered partial payment of Residuals overdue to Mr. Brown.

107.   Mr. Brown had hoped to expand AMS's services so that he could act as a consultant for merchants who wish to negotiate their merchant-services contracts.

108.   To ensure there would be no confusion to the public, AMS's website contains the express disclaimer that AMS "cannot work with any customers of Mercantile Processing Inc." *See* Exhibit 12.

109.   AMS does not sell credit-card processing services, does not sell POS systems, gift or loyalty cards, or ATM services.  It provides *none* of the services offered by MPI.

110.   AMS, as Mr. Brown envisioned it, would be merely a consultant that assists businesses in negotiating their merchant-services contracts.

111.   AMS *has never earned a single cent of revenue from and has never had a single client other than MPI.*

### IX.   MPI HAS BEEN WITHHOLDING RESIDUALS SINCE MAY 2023

112.   On May 24, 2023, Defendant Morgan sent an email to Mr. Brown, stating that Morgan wanted to "review the violation of [Brown's] noncompete (Section 4.2 Head of Bank Partnerships Agreement)".  *See* Exhibit 12.

113.   Section 4.2 of the 2018 EA, to which Defendant Morgan was referring, is the single sentence that purports to prohibit Mr. Brown from working for a "competing entity" in *any capacity* throughout the much of the eastern seaboard "for one year".  *See* Exhibit 3 at §4.2

114.   That section purports to restrict Mr. Brown's activities for *just one year* from the date of the agreement, October 19, 2018.  *See* Exhibit 3 at §4.2.  Thus, the term of the so-called noncompete ended on October 19, 2019.

115.   But, on May 23, 2023, Defendant Morgan told Mr. Brown that he could not work for a "merchant services company of any type."  *See* Exhibit 12.

116.   Mr. Brown objected to Morgan's claim, pointing out that Section 4.2 of the 2018 EA did not prohibit him working for "merchant services company of any kind" and provides only that he cannot work for a "competing entity."  *Id.*

117.   Mr. Brown again reiterated that AMS was in no way competing with MPI.  *Id.*

118.   Defendant Morgan rejected Mr. Brown's argument out of hand without reason or support and continued (and continues) to insist that Mr. Brown cannot work in this industry in any capacity and threatening to sue Mr. Brown should he continue to operate AMS.

119.   On May 25, 2023, MPI's then-counsel wrote to Mr. Brown.  A copy of that letter is attached as Exhibit 13 (the "May 25 Letter").

120.   In the May 25 Letter, MPI's counsel alleged that AMS was "actively marketing the sale of products and services that MPI offers."  *Id.*

121.   The May 25 Letter provided absolutely *no facts* in support of this wild claim.

122.   Instead, the May 25 Letter stated that Section 4.1 of the 2018 EA prohited Mr. Brown from soliciting "company merchants anywhere in the United States from merchant accounts, including bank partnerships of MPI for a period of five (5) years."  Exhibit 13.

123.   The May 25 Letter, in just a single sentence, acknowledged that AMS advertised itself as unable to work with MPI's customer, while claiming that this simply could not believed, stating:

> While AMS's website explicitly states that it cannot do business with any MPI customer, my client is investigating whether AMS has retained MPI clients. [Exhibit 13]

124.   Again, both then and now, AMS has retained *no clients*.

125.    The May 25 Letter also claimed that Mr. Brown was in violation of

Section 4.2 of the 2018 EA—the term of which *had expired in 2019*. *See* Exhibit

13.

126.    The May 25 Letter then claimed that the "noncompete" in Section 4.2

applied *to all businesses* because it does not "limit the type of services and

products."  Exhibit 13.

127.    The May 25 Letter claims that, because Mr. Brown had registered his

business at his home residence, which was just miles from the Delaware office of

MPI, he was therefore automatically in violation of the noncompete.  *See* Exhibit

13.

128.    The May 25 Letter concludes as follows:

> Pursuant to Section 4 of the Agreement, MPI will
> immediately cease payment of any residuals owed to you
> under the Agreement until you come back into compliance
> with your obligations. MPI is evaluating other agreements
> it has with you to assess whether you are in violation of
> any other duty you agreed to perform and will make an
> appropriate decision as to those agreements. Failure to
> come into compliance with your obligations under the
> Agreement may result in MPI taking additional action to
> enforce its rights and seek redress before a court of law or
> equity.  [Exhibit 13]

129.    Stated differently, MPI unilaterally withheld the Residuals "owed to

[Mr. Brown] under the [2018 EA]" until he somehow "come[s] back into

21

compliance" and that his "failure" to do so could result in him being sued by MPI. *See* Exhibit 13.

130.   Again, Mr. Brown was never "out of compliance" with Section 4.2, which had expired several years earlier in 2019 and which, when (if ever) valid and in effect, prohibited Mr. Brown from working for a "competing entity," which he never did and has never done.

131.   Mr. Brown's then-counsel, a California firm, responded in writing to the May 25 Letter on May 31, 2023 (attached as Exhibit 14, the "Response Letter").

132.   In the Response Letter, Mr. Brown's counsel attempted to assuage MPI's apparent concerns, explaining:

> There appears to be some confusion on MPI's end concerning the services Mr. Brown currently offers and supplies within the merchant services marketplace. Mr. Brown is a consultant to merchants offering consulting services relating to such merchants' processing charges and assists them with recapturing fee overcharges while monitoring ongoing contract compliance by their respective service providers, services which MPI does not offer, nor has it ever offered.  [Exhibit 14].

133.    The Response Letter then made explicitly clear that Mr. Brown was, in no event, in violation of any restrictive coveant, regardless of term, because AMS did not compete with MPI:

> Mr. Brown is neither engaged in any business which competes with MPI nor has Mr. Brown attempted to acquire any MPI merchant with replacement processing services by wrongful solicitation.  [Exhibit 14]

134.    The Response Letter went on to explain, in great detail, the nature of the consultancy business that AMS hoped to develop and then again reiterating that AMS did not compete with MPI and that Mr. Brown was not in violation of any covenant:

> Mr. Brown does not acquire merchants (or assist in the process of acquiring merchants) for processing services and Mr. Brown does not sell or provide servicing for any POS equipment. His conduct does not violate any non-compete duty he may owe to MPI, and he is not engaging in any wrongful solicitation of MPI merchants.  [Exhibit 14].

135.    MPI did not want to hear any further explanation, did not request an affidavit from Mr. Brown attesting to the representations made by his counsel, or make any other attempt to confirm (or disprove) the unsupported belief that AMS was somehow competing because it was closeby.

136.    Instead, MPI's then-counsel responded stating that MPI rejected the explanation and would be withholding all Residuals going forward.

137.   MPI made good on that threat and withheld an unknown portion of Mr. Brown's May Residuals, which Mr. Brown estimates to be approximately 60-70% of the Residuals due that month.

138.   Mr. Brown attempted to determine the amount withheld for May but, by that time, MPI had blocked him from accessing its residual-reporting portal, IRIS.

139.   MPI has refused Mr. Brown's current counsel's repeated requests that MPI return access to Mr. Brown to that critical data.

140.   MPI has paid nothing to Mr. Brown for the Residuals earned in June 2023.

141.   MPI has paid nothing to Mr. Brown for the Residuals he earned in July 2023.

142.   As of the filing of this Verified Complaint, MPI has represented through counsel that it will not pay the August 2023 Residuals (or any others) when they become due.

143.   Despite Mr. Brown's demands for payment of the Residuals, including demands made by his current (Delaware) counsel to MPI's current (Maryland and Delaware) counsel for payment of the outstanding Residuals, MPI has failed to tender a single cent.

144.   Because of MPI's looming threat of suit and its ongoing and months-long failure to pay him, Mr. Brown has had to leave his dreams for AMS on hold, exit his chosen industry and take a job in roofing sales until he is able to safely return to his new venture at AMS or engage in other work as he may chose.

## X.   MPI PREVENTS MR. BROWN FROM PERFORMING

145.   The 2018 EA provides that, following his employment with MPI, his relationship with MPI would convert to one of an independent contractor.  *See* Exhibit 3 at § 5.

146.   Mr. Brown, like all MPI sales agents, are incentivized to continue to service their accounts following the end of their employment in order to ensure that they continue to receive the Residuals.

147.   Therefore, Mr. Brown is required to provide service to his MPI accounts—either at the request of the account or at the request of MPI's Customer Service Department.

148.   Since leaving MPI in February 2023, Mr. Brown has continued to receive requests from MPI to perform work for his accounts and he has continued to oblige those requests.

149.   Mr. Brown has not been compensated for any of the work he has performed for and at the direction of MPI, with MPI's knowledge.

150.   On August 2, 2023, Mr. Brown, through counsel, notified MPI that he was still receiving and responding to inquiries from his accounts but was still not being paid.

151.   In retaliation, MPI issued a letter to Mr. Brown on August 7, 2023, stating:

> It has come to our attention that you have now made it clear that you no longer have any interest in servicing Mercantile Processing, Inc. (MPI) accounts. Accordingly, effective immediately, you should no longer service any MPI accounts and MPI will make no request for you to do so. This notice includes your recent communication regarding [Redacted Client Name].  If you are contacted by a merchant directly, please refer all such inquires to your counsel who will then pass them on to us.  [Exhibit 15]

152.   At no time did Mr. Brown or his counsel imply, suggest, or state that Mr. Brown "no longer ha[s] any interest in servicing" his MPI accounts as is falsely stated in MPI's letter.

153.   Mr. Brown's counsel responded to MPI's counsel immediately upon receipt of Morgan's threatening letter and insisted that Mr. Brown had never impliedly or expressly stated that he was "refusing to service" MPI accounts but, as she had told MPI's counsel repeatedly, Mr. Brown had been servicing the accounts consistently since his last day in February 2023.

154.   MPI's counsel failed to respond to this request and, as it stands, Mr. Brown is left in an impossible situation yet again—being instructed by MPI not to

service accounts but if he fails to do so, he could be jeopardizing his future Residuals.

155.    Defendant Morgan forwarded the letter to Mr. Brown directly at 9:19 a.m. on August 8, 2023.  *Id.*

156.    On August 8, 2023, Mr. Brown was contacted by one of his accounts for assistance.  However, considering the letter from MPI, Mr. Brown is unable to perform his contractual obligations by servicing the account.

157.    His inability to perform is causing an immediate and irreparable harm to him because the Residuals are dependent upon the account remaining with MPI.

158.    If MPI fails to satisfy the needs of the account, the account may leave MPI for a competitor, thereby causing Mr. Brown immediate and irreparable harm not remedied by money damanges.

## COUNT I:  DECLARATORY RELIEF
### (2023 IAA Is Invalid)
### (Brown v. MPI)

159.    Plaintiff incorporates and restates by reference all preceding paragraphs.

160.    Mr. Brown signed the 2023 IAA but received no valid consideration for doing so.

161.    Mr. Brown was entitled to his Residuals as a result of his 2018 EA.

162.   Thus, Mr. Brown seeks a declaration that the 2023 IAA is invalid for lack of consideration and that the 2018 EA is the governing agreement.

## COUNT II:  DECLARATORY RELIEF
### (No Restrictive Covenants)

163.   Plaintiff incorporates and restates by reference all preceding paragraphs.

164.   MPI asserts that Mr. Brown is subject to the Covenants set forth in Section 4 of the 2018 EA.

165.   Even if the 2018 EA did contain a valid covenant not to compete or not to solicit, MPI's failure to timely pay Mr. Brown's earned compensation constitutes a material breach of that agreement, which voids all post-employment covenants in accordance with *Dickinson Medical Group., P.A. v. Foote*, No. 84C-JL-22, 1989 WL 40965 (Del. Super. Mar. 23, 1989).

166.   The 2018 EA does not contain a valid noncompete restriction.

167.   Instead, Section 4 is an overly broad and unreasonable provision that MPI now seeks to use to prevent Mr. Brown from making a living despite knowing that Mr. Brown is the sole provider with a young family.

168.   The five-year term of the "Non-Solicit," which is effectively a noncompete and which applies to *every merchant in the United States regardless of whether MPI ever did or even could service that account* is *per s*e overly broad under Delaware law.

28

169.   The obvious vagueness of the "Noncompete," which fails to even define "competing business" also renders this covenant unenforceable.

170.   And, even if the 2018 EA did contain a valid restrictive covenant *and* MPI had properly paid Mr. Brown the owed Residuals, the term of the covenants is *one year from the date of the agreement* and therefore expired in October 2019.

171.   Thus, Plaintiff seeks a declaration that he is not subject to any restrictive covenants with Defendant MPI.

## COUNT III:  DECLARATORY RELIEF
### (Forfeiture Provision Is Invalid)

172.   Plaintiff incorporates and restates by reference all preceding paragraphs.

173.   The Residuals constitute wages under Delaware law.  *See* 19 *Del. C.* § 1101(8).

174.   Delaware law prohibits the waiver or forfeiture of wages by private agreement.  *See* 19 *Del. C.*  § 1110.

175.   The Residuals were earned at the time Mr. Brown secured the deal and are to be paid into the future pursuant to the 2018 EA.

176.   The Residuals were earned by Mr. Brown for the work he performed while an employee of MPI, from 2015 to 2023.

177.   Thus, the provision in the 2018 EA that purports to constitute a waiver of the Residuals is unlawful *per se*.

29

178.   Plaintiff seeks a declaration that the forfeiture provision in the 2018 EA is unlawful and void and is not a valid basis for failing to pay the Residuals.

## COUNT IV:  SPECIFIC RELIEF
### (Brown v. MPI)

179.   Plaintiff incorporates and restates by reference all preceding paragraphs.

180.   MPI has an ongoing obligation to act in accordance with the 2018 EA, including its obligation to pay the Residuals and to permit Mr. Brown to continue to perform the services as provided for in the 2018 EA.

181.   MPI is refusing to perform under the 2018 EA.

182.   Plaintiff therefore seeks an order directing MPI to act in accordance with the declarations sought in Counts I-III, above.

## COUNT V:  PRELIMINARY INJUNCTION
### (Brown v. All Defendants)

183.   Plaintiff incorporates and restates by reference all preceding paragraphs.

184.   The Individual Defendants have taken intentional steps to prevent Mr. Brown from performing his obligations under the 2018 EA by directing MPI not to pay Mr. Brown the Residuals, beginning in January 2023, and by instructing him not to service the accounts in August 2023.

185.   Plaintiff seeks a preliminary injunction enjoining the Individual Defendants from continuing to interfere with Mr. Brown's performance of the 2018 EA by instructing MPI to withhold Residual payments.

186.   Plaintiff seeks a preliminary injunction enjoining MPI from seeking to enforce the Covenants, from further withholding Residuals and from further interfering with Mr. Brown's performance of his obligations with respect to the MPI accounts for which Mr. Brown has ongoing responsibility.

187.   Absent an injunction, Mr. Brown will suffer an immediate and irreparable harm that cannot be rectified by an award of monetary damages.

### COUNT VI:  PERMANENT INJUNCTION
### (Brown v. All Defendants)

188.   Plaintiff incorporates and restates by reference all preceding paragraphs.

189.   The Individual Defendants have taken intentional steps to prevent Mr. Brown from performing his obligations under the 2018 EA by directing MPI not to pay Mr. Brown the Residuals, beginning in January 2023, and by instructing him not to service the accounts.

190.   Plaintiff seeks a permanent injunction enjoining the Individual Defendants from continuing to interfere with Mr. Brown's performance of the 2018 EA by instructing MPI to withhold Residual payments.

191.   Plaintiff seeks a permanent injunction enjoining MPI from seeking to enforce the Covenants, from further withholding Residuals, and from further interfering with Mr. Brown's performance of his obligations with respect to the MPI accounts for which Mr. Brown has ongoing responsibility.

192.   Absent an injunction, Mr. Brown will suffer an immediate and irreparable harm that cannot be rectified by an award of monetary damages.

### COUNT VII:  DWPCA
### (Brown v. All Defendants for Untimely Payment)

193.   Plaintiff incorporates and restates by reference all preceding paragraphs.

194.   Pursuant to the Delaware Wage Payment and Collection Act ("DWPCA"), Mr. Brown was an "employee" at the time he earned the Residuals.

195.   Pursuant to the DWPCA, MPI was Mr. Brown's "employer."

196.   The Individual Defendants were Mr. Brown's "employers" because they are officers of a Delaware corporation who have knowingly and intentionally directed MPI to withhold wages from Mr. Brown.

197.   The Residuals constitute "wages" under the DWPCA because they are compensation due to Mr. Brown "by reason of [his] employment."  19 *Del. C.* §1101(a)(8).

198.   The DWPCA provides that employees may not waive their wages by agreement.

199.   MPI, at the direction of the Individual Defendants, knowingly and intentionally failed to timely pay the Residuals due and owing for January 2022, and February and March 2023.

200.   By withholding and failing to pay the Residuals in January 2022 and February and March 2023, MPI violated the DWPCA's requirement that wages be paid on regular paydays at least once monthly.

## COUNT VIII:  DWPCA
### (Brown v. All Defendants for Failure to Pay)

201.   Plaintiff incorporates and restates by reference all preceding paragraphs.

202.   Pursuant to the Delaware Wage Payment and Collection Act ("DWPCA"), Mr. Brown was an "employee" at the time he earned the Residuals.

203.   Pursuant to the DWPCA, MPI was Mr. Brown's "employer."

204.   The Residuals constitute "wages" under the DWPCA because they are compensation due to Mr. Brown "by reason of [his] employment."  19 *Del. C.* §1101(a)(8).

205.   The DWPCA provides that employees may not waive their wages by agreement.

206.   MPI, at the direction of the Individual Defendants, knowingly and intentionally failed to pay the Residuals due and owing for May, June, and July 2023 and has stated through counsel that it will not pay Residuals going forward.

33

207.   By continuing to withhold the Residuals for May, June, and July 2023, Defendants have violated and continue to violate the DWPCA.

## COUNT IX:  FLSA RETALIATION
### (Brown v. All Defendants)

208.   Plaintiff incorporates and restates by reference all preceding paragraphs.

209.   Section 15(a)(3) of the federal Fair Labor Standards Act ("FLSA") prohibits "any person" from retaliating against a current or former employee because that employee has complained of the employer's failure to pay wages.

210.   In retaliation for Mr. Brown's demands to be paid the Residuals owed, Defendants put Mr. Brown on a "Performance Improvement Plan" in violation of the FLSA.

211.   Plaintiff incorporates and restates by reference all preceding paragraph.

212.   MPI was Mr. Brown's "employer" as that term is defined by the Consolidated Omnibus Reconciliation Act ("COBRA").

213.   Upon information and belief, MPI administers its own COBRA notices.

214.   The Employment Retirement Income Security Act of 1974 ("ERISA") required that MPI issue Mr. Brown a COBRA election notice within fourteen (14)

34

days of his change in employment status from employee to contractor as of February 10, 2023.

215.   MPI never issued the requisite COBRA notice and the 14-day period has long expired.

216.   Thus, MPI is liable for a penalty of up to $110 per day from the date of the failure on February 25, 2023, until corrected.

217.   In additiona, MPI is liable for attorney's fees and costs incurred in pursing his rights under ERISA to receive a COBRA notice.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

(a)   A declaration that the 2023 IAA is void for lack of consideration and the 2018 EA controls.

(b)   A declaration that Jeremy Brown is not subject to any restrictive covenants with Mercantile Processing, Inc.

(c)   A declaration that the forfeiture provision in the 2018 EA is invalid;

(d)   A preliminary injunction enjoining Defendants from continuing to prevent Plaintiff from performing the 2018 EA.

(e)   A permanent injunction enjoining Defendants from continuing to prevent Plaintiff from performing the 2018 EA.

(f)   An order directing MPI to release the Residuals immediately and thereby specifically perform under the 2018 EA.

(g)   An order that the Defendants are jointly and severally liable to Jeremey Brown for all unpaid Residuals.

(h)   An order that Defendants are jointly and severally liable to Jeremy Brown for liquidated damages in an amount equal to the unpaid Residuals and Residuals not timely paid.

(i)   An order that Defendants are jointly and severally liable to Jeremy Brown for all fees and costs incurred in pursuing his rights against Defendants.

(j)   An order that Defendants are jointly and severally liable to Jeremy Brown for all damages incurred as a result of Defendants' unlawful retaliation.

(k)   An order that Defendants are jointly and severally liable to Jeremy Brown for liquidated damages in an amount equal to the harm incurred as a result of Defendants' unlawful retaliation.

(l)   An order that Defendants are jointly and severally liable to Jeremy Brown for fees and costs incurred in pursing retaliation claim.

(m)   Any and all other relief that the Court deems just.

CLARK HILL PLC

*/s/ Margaret M. DiBianca*

Margaret M. DiBianca, Esq. (No. 4539)
824 N. Market Street, Ste. 710
Wilmington, DE  19801
Telephone:  302-250-4748
Email:  mdibianca@clarkhill.com

Dated:      August 21, 2023          *Attorneys for Plaintiff*

37

# TABLE OF EXHIBITS

| Exhibit | Description |
|---|---|
| 1 | 2015 EA |
| 2 | 2015 IAA |
| 3 | 2018 EA |
| 4 | 2019 Amendment |
| 5 | Woodsboro Transition Plan & Timeline |
| 6 | 2022.09.22 Email from McMillan to Plaintiff |
| 7 | 2022.12.15 Email from Plaintiff to McMillan |
| 8 | MPI LinkedIn page |
| 9 | Performance Improvement Plan (PIP) |
| 10 | 2023 IAA |
| 11 | 2023.03.22 Email from Morgan to Plaintiff (releasing residuals) |
| 12 | 2023.05.24 Emails between Morgan and Plaintiff (re: 4.2 and AMS) |
| 13 | 2023.05.25 Ltr. from MPI Counsel |
| 14 | 2023.05.31 Response Ltr. to MPI Counsel |
| 15 | 2023.08.07 Ltr from MPI to Plaintiff |

# TAB 2

EFiled:  Aug 21 2023 05:10PM EDT
Transaction ID 70683025
Case No. 2023-0859-

# Exhibit 1

## BANK RELATIONSHIP MANAGER Employment Agreement

This Bank Relationship Manager Employment Agreement ("*Agreement*") is entered into as of Sept 15th, 2015 by and between Jeremy Brown ("*Bank Relationship Manager*") and Mercantile Processing Inc., a Delaware corporation (the "*Company*"), this Agreement shall supersede any verbal or written offer previously entered into by the parties.

## 1.  EMPLOYMENT

The Company agrees to continue to employ Bank Relationship Manager, and Bank Relationship Manager agrees to continue to accept employment by the Company as its Head of Sales and report to the Company's Chief Executive Officer. Changes may be made from time to time by the Company in its sole discretion to the duties, reporting relationships and title of Bank Relationship Manager. Bank Relationship Manager will perform the duties as are commensurate and consistent with Bank Relationship Manager's position and will devote Bank Relationship Manager's working time, attention and efforts to the Company and to discharging the responsibilities of Bank Relationship Manager's position, and such other duties as may be assigned from time to time by the Company, which relate to the business of the Company and are reasonably consistent with Bank Relationship Manager's position. During Bank Relationship Manager's employment, Bank Relationship Manager will not engage in any business activity that, in the reasonable judgment of the Board of Directors, conflicts with the duties of Bank Relationship Manager under this Agreement, whether or not such activity is pursued for gain, profit or other advantage.

## 2.  COMPENSATION AND BENEFITS

### 2.1  Annual Salary

Bank Relationship Manager's compensation shall consist of an annual base salary (the "*Salary*") of $40,000 payable in semi-monthly installments in accordance with the payroll practices of the Company. The salary is directly comparable with the sales quotas outlined in the schedule A.  In addition to the salary the Bank Relationship Manager shall be entitled to residuals on previous accounts obtained as a sales agent and commissions outlined in the Quota Calculator. The Salary shall be reviewed, and shall be subject to change, by the Chief Executive Officer and/or the Board of Directors, as applicable, at least annually while Bank Relationship Manager is employed hereunder.

### 2.3  Benefits

Bank Relationship Manager shall be responsible for all his own benefits. Including but not limited to; health, dental, eye, car insurance, and life insurance.

### 2.4  Vacation and Other Paid Time-Off Benefits

Bank Relationship Manager shall be entitled to paid time-off and sick leave as laid out in the employee hand book.

## 3.  TERMINATION

### 3.1  Employment At Will

Bank Relationship Manager acknowledges and understands that employment with the Company is at will and can be terminated by either party for no reason or for any reason not otherwise specifically prohibited by law. Nothing in this Agreement is intended to alter Bank

Relationship Manager's at-will employment status or obligate the Company to continue to employ Bank Relationship Manager for any specific period of time, or in any specific role or geographic location. Except as expressly provided for in this Agreement, upon any termination of employment, Bank Relationship Manager shall not be entitled to receive any payments or benefits under this Agreement other than unpaid Salary earned through the date of termination and unused vacation that has accrued as of the date of Bank Relationship Manager's termination of employment that would be payable under the Company's standard policy.

### 3.2   Automatic Termination on Death or Total Disability

This Agreement and Bank Relationship Manager's employment hereunder shall terminate automatically upon the death or Total Disability of Bank Relationship Manager. "*Total Disability*" shall mean Bank Relationship Manager's inability, with reasonable accommodation, to perform the duties of Bank Relationship Manager's position for a period or periods aggregating ninety (90) days in any period of one hundred eighty (180) consecutive days as a result of physical or mental illness, loss of legal capacity or any other cause beyond Bank Relationship Manager's control. Bank Relationship Manager and the Company hereby acknowledge that Bank Relationship Manager's ability to perform Bank Relationship Manager's duties is the essence of this Agreement. Termination hereunder shall be deemed to be effective (a) at the end of the calendar month in which Bank Relationship Manager's death occurs or (b) immediately upon a determination by the Board of Directors (or the Compensation Committee thereof) of Bank Relationship Manager's Total Disability. In the case of termination of employment under this Section 3.2, Bank Relationship Manager shall not be entitled to receive any payments or benefits under this Agreement other than residuals as outlined in the independent agent contract. In the case of death Bank Relationship Managers residual will be pass to next of kin or transferred as stated by his will.

### 4.   Non-Solicitation, Non Complete, Non Disclosure

In the case of any violation of section 4, during or after employment; Bank Relationship Manager forfeits their rights to residuals or compensation under the schedule A and is liable for any damage to Company.

### 4.1   Non Solicitation

The Bank Relationship Manager acknowledges that during the performance of this agreement, it will acquire information and contacts which are valuable to MPI. The Bank Relationship Manager further acknowledges that it is necessary to protect the interest of MPI and its merchant base by entering into the following covenant not to compete, as provided herein.

The Bank Relationship Manager covenants, represents, acknowledges and agrees that for a period of five (5) years following the termination of this agreement, neither the Bank Relationship Manager, its successors or assigns, nor its Associated Sales Personnel, either, individually or through any other entity for which he, she, or it works or from which he, she, or it would receive financial remuneration for the placement of Merchant Client Accounts, will not solicit company merchant applications anywhere in the United States of America from Merchant Client Accounts.

The Bank Relationship Manager acknowledges, agrees and understands that any violation of this Section shall cause MPI immediate and irreparable harm for which there is no adequate

remedy at law.  Sales Manger further acknowledges, agrees and understands that in the event Bank Relationship Manager breaches any of these covenants, notwithstanding any other remedy at law or equity, MPI may protect its right of property and good will by seeking injunctive relief and related damages.

### 4.1   Non Compete

Bank Relationship Manager Acknowledges that MPI has a regional advantage and agrees that for the term of one year not to work for a competing entity or financial institution within 250 miles.

### 4.1   Non Disclosure

The Bank Relationship Manager acknowledges that during the performance of this agreement, it may acquire Trade Secrets and Confidential Information of MPI and its affiliates, and further that the disclosure of said Trade Secrets and Confidential Information to competitors of MPI or the public would be damaging to MPI its affiliates, successors, and assigns.
The Bank Relationship Manager shall not at any time during or after the termination of this agreement disclose to any third party any Trade Secrets or Confidential Information it obtained as a result of this agreement.
All sales manuals, customer lists, software and other media including trademarks provided to the Bank Relationship Manager by MPI shall at all times remain the property of MPI. Upon termination or expiration of this agreement, the Bank Relationship Manager shall immediately return all sales manuals, price lists, customer lists, mailing lists, and any and all other documents, materials, and media however recorded.  The Bank Relationship Manager shall ensure that said proprietary items are properly protected from disclosure, damage, or theft.

### 5.   Continuation of Payment

Upon termination or resignation of Bank Relationship Manager, Bank Relationship Manager is entitled to ongoing residuals as outlined in Independent Agent Agreement and schedule A. Upon termination or resignation Bank Relationship Manager will not be entitled to any right or benefit that is outline in the employee handbook. Bank Relationship Manager will become a subcontractor as outline in the Independent Agent Agreement.

Accounts boards by agent or agent's referral partners will pay residuals for life of the account as dictated in Independent agent agreement. Accounts boards through Bank of Delmarva will be for 3 years after termination or resignation.

### 4.   ASSIGNMENT

This Agreement is personal to Bank Relationship Manager and shall not be assignable by Bank Relationship Manager. The Company may assign its rights hereunder to (a) any Successor Employer; (b) any other corporation resulting from any merger, consolidation or other reorganization to which the Company is a party; (c) any other corporation, partnership, association or other person to which the Company may transfer all or substantially all of the assets and business of the Company existing at such time; or (d) any subsidiary, parent or other affiliate of the Company. All of the terms and provisions of this Agreement shall be binding upon and shall inure to the benefit of and be enforceable by the parties hereto and their respective successors and permitted assigns.

## 5.  AMENDMENTS IN WRITING

No amendment, modification, waiver, termination or discharge of any provision of this Agreement, or consent to any departure therefrom by either party hereto, shall in any event be effective unless the same shall be in writing, specifically identifying this Agreement and the provision intended to be amended, modified, waived, terminated or discharged and signed by the Company and Bank Relationship Manager, and each such amendment, modification, waiver, termination or discharge shall be effective only in the specific instance and for the specific purpose for which given. No provision of this Agreement shall be varied, contradicted or explained by any oral agreement, course of dealing or performance or any other matter not set forth in an agreement in writing and signed by the Company and Bank Relationship Manager.

## 6.  NOTICES

Every notice relating to this Agreement shall be in writing and shall be given by personal delivery, by a reputable same-day or overnight courier service (charges prepaid), by registered or certified mail (postage prepaid, return receipt requested) or by facsimile to the recipient with a confirmation copy to follow the next day to be delivered by personal delivery or by a reputable same-day or overnight courier service to the appropriate party's address or fax number below (or such other address and fax number as a party may designate by notice to the other parties):

7

If to the Company:    Mercantile Processing Inc
                      32695 Roxana  Rd
                      Millville, DE 19967
                      Attn: Chief Executive Officer

If to the Bank
Relationship
Manager:              Jeremy Brown
                      21379 Tree View
                      Millsboro, DE 19966

## 7.  APPLICABLE LAW

This Agreement shall in all respects, including all matters of construction, validity and performance, be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without regard to any rules governing conflicts of laws.

## 8.  ENTIRE AGREEMENT

This Agreement, on and as of the Effective Date, constitutes the entire agreement between the Company and Bank Relationship Manager with respect to the subject matter hereof, and all prior or contemporaneous oral or written communications, understandings or agreements between the Company and Bank Relationship Manager with respect to such subject matter are hereby superseded in their entirety, except as otherwise provided herein.

## 9.  SEVERABILITY

If any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement or any action in any other

jurisdiction, but this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

## 10. WAIVERS

No delay or failure by any party hereto in exercising, protecting, or enforcing any of its rights, titles, interests, or remedies hereunder, and no course of dealing or performance with respect thereto, shall constitute a waiver thereof. The express waiver by a party hereto of any right, title, interest, or remedy in a particular instance or circumstance shall not constitute a waiver thereof in any other instance or circumstance. All rights and remedies shall be cumulative and not exclusive of any other rights or remedies.

## 11. HEADINGS

All headings used herein are for convenience only and shall not in any way affect the construction of, or be taken into consideration in interpreting, this Agreement.

## 12. COUNTERPARTS

This Agreement, and any amendment or modification entered into pursuant to Section 5 hereof, may be executed in any number of counterparts, each of which counterparts, when so executed and delivered, shall be deemed to be an original and all of which counterparts, taken together, shall constitute one and the same instrument.

**IN WITNESS WHEREOF**, the parties have executed and entered into this Agreement effective on the date first set forth above.

BANK RELATIONSHIP
MANAGER

Mercantile Processing INC

By /

Its CEO

# Exhibit 2

# INDEPENDENT AGENT AGREEMENT

**THIS AGREEMENT** dated _____, 20___, between **MPI (Mercantile Processing Inc)**

and; _Jeremy Brown_____ located at _21379  Greeview Lane_

_Millsboro  De  19966_____ (Hereinafter referred to as **IA**) has been entered
into between the parties as follows:

**WHEREAS MPI** is in the business of providing certain electronic payment services to the business community
including but not limited to the electronic capture of transactions utilizing VISA U.S.A., Inc. (hereinafter referred
to as VISA), MasterCard International, Inc. (hereinafter referred to as MasterCard), Discover Card, and American
Express (including any other credit card or debit card company, collectively referred to herein as "Credit/Debit
Card Companies"); the sale of electronic draft capture equipment; and the marketing on behalf of several financial
institutions;

**WHEREAS MPI** is desirous of allowing the independent marketing of its services under a basis limited as
specified herein;

**WHEREAS** the **IA** is an independent sales organization willing to market the services and equipment of **MPI**
within the limitations specified herein; and

**WHEREAS** the parties intend to revoke all previous agreements between the parties unless specifically
incorporated herein;

**NOW THEREFORE,** to evidence the aforementioned intent of the parties and in consideration of the foregoing
premises, and of the mutual covenants and conditions hereinafter set forth, the parties hereto intending to be legally
bound agree as follows:

## 1.  **Definitions.**

1-1 Except as provided below; for purposes of interpretation of this agreement the following terms shall be
construed as follows:

A.   "Associated Sales Personnel" shall include any and all employees, independent contractors, agents or any other
person who acts for or on behalf of the **IA**, or is controlled to any extent whatsoever by the **IA** in the solicitation of
merchant applications to be submitted to **MPI** or in any other marketing activity undertaken on behalf of **MPI**.

B.   **MPI** shall include the corporation and its successors, assigns, subsidiaries and affiliates.

C.   "Cause" shall mean to be in default or material breach of any term of the agreement.

D.   "The **IA**" is the above named entity which may be a corporation, partnership, sole proprietorship doing
business under an assumed name, an individual or any other entity.

E.   "Merchant Client Accounts" are those accounts, which originate from merchant clients solicited by the **IA** and
placed through **MPI**.

_____ **MPI** Initials                    _____ **IA** Initials

F. "Good Standing" shall mean to not be in breach or default of any or all of the terms of this agreement.

G-1 The term "Trade Secrets" shall mean the whole or any portion or phrase of any scientific or technical information, design, process, procedure, formula, or improvement that is valuable and not generally known to competitors of **MPI**. Trade Secrets shall include, without limitation, the specialized information and technology **MPI** may develop or acquire with respect to computer software programs, including without limitations all computer programs, source code, object code, listings, print-outs, flow charts, written algorithms, research materials, programming notes, programming aids, data specifications, test results and related documentation (all of the foregoing hereinafter referred to as "software products").

G-2 The term "Confidential Information" shall mean any data or information, other than Trade Secrets, that is important to **MPI**, and not generally known by the public. To the extent consistent with the foregoing definition, Confidential Information includes without limitation the following: (1) the sales records, profit and performance reports, pricing manuals, sales manuals, training manuals, selling and pricing procedures and financing methods of **MPI;** (2) strategic data, including marketing and development plans, forecasts and forecast assumptions and volumes, and future plans and potential strategies of **MPI;** and (3) customer data, including customer lists, names of customers and their representatives, data provided by or about prospective, existing or past customers, customer service materials, and the type, quantity and specifications of products purchased, leased or licensed by customers of **MPI**.

G-3 Notwithstanding the definitions set forth above, "Trade Secrets" and Confidential Information does not include: (1) that which is or becomes generally known to the public; (2) that which is already known or is developed after termination by the **IA** or Associated Sales Personnel through entirely independent efforts; (3) that which the **IA** or Associated Sales Personnel obtains through an entirely independent source having a bona fide right to use and disclose such information; (4) that which is required to be disclosed by law, except to the extent eligible for special treatment under an appropriate protective order; or (5) that which is approved by the company for unrestricted release by express authorization.

## 2. <u>Terms and Renewal.</u>

2-1 The term of this Agreement shall be two (2) years. This Agreement shall be renewed upon the expiration of the term hereof for successive one (1) year periods, unless notice of a termination is given (i) by **IA** or **MPI** within (30) days of the expiration of the initial, or any renewal term or (ii) pursuant to Sections 2.2.

2-2 **MPI** may immediately terminate this agreement at any time by giving written notice to the **IA** for any one of the following reasons:

A. Fraud, or misrepresentation by the **IA** or Associated Sales Personnel to **MPI** clients, potential clients, merchants or any other related parties either prior to the execution of this agreement to induce its execution, or during its term, including attempts to induce **MPI** to execute or continue performance of merchant agreements whether or not in collusion with merchant clients by making false representations.

B. Non-compliance by the **IA** or Associated Sales Personnel with applicable Credit/Debit Card Company bylaws, rules and regulations, state or federal laws and regulations.

C. Impossibility or impracticability of performance by **MPI** due to changes: in Credit/Debit Card Company bylaws, rules and regulations; in bylaws, rules and regulations of any other provider of services to **MPI**; or in federal, state or local laws, regulations, or ordinances which this agreement cannot reasonably be modified to accommodate.

**MPI** Initials                    **IA** Initials

D.   The violation, omission, or breach by the **IA** or Associated Sales Personnel of any provision, duty, or obligation required of it under this agreement.

E.   The **IA** makes any attempt to convert any Merchant Client Account relationship from **MPI** to any other entity performing services similar to **MPI**.

F.   **MPI** may, within 10 days written notice, terminate this agreement if **MPI**, in its sole and exclusive judgment, determines that its business reputation is negatively affected by the quality of services rendered by the **IA**.

G.  The **IA** fails to present itself to the marketplace as **MPI** when soliciting **MPI** Merchant Client Accounts.

## 3.   <u>Consideration.</u>

3-1 The **IA** acknowledges that each term of this agreement constitutes adequate consideration for all other terms.

## 4.   <u>Force Majeure.</u>

4-1   The performance of **MPI** hereunder is subject to interruption and delay due to causes beyond its control such as acts of God, acts of any government, war or other hostility, civil disorder, weather, fire, power failure, equipment failure, labor dispute, and like causes.  Said interruption or delay shall not be deemed to be a breach hereunder.

## 5.   <u>Duties and Responsibilities of IA.</u>

5-1   The **IA** shall use its best efforts to solicit merchant client applications and agreements for the credit card transaction processing services of **MPI** and the sale or lease of the related equipment to merchant clients.  The **IA** shall assist in the execution and distribution by the merchant client of the appropriate merchant agreement and any modifications thereof.  Upon completion of these requirements, the merchant client shall become a Merchant Client Account.

5-2   The **IA** shall be responsible for the initial setup of the equipment used in providing the processing services for Merchant Client Accounts, including but not limited to the installation of the equipment, the initial training of merchant and merchant personnel, and the delivery of operating and training manuals to the merchant.

5-3     The **IA** shall at **IA's** expense recruit, hire, train, and supervise a staff of sales and customer service representatives to solicit and service the merchant applications in compliance with requirements of **MPI** and its financial institution for establishing new Merchant Client Accounts.

5-4   The **IA** shall be responsible for the collection and disbursement of all applicable sales tax due upon the sale of equipment to any Merchant Client Accounts and any and all reporting requirements thereof.

5-5     The **IA** and **MPI** shall communicate to all Merchant Client Accounts any and all necessary information including but not limited to changes in pricing and service from **MPI**, its financial institutions, or network providers.

5-6   The **IA** shall ensure that its Associated Sales Personnel are properly trained and supervised so as to act at all times in a professional manner while marketing the services and products of **MPI**.

**MPI** Initials          **IA** Initials

5-7   The **IA** shall properly adhere to any and all government regulations including but not limited to reporting of any and all appropriate tax, the acquisition of any and all documents of employment insurance including but not limited to workers compensation, unemployment insurance, and state disability insurance.

5-8   The **IA** shall, throughout the term of this agreement, obtain and maintain at its own cost and expense from a qualified insurance company, a comprehensive commercial general liability insurance policy naming **MPI** as an additional insured.

5-9   The **IA** shall ensure that its Associated Sales Personnel have been subject to review for exclusion by **MPI,** both prior to and during their employment or association with the **IA,** from the marketing of **MPI** services or products for reasons including but not limited to felony convictions, discharge from previous employment for cause, or any other indication of moral turpitude which would render the Associated Sales Personnel to be an unacceptable representative of **MPI** and the **IA.**

5-10   The **IA** shall be responsible for the initial customer contact concerning maintenance and service (if so contacted by the merchant), the ongoing servicing and replacement of the Merchant Client Accounts' equipment and software, and shall, upon request by **MPI**, act as liaIAn between **MPI** and the Merchant Client Accounts in handling equipment maintenance and servicing.

5-11   The **IA** shall submit a resale Tax ID number as well as any tax exempt certificate/resale certificate, etc. required by their respective state of business.

5-12   The **IA** must have prior written approval before any reproduction of any and all marketing materials including but not limited to any and all of the corporate identities or logos of **MPI**, its processors, and Credit/Debit Card Companies.

5-13   The **IA** shall provide **MPI** with a written list of all proposed associated personnel and current Associated Sales Personnel, their social security numbers and the addresses and telephone numbers of the principal office of itself and all Associated Sales Personnel regardless of whether said sales personnel are employees of the **IA** or independent contractors providing services to the **IA**.  Furthermore the **IA** shall provide **MPI** with any other information which is reasonably necessary for the performance of this agreement or compliance with Credit/Debit Card Company bylaws, rules ands regulations, upon request and within a reasonable time thereof.

5-14   The **IA** shall permit **MPI** to check the credit of the **IA** and/or any of its Associated Sales Personnel and shall execute any all documents, consents or authorizations necessary to facilitate the performance of said credit check.

5-15   **IA** represents that it does not have a contractual relationship for the placement of credit card transaction processing services or for the sale or lease of equipment related to said services with any entity providing services similar to those to be performed by **MPI** under the terms of this Agreement which would bar **IA** from entering into this Agreement.

5-16   The **IA** shall be responsible for notifying in writing to **MPI** any and all residual discrepancies or errors in residual reporting within 60 days of original receipt of such residual report identifying such discrepancy or error. **MPI** will not be responsible to **IA** for any discrepancies or errors in residual reporting which have not been notified to **MPI** and which exceed the 60 day notification period.

_____ **MPI** Initials          _____ **IA** Initials

### 6. Duties and Responsibilities of MPI.

6-1 **MPI** shall sell equipment, software, supplies and Merchant Client Account leasing services to **IA** at contract stipulated prices. **IA** may use alternate suppliers of equipment, software, leasing and supplies at the discretion of the **IA**.

6-2 **MPI** shall provide pricing of its electronic processing services to **IA**, as specified in your Pricing Addendum Schedule and any addenda thereto, which is annexed hereto and made a part hereof.

6-3 **MPI** shall provide the following to **IA**, including but not limited to, merchant application forms, promotional material, certain technical support and training for its personnel, monthly residual reporting including monthly transactional volume, average ticket information, the discount rate charged, and the commission earned, by the **IA**, certain on line electronic mail reporting, customer service and support, equipment maintenance, new and innovative value added products and services, merchant status reporting, fully integrated payment capabilities, and electronic ACH products.

### 7. Compensation/Base Commission of IA.

7-1 The **IA** shall be entitled to retain fees collected by it in excess of the pricing it obtains from **MPI** for on site inspection, equipment setup, and merchant client applications fees. Pricing may be amended or modified from time to time within the discretion of **MPI** and its financial institutions, and the **IA** shall be bound by such change upon written notice by **MPI**.

7-2 The **IA** may be entitled to a monthly residual base commission above the price it obtains from **MPI** for the credit card processing of Merchant Client Accounts. This **IA** residual base commission shall be calculated by subtracting the buy rate price the **IA** obtains from **MPI** from the price received from the Merchant Client Accounts multiplied by the monthly Merchant Client Accounts monthly credit card processing volume. The buy rate price **IA** obtains from **MPI** may be amended from time to time within the discretion of **MPI** and its financial institution, and the **IA** shall be bound by such change upon written notice by **MPI**.

7-3 Residual base commissions shall be payable by **MPI** to the **IA** approximately one month after the commissions are earned, subject to **MPI**'s right to setoff any amount owed to it by the **IA**.

7-4 The **IA** acknowledges that **MPI** may be subject to price changes in its clearing, settlement, interchange and communication transactions that are beyond its control. **MPI** shall use its best efforts to provide written explanation of any price change to the extent that such price change is the result of changes in the direct costs of **MPI**'s processing services. **IA** shall be bound by such change upon written notice by **MPI**

### 8. Ongoing Commissions to IA.

8-1 Upon the expiration of this agreement, if the **IA** is in Good Standing, the **IA** shall be entitled to ongoing commissions from the processing of Merchant Client Account transactions subject to paragraph **8-3**.

8-2 If **IA** defaults in the performance of any of the terms or conditions of this agreement or materially breaches this agreement and said default or breach continues uncured for a period of thirty (30) days from the date **MPI** gives notice to the **IA** in the manner set forth below of said default or breach, this agreement shall automatically terminate, the **IA** shall forfeit any right to any payment hereunder and **MPI** shall be entitled to all rights, privileges, and interest of **IA** in Merchant Client Accounts, without further notice to **IA**. **MPI** in addition shall be entitled to protect and enforce all of its rights, remedies and interest hereunder to the fullest extent permissible at law and in equity.            _____MPI Initials                    _____IA Initials

8-3 Upon the expiration of this agreement, **IA** agrees and acknowledges that if **IA's** compensation for any monthly period is less than $200.00 and/or new merchant account have not been submitted, by **IA,** for two consecutive years, **IA** relinquishes any and all right to payment or to the carryover to future periods of such amounts.

## 9.   **Merchant Client Applications.**

9-1 The **IA** agrees to submit all merchant client applications as provided herein.  The **IA** shall use the merchant application forms and merchant agreement forms, which **MPI** shall provide from time to time and shall not modify or alter such forms in any way without the express written permission of the president of **MPI**. The parties agree that any application may within the sole discretion of **MPI** be denied for any reason whatsoever.  All agreements with Merchant Client Accounts for processing services shall be between the Merchant Client Account and **MPI** its successors or assigns and **MPI's** settling bank.  Any failure on the part of the **IA** to perform any or all of the terms and conditions set forth in this Section 9-1 shall constitute a material breach of this agreement.

## 10.   **Confidential Information and Trade Secrets.**

10-1 The **IA** acknowledges that during the performance of this agreement, it may acquire Trade Secrets and Confidential Information of **MPI** and its affiliates, and further that the disclosure of said Trade Secrets and Confidential Information to competitors of **MPI** or the public would be damaging to **MPI** its affiliates, successors, and assigns.

10-2 The **IA** shall not at any time during or after the termination of this agreement disclose to any third party any Trade Secrets or Confidential Information it obtained as a result of this agreement.

10-3 All sales manuals, customer lists, software and other media including trademarks provided to the **IA** by **MPI** shall at all times remain the property of **MPI**.  Upon termination or expiration of this agreement, the **IA** shall immediately return all sales manuals, price lists, customer lists, mailing lists, and any and all other documents, materials, and media however recorded.  The **IA** shall ensure that said proprietary items are properly protected from disclosure, damage, or theft.

## 11.   **Disclaimer of Warranties.**

11-1 The parties acknowledge that **MPI** is not the manufacturer of any equipment provided to the **IA** for sale or lease. Unless otherwise expressly contained in an extended warranty or maintenance agreement provided by **MPI,** all equipment of any kind is sold "as is", there are no warranties which extend beyond the face of this agreement, and **MPI** expressly disclaims all warranties, express or implied, of any kind including warranties of merchantability and fitness for a particular purpose.

## 12.   **Covenant not to Compete.**

12-1 The **IA** acknowledges that during the performance of this agreement, it will acquire information and contacts which are valuable to **MPI**.  The **IA** further acknowledges that it is necessary to protect the interest of **MPI** and its merchant base by entering into the following covenant not to compete, as provided herein.

12-2 The **IA** covenants, represents, acknowledges and agrees that for a period of five (5) years following the termination of this agreement, neither the **IA,** its successors or assigns, any individual owning an equity interest in the **IA** nor its Associated Sales Personnel, either, individually or through any other entity for which he, she, or it works or from which he, she, or it would receive financial remuneration for the placement of Merchant Client Accounts, will not solicit merchant applications anywhere in the United States of America from Merchant Client

_____ **MPI** Initials                                    _____ **IA** Initials

Accounts.  Agent will have 60 days of training during which Agent will have option to opt out of regional non-compete.  Regardless of the result the remainder of contract will stay in effect to its term.

12-3 The **IA** acknowledges, agrees and understands that any violation of Section 10, 12-1, or 12-2 herein above shall cause **MPI** immediate and irreparable harm for which there is no adequate remedy at law.  **IA** further acknowledges, agrees and understands that in the event **IA** or any of its Associated Sales Personnel breaches any of these covenants, notwithstanding any other remedy at law or equity, **MPI** may protect its right of property and good will by seeking injunctive relief and related damages as well as capturing all residuals that **IA** would otherwise be entitled to.

## 13.   Transfer of Merchant Client Accounts.

13-1 The parties agree that their relationship is based upon the unique capabilities of the **IA** and its Associated Sales Personnel and therefore the **IA** may not transfer or assign any right, duty, obligation, or interest in Merchant Client Accounts without the written consent of **MPI** which shall not be unreasonably withheld.

13-2 The **IA** shall have the right to solicit offers for the sale of its interest in Merchant Client Accounts. Upon receipt of a written offer to purchase all or a portion of the Merchant Client Accounts ("Written Offer"), **MPI** shall have forty-five (45) days from notice thereof to match the terms and conditions of the Written Offer, by giving notice to the **IA** within the aforementioned forty-five (45) day period.  In the event **MPI** does not match the Written Offer, the **IA** may sell the Merchant Client Accounts to the entity making the Written Offer under the same terms and conditions as the Written Offer.

13-3 **MPI** may sell Merchant Client Accounts without the consent of **IA**.  If the sale's price for the Merchant Client Accounts is predicated on a multiple of monthly commissions received by **MPI** and at the option of **IA**, **IA** chooses to participate in said sale with **MPI** for its share of Merchant Client Accounts in which said sale terminates the interest of **IA** in the Merchant Client Accounts, the sale's price payable to **IA** from **MPI** for **IA's** interest in said Merchant Client Accounts shall be determined by the same multiple of monthly commissions that **MPI** received for said Merchant Client Accounts.  Payment of the sale's price to the **IA** shall be under the same terms and conditions as agreed to by **MPI**.

13-4 If the sale of the Merchant Client Accounts by **MPI** does not terminate the interest of the **IA** in the Merchant Client Accounts, or the sale's price is not based on a multiple of earnings, the **IA** shall have the option of continuing the relationship with the purchaser of the Merchant Client Accounts or forcing said purchaser to pay a one-time fee to **IA** for its interest in the Merchant Client Accounts equal to fifteen (15) times the average monthly commissions earned by the **IA** on the Merchant Client Accounts for the three (3) month period immediately preceding the date of the sale of **MPI's** interest in the Merchant Client Accounts.  For purposes of this paragraph, the sale or transfer of Merchant Client Accounts to the spouse, or the lineal descendants or ascendants of a stockholder of **MPI**, or an entity in which a stockholder or **MPI** has an equitable or beneficial interest shall not entitle **IA** to any payment hereunder.

13-5Payment under this Article "13" shall release and discharge **MPI** from any further payment under any other paragraph of this agreement.

## 14.   Jurisdiction and Venue of Disputes.

14-1 The parties agree that with respect to any dispute concerning this agreement, the state or federal court in Delaware shall have exclusive subject matter jurisdiction.

**MPI** Initials                                    **IA** Initials

**15.  Non-Waiver of Rights and Obligations.**

15-1 Failure on the part of **MPI** to exercise any right or privilege granted to it or to insist upon the full performance of any obligation assumed by the **IA** shall not be construed as waiving any such right, privilege, obligation, or duty, or as creating any custom contrary thereto.  Any waiver of any right, privilege, obligation, or duty by **MPI** must be in writing, and if not in writing shall not be binding in any way and the written waiver of any right, obligation, or duty by **MPI** shall not operate beyond its terms.  Any modification to this agreement must be in writing, and this provision may not be modified except in writing.

**16.  Governing Law.**

16-1 The parties agree that except insofar as federal law may preempt, the laws of the State of Delaware shall govern this agreement.

**17.  Further Assurances and Survival of Covenants.**

17-1 The **IA** shall execute all additional instruments and other documents, perform all additional acts and cooperate with **MPI** in every other way, which may be requested by **MPI** to carry out this agreement or the intent hereof.

17-2 All covenants of the **IA** shall survive the expiration or termination of this agreement to the extent required for their full observance and performance.

**18.  Severance/Savings Clause.**

18-1 Any provision of this agreement held to be void, invalid, or unenforceable in any way shall be deemed to be severed, and the remainder of this agreement shall remain in full force and effect as if the severed portion had never been included.

**19.  Merger and Modification.**

19-1 This agreement shall supersede and replace any and every existing contract and agreement between the **IA** and **MPI**, which is not specifically incorporated herein.

**20.  Written Notice.**

20-1 All notices required by this agreement are to be in writing and shall be deemed to have been properly given, in the absence of rebutting evidence, upon the placing for delivery by certified mail, return receipt requested to the address below within the time period required by this agreement.  Notice by facsimile machine must be memorialized by certified mail as provided herein:

MPI address:          **Mercantile Processing Inc**
                                 35129 Roxana Rd
                                 Frankford, DE 19945

IA address:          21379  Tree view Lane

                            Millsboro De, 19966


_____ MPI Initials                    _____ IA Initials

**21.** **Title and Headings.**

21-1 The title and headings in this agreement exist solely for the convenience of the reader and do not limit the subject matter or effect of any term hereof.

**22.** **Indemnity for Actions/Omissions.**

22-1 The **IA**, its successors and/or assigns agrees to defend, indemnify, and hold harmless **MPI** its successors and/or assigns, its directors, officers, employees, its settling bank, its leasing companies and its shareholders (all of whom are hereinafter referred to as "Indemnities") from, for, and against any and all liability, loss, and expense (including reasonable attorney fees) whether or not presently known, discovered or contemplated and regardless of when discovered by anyone, which any Indemnity has incurred or may incur at any time during the performance of this agreement or thereafter which either wholly or partly arises as a result of any actual or alleged act, omission, transaction, or occurrence of the **IA**, its successors and/or assigns, its Associated Sales Personnel, its directors, officers, employees and subcontractors regardless of whether the **IA** is ultimately absolved of any liability.

**23.** **Setoff.**

23-1 **MPI** may at any time without notice apply any commissions or other credit balance owed to the **IA** by **MPI** to reduce any past due amounts of any kind whatsoever.

**24.** **Limitations of Claims and Damages.**

24-1 Any claim by **IA** which arises out of this agreement, or the performance thereof must be brought against **MPI** within one year after the basis for the claim becomes known to **IA**.

24-2 **MPI** shall not be liable to the **IA** for any consequential damages caused by its failure to perform under this agreement including, but not limited to, lost profits or damage to goodwill regardless of whether the claim arises in contract or in tort.

**25.** **Construction.**

25-1 Whenever the context so requires, the male gender when used herein shall be deemed to include the female gender, the female gender shall be deemed to include the male gender, the singular shall be deemed to include the plural and the plural shall be deemed to include the singular.

**26.** **Representation by Counsel.**

26-1 Each party has had the opportunity to have this agreement reviewed by counsel of his choosing prior to signing, and represents that he has reviewed this agreement with counsel, or hereby knowingly waives the right to have counsel review this agreement.

**IN WITNESS WHEREOF, the parties hereto enter into this agreement this** _25ᵗʰ_ **day of** _September_ **, 20** _15_ **:**

IA Business Name: _Jeremy J. Brown_

Name of Owner: _Jeremy J. Brown_

Signature of Owner: _Jeremy J Brown_

Title: _Mr_

_(initials)_ MPI Initials                    _(initials)_ IA Initials

**Owner SS#:** 234 - 35 - 6671

**Federal Tax ID:**

**Address:** 21379 Treeview Lane

Millsboro De , 19966

**Tel. #:** (888) 443-0018

**Email:** brownjj_87@Yahoo.Com

**Fax #:**

**\*INTERNAL USE\***

**Accepted By:**

**Printed Name**    Kyle  Morgan  Pres

MPI Initials            IA Initials

## MERCANTILE PROCESSING INC.

## Schedule A - Revenue Split Pricing (BOD @ 15%)

Gross Interchange Pass-Through + Dues and Assessments

Effective 2/14/12

| Interchange | Buy Rate | ISO/IA |
|---|---|---|
| VISA/MC/DISC Associations Fees and Other Charges | Pass-Through | 50% over |
| **Network/Risk Fees** | **Buy Rate** | **ISO/IA** |
| Risk Monitoring Fee | 0.02% | N/A |
| VISA/MC/DISC Authorzation Fee; Dial/IP VITAL Network | $0.04 | 50% over |
| VISA/MC/DISC DEBIT (Regulated/Unregulated) Authorzation Fee; Dial/IP VITAL Network | $0.04 | 50% over |
| Voice Authorizations | $0.52 | 50% over |
| ARU | $0.52 | 50% over |
| **Monthly/One Time Fees** | **Buy Rate** | **ISO/IA** |
| Monthly Support Fee Vital | $10.00 | 50% over |
| Monthyl Support Fee First Data | $10.00 | 50% over |
| Charge Back Fee | $25.00 | 50% over |
| Retrival Fee | $15.00 | 50% over |
| DDA Change/Return Fee | $15.00 | 50% over |
| Batch Fee | $0.00 | 50% over |
| IRS Administration Fee | $59.95 | 50% over |
| Monthly Account on File Fee | $0.00 | 50% over |
| Monthly Minimum (optional) | $0.00 | 50% over |
| Application Fee (optional) | $0.00 | 50% over |
| **Other Services** | **Buy Rate** | **ISO/IA** |
| Gift Card | Varies | 50% over |
| Equipment Pricing and leasing(See Terminal Pricing Schedule) | | |
| Payroll | Varies | 50% over |
| Cash Advance | Varies | 50% over |
| PCI Compliance (Mandatory) - billed quarterly (18.80 compliant/ 28.80 noncompliant) | Varies | 50% Payback AMt |
| | $0.00 | $0.00 |

_Jeremy Brown_
Agent Name (Print)

_Jeremy Brown_
Agent Signature

9 - 25 - 15
Date

_Kyle Milan_
MPI Officer (Print)

_(signature)_
Authorized Signature

_9/25/15_
Date

**MERCANTILE PROCESSING INC.**

## Schedule B - Additional Service Pricing
### Value Added Services
Shipping additional
Effective 2/14/12

| Payroll | Buy Rate | ISO/IA |
|---|---|---|
| Monthly - Retail, MOTO, Wholesale, Government | $35 | 50% over |
| Monthly - Restaurant, Adjusted Tip, Job Costing | $60.00 | 50% over |
| Per employee per pay period | $1.00 | 50% over |
| Check Delivery per pay run | $5.00 | 50% over |
| W2 | $3.50 | 50% over |
| **Gift Card / Loyalty Program** | **Buy Rate** | **ISO/IA** |
| Monthly Support | $7.50 | 50% over |
| Charge Back Fee | $25.00 | 50% over |
| Per Item | $0.14 | 50% over |
| Text(Per text number) | $0.35 | 50% over |
| Email Blast (To enire loyalty list) | $5.00 | 50% over |
| Art fee (1 hr min) | $145 hr | 50% over |
| 100 Cards | $99.00 | 50% over |
| 250 Cards | $200.00 | 50% over |
| 500 Cards | $300.00 | 50% over |
| 1000 Cards | $500.00 | 50% over |
| 2500 Cards | $1,000.00 | 50% over |
| **ATM Services** | **Buy Rate** | **ISO/IA** |
| ATM - Surcharge | $0.25 | 50% over |
| ATM- Monthly | $5.00 | 50% over |
| ATM Equipment Sales | $0.00 | 50% over |

Jeremy Brown
Agent Name (Print)

_Agent Signature_

9-25-15
Date

Kyle Milam
MPI Officer (Print)

_Authorized Signature_

Date

# MERCANTILE PROCESSING INC.

## Schedule C - POS Lavu

POS Lavu
Shipping additional
Effective 2/14/12

| POS Lavu License- One Time | Buy Rate | ISO/IA |
|---|---|---|
| Deal 1-4 Commission License Fees- Silver License- Cannot Increase Cost (One Time) | $895.00 | 50%over |
| Deal 5- 9 Commission License Fees- Silver License- Cannot Increase Cost (One Time) | $895.00 | 50%over |
| Deal 10+ Commission License Fees- Silver License- Cannot Increase Cost (One Time) | $895.00 | 50%over |
| Deal 1-4 Commission License Fees- Gold License- Cannot Increase Cost (One Time) | $1,495.00 | 50%over |
| Deal 5- 9 Commission License Fees- Gold License- Cannot Increase Cost (One Time) | $1,495.00 | 50%over |
| Deal 10+ Commission License Fees- Gold License- Cannot Increase Cost (One Time) | $1,495.00 | 50%over |
| Deal 1-4 Commission License Fees- Pro License- Cannot Increase Cost (One Time) | $2,495.00 | 50%over |
| Deal 5- 9 Commission License Fees- Pro License- Cannot Increase Cost (One Time) | $2,495.00 | 50%over |
| Deal 10+ Commission License Fees- Pro License- Cannot Increase Cost (One Time) | $2,495.00 | 50%over |

| License Fee Monthly Cost Structure | Buy Rate | ISO/IA |
|---|---|---|
| Silver License- Cannot Increase Cost (Monthly) | $39.00 | N/A |
| Gold License- Cannot Increase Cost (Monthly) | $79.00 | N/A |
| Pro License- Cannot Increase Cost (Monthly) | $149.00 | N/A |
| Additional Terminal Cost for Pro License (Monthly) | $20.00 | N/A |

| Equipment Commission | Buy Rate | ISO/IA |
|---|---|---|
| Apple Product *Pricing of equipment indicated on POS Lavu Kit | N/A | 50%over |
| Non- Apple Product Accessories *Pricing of equipment indicated on POS Lavu Kit | N/A | 50%over |
| Installation/Setup Fee- Billed through MPI via credit card | 3% | 50%over |
| Installation/Setup Fee- Billed through Agent | $0.00 | 50%over |

_____
Agent Signature

9-25-15
Date

_____
Authorized Signature

9/2/15
Date

Jeremy Brown
Agent Name (Print)

Kyle Murry
MPI Officer (Print)

# MERCANTILE PROCESSING INC.

**Schedule D - ePN Processing**
Virtual Terminal Options
Shipping additional
Effective 8/8/14

| Authorize.net | Buy Rate | ISO/IA |
|---|---|---|
| Set Up Fee | $49.00 | 50%/Over |
| Monthly Fee | $10.00 | 50%/Over |
| Per Transaction Fee | $0.05 | 50%/Over |
| **Tgate/Bridgepay** | **Buy Rate** | **ISO/IA** |
| Set Up Fee | $29.00 | 50%/Over |
| Monthly Minimum | $20.00 | 50%/Over |
| Per Transaction Fee | $ 0.015 | 50%/Over |
| **ePN Set Up Fees (One Time)** | **Buy Rate** | **ISO/IA** |
| Online Terminal Only | $29.00 | 50%/Over |
| Internet Basic | $39.00 | 50%/Over |
| ePN Cart | $80.00 | 50%/Over |
| ePN BillPay | $50.00 | 50%/Over |
| ePN Mobile Pro | $49.00 | 50%/Over |
| ePN Plug In (For Quickbooks) | $100.00 | 50%/Over |
| ePN POS | $75.00 | 50%/Over |
| ePN Recur | $55.00 | 50%/Over |
| Customer Data Manager (CDM) | $5.00 | 50%/Over |
| **ePN Monthly Fees** | **Buy Rate** | **ISO/IA** |
| Online Terminal Only | $12.00 | 50%/Over |
| Internet Basic | $20.00 | 50%/Over |
| ePN Cart | $18.00 | 50%/Over |
| ePN BillPay | $15.00 | 50%/Over |
| ePN Mobile Pro | $8.00 | 50%/Over |
| ePN Plug In (For Quickbooks) | $0.00 | 50%/Over |
| ePN POS | $0.00 | 50%/Over |
| Customer Data Manager (CDM) | $15.00 | 50%/Over |
| **ePN Transaction Fees** | **Buy Rate** | **ISO/IA** |
| Online Terminal Only | $0.05 | 50%/Over |
| Internet Basic \| 1-250 Transactions | $0.00 | 50%/Over |
| Internet Basic \| 251+ Transactions | $0.00 | 50%/Over |
| ePN Cart | $0.05 | 50%/Over |
| ePN BillPay \| 1-250 Transactions | $0.00 | 50%/Over |
| ePN BillPay \| 251 + Transactions | $0.00 | 50%/Over |
| ePN Mobile Pro | $0.05 | 50%/Over |
| ePN Plug In (For Quickbooks) | $0.00 | 50%/Over |
| ePN POS | $0.00 | 50%/Over |
| ePN Recur | $0.00 | 50%/Over |

Agent Name (Print): Jeremy Brown

Agent Signature

Date: 9-25-15

MPI Officer (Print)

Authorized Signature

Date

# Exhibit 3

## Head of Bank Partnerships Employment Agreement

This Head of Bank Partnerships Employment Agreement ("*Agreement*") is entered into as of Oct 1st, 2018 by and between Jeremy Brown ("*Head of Bank Partnerships*") and Mercantile Processing Inc., a Delaware corporation (the "*Company*"), this Agreement shall supersede any verbal or written offer previously entered into by the parties.

## 1.  EMPLOYMENT

The Company agrees to continue to employ Head of Bank Partnerships, and Head of Bank Partnerships agrees to continue to accept employment by the Company as its bank sales lead and report to the Director of Sales. Changes may be made from time to time by the Company in its sole discretion to the duties, reporting relationships and title of Head of Bank Partnerships. Head of Bank Partnerships will perform the duties as are commensurate and consistent with Head of Bank Partnerships' position and will devote Head of Bank Partnerships' working time, attention and efforts to the Company and to discharging the responsibilities of Head of Bank Partnerships' position, and such other duties as may be assigned from time to time by the Company, which relate to the business of the Company and are reasonably consistent with Head of Bank Partnerships' position. During Head of Bank Partnerships' employment, Head of Bank Partnerships will not engage in any business activity that, in the reasonable judgment of the CEO, conflicts with the duties of Head of Bank Partnerships under this Agreement, whether or not such activity is pursued for gain, profit or other advantage.

## 2.  COMPENSATION AND BENEFITS

### 2.1  Annual Salary

Head of Bank Partnerships compensation shall consist of an annual base salary (the "*Salary*") of $48,000 payable in semi-monthly installments in accordance with the payroll practices of the Company. The salary is directly comparable with the Bank quota outlined in the attached link.  In addition to the salary the Head of Bank Partnerships shall be entitled to residuals on previous accounts obtained as a sales agent and 15 % of net residual from subordinate employees and portfolio banks. Head of Partnerships may take residuals at 50% for direct sales per approval of Director of Sales. The Salary shall be reviewed, and shall be subject to change, by the Chief Executive Officer and/or the Board of Directors, as applicable, at least annually while Head of Bank Partnerships is employed hereunder. Annual review of salary will be completed in October of each year.

### 2.3  Benefits

Head of Bank Partnerships shall be responsible for all his own benefits. Including but not limited to; health, dental, eye, car insurance, and life insurance.

### 2.4  Vacation and Other Paid Time-Off Benefits

Head of Bank Partnerships shall be entitled to paid time-off and sick leave as laid out in the employee hand book.

## 3.  TERMINATION

### 3.1   Employment At Will

Head of Bank Partnerships acknowledges and understands that employment with the Company is at will and can be terminated by either party for no reason or for any reason not otherwise specifically prohibited by law. Nothing in this Agreement is intended to alter Head of Bank Partnerships' at-will employment status or obligate the Company to continue to employ Head of Bank Partnerships for any specific period of time, or in any specific role or geographic location. Except as expressly provided for in this Agreement, upon any termination of employment, Head of Bank Partnerships shall not be entitled to receive any payments or benefits under this Agreement other than unpaid Salary earned through the date of termination and unused vacation that has accrued as of the date of Head of Bank Partnerships' termination of employment that would be payable under the Company's standard policy.

### 3.2   Automatic Termination on Death or Total Disability

This Agreement and Head of Bank Partnerships' employment hereunder shall terminate automatically upon the death or Total Disability of Head of Bank Partnerships. *"Total Disability"* shall mean Head of Bank Partnerships' inability, with reasonable accommodation, to perform the duties of Head of Bank Partnerships' position for a period or periods aggregating ninety (90) days in any period of one hundred eighty (180) consecutive days as a result of physical or mental illness, loss of legal capacity or any other cause beyond Head of Bank Partnerships' control. Head of Bank Partnerships and the Company hereby acknowledge that Head of Bank Partnerships' ability to perform Head of Bank Partnerships' duties is the essence of this Agreement. Termination hereunder shall be deemed to be effective (a) at the end of the calendar month in which Head of Bank Partnerships' death occurs or (b) immediately upon a determination by the Board of Directors (or the Compensation Committee thereof) of Head of Bank Partnerships' Total Disability. In the case of termination of employment under this Section 3.2, Head of Bank Partnerships shall not be entitled to receive any payments or benefits under this Agreement other than residuals as outlined in the independent agent contract. In the case of death Head of Bank Partnerships residual will be pass to next of kin or transferred as stated by his will.

## 4.   Non-Solicitation, Non Complete, Non Disclosure

In the case of any violation of section 4, during or after employment; Head of Bank Partnerships forfeits their rights to residuals or compensation under the schedule A and is liable for any damage to Company.

### 4.1   Non Solicitation

The Head of Bank Partnerships acknowledges that during the performance of this agreement, it will acquire information and contacts which are valuable to MPI.  The Head of Bank Partnerships further acknowledges that it is necessary to protect the interest of MPI and its merchant base by entering into the following covenant not to compete, as provided herein.

The Head of Bank Partnerships covenants, represents, acknowledges and agrees that for a period of five (5) years following the termination of this agreement, neither the Head of Bank Partnerships, its successors or assigns, nor its Associated Sales Personnel, either, individually or

through any other entity for which he, she, or it works or from which he, she, or it would receive financial remuneration for the placement of Merchant Client Accounts, will not solicit company merchant applications anywhere in the United States of America from Merchant Client Accounts and will not solicit bank partnerships for any competing entity.

The Head of Bank Partnerships acknowledges, agrees and understands that any violation of this Section shall cause MPI immediate and irreparable harm for which there is no adequate remedy at law. Head of Bank Partnerships further acknowledges, agrees and understands that in the event Head of Bank Partnerships breaches any of these covenants, notwithstanding any other remedy at law or equity, MPI may protect its right of property and good will by seeking injunctive relief and related damages.

### 4.2   Non Compete

Head of Bank Partnerships Acknowledges that MPI has a regional advantage and agrees that for the term of one year not to work for a competing entity within 100 miles of an MPI Office.

### 4.3   Non Disclosure

The Head of Bank Partnerships acknowledges that during the performance of this agreement, it may acquire Trade Secrets and Confidential Information of MPI and its affiliates, and further that the disclosure of said Trade Secrets and Confidential Information to competitors of MPI or the public would be damaging to MPI its affiliates, successors, and assigns.
The Head of Bank Partnerships shall not at any time during or after the termination of this agreement disclose to any third party any Trade Secrets or Confidential Information it obtained as a result of this agreement.
All sales manuals, customer lists, software and other media including trademarks provided to the Head of Bank Partnerships by MPI shall at all times remain the property of MPI. Upon termination or expiration of this agreement, the Head of Bank Partnerships shall immediately return all sales manuals, price lists, customer lists, mailing lists, and any and all other documents, materials, and media however recorded. The Head of Bank Partnerships shall ensure that said proprietary items are properly protected from disclosure, damage, or theft.

### 5.   Continuation of Payment
Upon termination or resignation of Head of Bank Partnerships, Head of Bank Partnerships is entitled to ongoing residuals as outlined in Independent Agent Agreement and schedule A. Upon termination or resignation Head of Bank Partnerships will not be entitled to any right or benefit that is outline in the employee handbook. Head of Bank Partnerships will become a subcontractor as outline in the Independent Agent Agreement.

Accounts boarded by agent will pay residuals for life of the account as dictated in Independent agent agreement. Accounts boards through bank partnerships will pay for 5 years after termination or resignation or agent will be paid a 36 times (based on monthly average) one time lump sum of bank partnerships value. Residual income is defined as recurring revenue generated by direct and indirect accounts for products and services including but not limited to

merchant services, payroll, ACH, Gift Card, Loyalty, Payroll, ATM, gateway and rentals.

## 4. ASSIGNMENT

This Agreement is personal to Head of Bank Partnerships and shall not be assignable by Head of Bank Partnerships. The Company may assign its rights hereunder to (a) any Successor Employer; (b) any other corporation resulting from any merger, consolidation or other reorganization to which the Company is a party; (c) any other corporation, partnership, association or other person to which the Company may transfer all or substantially all of the assets and business of the Company existing at such time; or (d) any subsidiary, parent or other affiliate of the Company. All of the terms and provisions of this Agreement shall be binding upon and shall inure to the benefit of and be enforceable by the parties hereto and their respective successors and permitted assigns.

## 5. AMENDMENTS IN WRITING

No amendment, modification, waiver, termination or discharge of any provision of this Agreement, or consent to any departure therefrom by either party hereto, shall in any event be effective unless the same shall be in writing, specifically identifying this Agreement and the provision intended to be amended, modified, waived, terminated or discharged and signed by the Company and Head of Bank Partnerships, and each such amendment, modification, waiver, termination or discharge shall be effective only in the specific instance and for the specific purpose for which given. No provision of this Agreement shall be varied, contradicted or explained by any oral agreement, course of dealing or performance or any other matter not set forth in an agreement in writing and signed by the Company and Head of Bank Partnerships.

## 6. NOTICES

Every notice relating to this Agreement shall be in writing and shall be given by personal delivery, by a reputable same-day or overnight courier service (charges prepaid), by registered or certified mail (postage prepaid, return receipt requested) or by facsimile to the recipient with a confirmation copy to follow the next day to be delivered by personal delivery or by a reputable same-day or overnight courier service to the appropriate party's address or fax number below (or such other address and fax number as a party may designate by notice to the other parties):

7

| If to the Company : | Mercantile Processing Inc |
| --- | --- |
|  | 32695 Roxana  Rd<br>Millville, DE 19967<br>Attn: Chief Executive Officer |
| Head of Bank Partnerships: | Jeremy Brown |
|  | 21379 Tree View<br>Millsboro, DE 19966 |

## 7. APPLICABLE LAW

This Agreement shall in all respects, including all matters of construction, validity and performance, be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without regard to any rules governing conflicts of laws.

## 8.  ENTIRE AGREEMENT

This Agreement, on and as of the Effective Date, constitutes the entire agreement between the Company and Head of Bank Partnerships with respect to the subject matter hereof, and all prior or contemporaneous oral or written communications, understandings or agreements between the Company and Head of Bank Partnerships with respect to such subject matter are hereby superseded in their entirety, except as otherwise provided herein.

## 9.  SEVERABILITY

If any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement or any action in any other jurisdiction, but this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

## 10. WAIVERS

No delay or failure by any party hereto in exercising, protecting, or enforcing any of its rights, titles, interests, or remedies hereunder, and no course of dealing or performance with respect thereto, shall constitute a waiver thereof. The express waiver by a party hereto of any right, title, interest, or remedy in a particular instance or circumstance shall not constitute a waiver thereof in any other instance or circumstance. All rights and remedies shall be cumulative and not exclusive of any other rights or remedies.

## 11. HEADINGS

All headings used herein are for convenience only and shall not in any way affect the construction of, or be taken into consideration in interpreting, this Agreement.

## 12. COUNTERPARTS

This Agreement, and any amendment or modification entered into pursuant to Section 5 hereof, may be executed in any number of counterparts, each of which counterparts, when so executed and delivered, shall be deemed to be an original and all of which counterparts, taken together, shall constitute one and the same instrument.

**IN WITNESS WHEREOF**, the parties have executed and entered into this Agreement effective on the date first set forth above.

Head of Bank Partnerships

Jeremy S Brown

Mercantile Processing INC

B /
y

Its   CEO   12/20/18

# Exhibit 4

**Changing Jeremy Brown to Bank Partnerships from Head of Bank Partnerships**

Current Bank value and Annualized Revenue even with direct sales quota: -$28,000
(Represents an Annualized revenue loss of $280,000 residual for MPI )

Current bank value based on true up+new accounts on 2019 but does not incorporate Tax, Car
or Marketing expense. Total MPI loss on JB for Oct-Oct term is $69,390

If JB had stayed as agent the variance for MPI gain would have been $107,025.

Items for consideration in removal from role include

- Bank Program production did not meet commitment in DOS Strategy for 2019
  - Bank partners did not provide commitment to DOS numbers
  - True Ups for 1880 and Jarretsville are vastly under what was projected for bank growth
- Lack of production impacting MPI's ability to continue to pay payroll as quotas are not being met.
  - Consistent issues with employees not meeting quotas for an extended amount of time
- Lack of production impacting other division (MPI POS Sales) and has lead to bandwidth issues of this team in an effort to make up the deficit.
  - Woodsboro Decrease in production after Conversion Bonus Year
  - Woodsboro Primary success with this bank partnership is associated with Conversion Bonus Year
- Employee unable to meet management and leadership expectations required for this role.
  - Consistent issues with training retention for both Sandy and Tom
  - Training and management of Lauran and Sandy
- Continuing in this role would be detrimental for the employee in measured performance and financially.
  - See October 2019 Evaluation
  - See CFO breakdown comparison

Current Cost
Salary: 48,00
Tax: $13,440
Car: $6,500
Health Insurance: $0
MBA Marketing: $21,450
**Total Cost:** $89,390

New Position Proposal:
Effective Oct 1 JB will have a personal quota with a .45 factor on salary. Like every other agent.
($(48,000/12 months+540 car) X1.45) = $6,583 monthly required quota.

JB will continue to receive 15% of all new Tom Murn and Casey Fitzgerald deals including subsequent banks through the end of 2019. Jeremy will receive in perpetuity any residuals earned during his tenure as head of bank partnerships through the end of 2019.

As of Jan 1 2020, Jeremy will no longer receive any residual for any new deals for bank partners assigned to MPI with exception of bank partners assigned to Jeremy as an agent.

Agent Responsibilities:
Agent for Bank of Delmarva
Agent for Liberty Bell
Agent for Virgina Bank of Commerce TBD
Any other partnerships as assigned and agreed upon by Agent and Director of sales..
Any existing merchant referrals
Any closed sales as a result of networking

**New Job as "Bank Partnerships"**
MPI recognizes value of Jeremy Brown as a valued member of the bank team. His services will be no longer required as the Head of Bank Partnerships where he is required to manage existing partners but will be incentivised to bring in new bank partners. Jeremy will be expected to represent MPI at MBA and other bank events.

New bank on quota:
- 100 < deal commitment (per year) $5,000 one time quota bonus  + 0% for three years
- 100-250 deal commitment (per year) $7,500 one time quota bonus + 3% for life of the bank partnership
- <250 deal commitment (per year) $10,000 one time quota bonus + 5% for life of the bank partnership

The percentage for on going and upfront will represent compensation and commitment for three years for a new relationships success and training. A penalty for bank not hitting the commitment must be committed to and the penalty must be equal to or greater than the upfront commission.

_____   Date 10-21-2019
Jeremy Brown

_____   Date 10/21/19
Katie McMillan

# Exhibit 5

 **MERCANTILE PROCESSING INC.**

Woodsboro Transition Plan & Timeline | Jeremy Brown

The purpose of this document is to capture expectations centered around the transition of Bank Relationship Management from Jeremy Brown to Jake Vacura in regards to expectations of Jeremy Brown for continued residual income for the merchants on the Woodsboro Bank portfolio.

This document is being created with the basic expectations that are required from the CRO to continue earning residual income on all merchants post the transition from Jeremy Brown to the NEW RM.

Expectations for Jeremy Brown can be found on the "Woodsboro Transition Plan & Timeline | Jeremy Brown & Jake Vacura" document in Drive. All items listed under "Expectations of transfer of partner management information" are requirements for continued residual income on the accounts that have been boarded on Woodsboro Bank. All of these requirements must be complete by October 13, 2022.

After the transition deadline of October 13, 2022, Jeremy Brown will no longer be required or asked to continue service on the bank partner or merchants (new or existing).

Should all transition activities be completed by the deadline, Jeremy Brown will continue to receive residual income on the portfolio boarded under Woodsboro bank and the percentage of 15%.

Should some transition activities not be completed by the deadline, Jeremy Brown will receive a reduced percentage of residual income on the book at 5%.

A minimum requirement to keep any residual income on the accounts will be for an in person introduction to all merchants that are currently processing.

Transition activities will be tracked in the "Woodsboro Transition Plan & Timeline | Jeremy Brown & Jake Vacura" document in Drive and will require both the Existing RM and the NEW RM to sign and date upon completion.

This is an amendment that has been created to stress the importance of the transition timeline and requirements.

_____     _____
Employee Signature (Jeremy Brown)          Date
_____     _____
CRO Signature (Katie McMillan)                 Date

# TAB 3

EFiled:  Aug 21 2023 05:10PM EDT
Transaction ID 70683025
Case No. 2023-0859-

# Exhibit 6

 **Gmail**

**Jeremy Brown <brownjjq87@gmail.com>**

---

## Woodsboro Book Final Response
2 messages

---

**Jeremy Brown** <jbrown@mpiprocessing.com>           Wed, Dec 21, 2022 at 9:14 AM
To: Kyle Morgan <kmorgan@mpiprocessing.com>, Kathryn McMillan <kmcmillan@mpiprocessing.com>
Bcc: brownjjq87@gmail.com

Good Morning,

On the heels of our communication last Friday I wanted to respond so there are no false expectations. I put some thought into what could be done to have the 10% that was taken away returned to me. As I took Kyle's advice and truly sat and thought about it I realized that the residual income is money that has already been earned over years of work. The reflection actually amplified the question as to why management would have me do more work to earn the money that is already mine.

I realized through that reflection process that I have more self respect and respect for my profession to do the same work over again and/or more work outside of my already loaded accountabilities. Only to "maybe" receive my rightfully earned residuals that are outlined through verbal agreements and contract agreements.

At this point I am focusing on new business and partnerships which are in line with the accountabilities of my Job. I can only hope that you will decide to do the right thing as the ownership of MPI, as managers of employees, and as people. In my educated opinion the right thing is to return the payroll percentage that I have earned through extensive hard work that has always been focused on the betterment of MPI.

I do not need nor expect a response.

Jeremy Brown
Bank Partnerships/Relationship Manager
Mercantile Processing Inc.
877-508-2831 x111 | f. 888-406-6926

### 2022 Winner, Better Business of Delaware Torch Award For Ethics



### MPI | More Than Payments

Our robust suite of business services can help you save time and save money!

Payroll | Gift Cards | Paper Program | POS | Mobile Payments

Shop online or ask our team about special bundles for your business!

877-508-2831, Option 2 | sales@mpiprocessing.com

Need help filling a claim for the Visa & MasterCard settlement ? We can help!

https://www.mpiprocessing.com/settle/



*This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the system manager. This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.*

**Jeremy Brown** <jbrown@mpiprocessing.com>                    Wed, Dec 21, 2022 at 10:14 AM
To: Jeremy Brown <brownjjq87@gmail.com>

Jeremy Brown
Bank Partnerships/Relationship Manager
Mercantile Processing Inc.
877-508-2831 x111 | f. 888-406-6926

### 2022 Winner, Better Business of Delaware Torch Award For Ethics



### MPI | More Than Payments

Our robust suite of business services can help you save time and save money!

Payroll | Gift Cards | Paper Program | POS | Mobile Payments

Shop online or ask our team about special bundles for your business!

877-508-2831, Option 2 | sales@mpiprocessing.com

Need help filling a claim for the Visa & MasterCard settlement ? We can help!

https://www.mpiprocessing.com/settle/



*This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the system manager. This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.*

---------- Forwarded message ---------
From: **Kyle Morgan** <kmorgan@mpiprocessing.com>
Date: Wed, Dec 21, 2022 at 10:11 AM
Subject: Re: Woodsboro Book Final Response

To: Jeremy Brown <jbrown@mpiprocessing.com>
Cc: Kathryn McMillan <kmcmillan@mpiprocessing.com>


I dont think that was the intention of the self reflection. I have scheduled a meeting for next Thursday in the office to provide some more clarity on the path forward.

Best Regards,
Kyle Morgan
CEO and Head of Product
Office: 877-508-2831 ext 100
kmorgan@mpiprocessing.com

**2022 Winner Better Business of Delaware Torch Award For Ethics**



**MPI | More Than Payments**

Did you know that MPI offers more than just an outstanding payments experience?

Our robust suite of business services can help you save time and save money!


Payroll | Gift Cards | Paper Program | POS | Mobile Payments


Shop online or ask our team about special bundles for your business!

877-508-2831, Option 2 | sales@mpiprocessing.com


Need help filing a claim for the Visa & MasterCard settlement? We can help!

https://www.mpiprocessing.com/settle/




*This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the system manager. This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.*

[Quoted text hidden]

# Exhibit 7



---------- Forwarded message ---------
From: **Jeremy Brown** <jbrown@mpiprocessing.com>
Date: Mon, Dec 19, 2022 at 7:59 AM
Subject: Fwd: Urgent Residual Mistake
To: Jeremy Brown <brownjjq87@gmail.com>


Jeremy Brown
Bank Partnerships/Relationship Manager
Mercantile Processing Inc.
877-508-2831 x111 | f. 888-406-6926

### 2022 Winner, Better Business of Delaware Torch Award For Ethics



### MPI | More Than Payments
Our robust suite of business services can help you save time and save money!

Payroll | Gift Cards | Paper Program | POS | Mobile Payments

Shop online or ask our team about special bundles for your business!
877-508-2831, Option 2 | sales@mpiprocessing.com

Need help filling a claim for the Visa & MasterCard settlement ? We can help!
https://www.mpiprocessing.com/settle/



*This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the system manager. This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.*

---------- Forwarded message ---------
From: **Kathryn McMillan** <kmcmillan@mpiprocessing.com>
Date: Fri, Dec 16, 2022 at 8:20 AM
Subject: Re: Urgent Residual Mistake
To: Jeremy Brown <jbrown@mpiprocessing.com>
Cc: MPI BIlling <billing@mpiprocessing.com>, Partner Support <partnersupport@mpiprocessing.com>

Jeremy,

The adjustment for the Woodsboro book as based on the transition plan that we discussed prior to the hand off to Jake. We can talk more about this during the one on one later today.

After the transition deadline of October 13, 2022, Jeremy Brown will no longer be required or asked to continue service on the bank partner or merchants (new or existing). Should all transition activities be completed by the deadline, Jeremy Brown will continue to receive residual income on the portfolio boarded under Woodsboro bank and the percentage of 15%. Should some transition activities not be completed by the deadline, Jeremy Brown will receive a reduced percentage of residual income on the book at 5%. A minimum requirement to keep any residual income on the accounts will be for an in person introduction to all merchants that are currently processing.

Thank you,
Katie

Kathryn McMillan
Chief Revenue Officer, CRO
Office | 302-524-8000, Ext. 115



**MPI | More Than Payments**
Did you know that MPI offers more than just an outstanding payments experience?
Our robust suite of business services can help you save time and save money!
Payroll | Gift Cards | Paper Program | POS | Mobile Payments

Shop online or ask our team about special bundles for your business!

877-508-2831, Option 2 | sales@mpiprocessing.com



*This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the system manager. This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.*

On Thu, Dec 15, 2022 at 3:40 PM Jeremy Brown <jbrown@mpiprocessing.com> wrote:

Good afternoon team. I have included billing, & partner support on this as you all work together on Iris as well residual reporting. I'm not privy to the exact process and wanted to keep this as efficient as possible.

I noticed a huge dip in my check this month. Even including the miss of quota for the payment period. Upon further review I found that all of the Woodsboro accounts agent % was reduced to 5%. This is about a $2000 a month difference. I respectfully request this is remedied as soon as possible and back pay provided prior to the end of the year.

--
Jeremy Brown
Head of Bank Partnerships
302-524-8000 x111
Mpiprocessing.com

Please excuse the brevity if this email as it is being sent using a mobile device.

# Exhibit 8



# Mercantile Processing, Inc. (MPI)

Provides the service you expect, at a rate that you can afford.

Financial Services · Millville, DE · 370 followers · 24 employees

+ Follow    Visit website ⧉    More

Home    **About**    Posts    Jobs    People

## Overview

Mercantile Processing Inc. is a locally owned Delaware company. Based in Sussex County, MPI's home office is in Frankford, Del. MPI serves the Delmarva area as a credit card processing broker, payroll solution provider, credit card terminal and ATM reseller and a gift/loyalty card program supplier.

Servicing small businesses, restaurants, hotels, and seasonal merchants, Mercantile Processing Inc. also has the ability to broker for state and federal institutions, large business, and cash advance companies. Customer service is most important to MPI. Mercantile Processing Inc. strives to provide local, helpful customer service to all of its customers.

Mercantile processing Inc. has also become a part of the local community. MPI is a member of several local BNI groups, chambers of commerces, and serves on the board of the Millsboro Chamber of Commerce.

Follow us on Twitter @MPIdelaware.

**Website**
http://www.mpiprocessing.com/

**Industry**
Financial Services

**Company size**
11-50 employees
24 on LinkedIn ⓘ

**Headquarters**
Millville, DE

**Founded**
2005

**Specialties**
Credit Card Processing, ACH, ATM, Payroll, Processing Loans, Gift Cards, and Loyalty Cards

## Locations (1)

Primary

32695 Roxana Road, Millville, DE 19967, US

Get directions ⧉



About                Accessibility
Community Guidelines    Careers
Privacy & Terms ▾       Ad Choices
Sales Solutions         Mobile
Safety Center

Talent Solutions
Marketing Solutions
Advertising
Small Business

Questions?
Visit our Help Center.

Manage your account and privacy
Go to your Settings.

Recommendation transparency
Learn more about Recommended Content.

Select Language
English (English)

LinkedIn Corporation © 2023

# Exhibit 9

| | |
|---|---|
| **TO:** | Jeremy Brown, Bank Partnerships |
| **FROM:** | Katie McMillan, CRO |
| **DATE:** | 01/27/2023 |
| | |
| **RE:** | **90-day Action/Performance Plan** |
| **CC:** | COO/CEO |

Jeremy, your performance as Bank Partnerships at MPI has recently raised concerns. Our findings have confirmed several areas requiring your immediate attention and course-correction. As a result, a time-critical path of action on your part is needed to correct the issues at hand. This matter is of extreme seriousness and warrants your unwavering commitment.

As an integral part of the Bank Partnerships role, you are expected to meet or exceed certain performance thresholds to ensure the success of the business and our merchants. At present, your performance is falling short in several critical areas, including but not limited to: **Following directives from supervisors, overall communication, team attitude and accountability, and adhering to MPI policies.**

Jeremy, you have positive qualities that you bring to our team. You are hardworking and bring strong energy to your role each day. However, we must see immediate and sustainable improvement from you in all the areas outlined below. The success of the business relies on every associate reviewing and executing all aspects of the role, and you are expected to drive that process. You have been provided with an outline of the daily, weekly, and monthly responsibilities that need to be met in order to improve your performance. These objectives must be implemented within the next 90 days and adhered to consistently moving forward:

- **Following directives from supervisors**
  - o Application count and monthly quota consistently met.
    - ▪ Monthly goal for <u>new business</u> to be met each month. ($6,956.70)
    - ▪ MID Count matching lead source expectations set forth in Agent Goals & Marketing Budget tab of <u>Quota</u>. (5)
    - ▪ This will be based on the performance of February, March and April 2023 Quota.
  - o Selling POS in line with company strategy.
    - ▪ Required ride a long day with the POS specialist once a month.
      - ● Employee must schedule appointments or demos for him and the POS Sales Specialist.
      - ● Any time not filled with appointments or demos will turn into "drop ins" on prospects and/or existing merchants.
      - ● Time in the field required is from 9 AM to 3 PM.
      - ● Each ride a long day needs to be scheduled with the POS Sales specialist for the next 3 months. It must be scheduled with the POS Specialist no later than 2/3/2023.
  - o Professional and consistent communication with bank branches
    - ▪ Updating the BOD Bank Tracker real time as the employee engages with branches to manage the relationship (not just to speak about a particular lead).
    - ▪ The BOD Bank Tracker is to be updated as each engagement occurs and all branches must have successful communication by the last day of each month.
      - ● Successful communication is defined as via telephone or in person
      - ● At least one successful communication is required each month.
    - ▪ Share the 2023 BOD Bank Tracker by 1/30/2023.

- o Completes tasks or directives given by CEO or CRO by the deadline established by leadership.
  - Leads provided by leadership need to be actively worked and followed up on weekly.
- o MBA Attendance and onboarding new bank partners (Bank Partnerships Role)
  - Updating lead sourcing associated with the MBA membership.
    - All MBA Group leads need to be updated in 30 day cycles.
    - All MBA group leads need to have an update in them for January by no later than 2/3/2023.
  - Formal presentation of bank partner program completed by no later than 2/10/2023.
    - Presentation must outline a plan of attendance for each MBA event.
    - A pipeline of potential banks to close in 2023-2024.
    - Information about each bank needs to be part of the presentation (i.e. asset size, footprint).
    - A monthly update to this presentation will be required as an update to CRO and CEO on progress in working this lead sourcing.
    - The employee is responsible for scheduling the 45 minute meeting with the CRO and CEO each month to provide this update.

- **Team attitude and accountability**
  - o Communicates with other staff members in a professional way.
    - No negative reports from other staff about employee's communication with them.
- **Overall Communication**
  - o Working in the Millville office full time when not scheduled to meet with merchants or partners.
    - Working remotely must be approved by management.
  - o Calendar must reflect all MPI business activities for each day during business hours (8AM to 5 PM).
- **Adhering to MPI policies**
  - o Engaging merchants in the book that is managed by the employee or that the employee receives residual income for that is also not linked to another active RM.
    - All merchants must have noted engagements at least twice a year.
      - Engagements are defined as in person or via phone.
      - Emails that were sent and not responded to need to have an additional attempt via phone to communicate with the merchant.
      - The employee must provide proof each month that all of the merchants (as defined above) have been engaged within the last 6 months.
  - o Reviewing residuals monthly to indicate if there are issues with payouts with residuals.
    - Following the agent responsibilities checklist in "MPI Agent Residuals Checklist and Best Practices".
    - By the 5th of each month, the employee must provide written proof that the following items were completed
      - Issues with merchants including but not limited to
        - o Merchants who are not generating revenue or have at least 6 months of negatives if on a flat rate.
        - o Merchants who have $0.00 volume as it indicates that they are not processing which impacts revenue.
      - Add/Deduct (One Time or Recurring) Billing
        - o Are the current items correct?
        - o Are the items being billed against split correctly?

o   Does it match the checklist submitted?

Jeremy, there is a need for substantial improvement in all areas above. With the planned growth of the company and your continued success, the need to follow operating procedures and establish proper communication practices is critical. Your ability to communicate, and to remain focused on details and follow-up will be important to meet your role expectations. Immediate and sustained improvement must be demonstrated within the next ninety (90) days. Failure to show such improvement may result in progressive disciplinary action, up to and including termination of at-will employment.

To support you in this process, we will be scheduling monthly meetings with you to discuss your progress on the above outlined areas and to provide guidance and coaching as needed.  As stated, our wish is for you to succeed in this endeavor, so please do not hesitate to utilize the leadership resources available to you.

A follow-up discussion will be scheduled for the week of May 1st to discuss the outcome of this performance action plan.

Your signature below indicates that you understand the objectives and measurements expected.

Acknowledged By:                                Administered By:

_____                        _____

_____                                _____

Date                                            Date

- *Included attachments: **Performance evaluations, written disciplinary actions, 2023 Quota expectations, MPI Agent residuals Checklist and Best Practices.***

# Exhibit 10



**MERCANTILE PROCESSING INC.**

### Mercantile Processing Inc. (MPI) 1099 Agent Agreement (2023)

**THIS AGREEMENT** dated _3/22/2023_ between **MPI (Mercantile Processing Inc)** and; _Authentic Merchant Solutions_ located at _21379 Treeview Ln Millsboro DE 19966_ (Hereinafter referred to as **IA**) has been entered into between the parties as follows:

**WHEREAS MPI** is in the business of providing certain electronic payment services to the business community including but not limited to the electronic capture of transactions utilizing VISA U.S.A., Inc. (hereinafter referred to as VISA), MasterCard International, Inc. (hereinafter referred to as MasterCard), Discover Card, and American Express (including any other credit card or debit card company, collectively referred to herein as "Credit/Debit Card Companies"); the sale of electronic draft capture equipment; and the marketing on behalf of several financial institutions;

**WHEREAS MPI** is desirous of allowing the independent marketing of its services under a basis limited as specified herein;

**WHEREAS** the **IA** is an independent sales organization willing to market the services and equipment of **MPI** within the limitations specified herein; and

**WHEREAS** the parties intend to revoke all previous agreements between the parties unless specifically incorporated herein;

**NOW THEREFORE**, to evidence the aforementioned intent of the parties and in consideration of the foregoing premises, and of the mutual covenants and conditions hereinafter set forth, the parties hereto intending to be legally bound agree as follows:

1. **Definitions.**

    1-1 Except as provided below; for purposes of interpretation of this agreement the following terms shall be construed as follows:

    A. "Associated Sales Personnel" shall include any and all employees, independent contractors, agents or any other person who acts for or on behalf of the **IA**, or is controlled to any extent whatsoever by the **IA** in the solicitation of merchant applications to be submitted to **MPI** or in any other marketing activity undertaken on behalf of **MPI**.

IA Initials _____                MPI Initials _____



### Mercantile Processing Inc. (MPI) 1099 Agent Agreement (2023)

B. **MPI** shall include the corporation and its successors, assigns, subsidiaries and affiliates.

C. "Cause" shall mean to be in default or material breach of any term of the agreement.

D. "The **IA"** is the above named entity which may be a corporation, partnership, sole proprietorship doing business under an assumed name, an individual or any other entity.

E. "Merchant Client Accounts" are those accounts, which originate from merchant clients solicited by the **IA** and placed through **MPI**.

F. "Good Standing" shall mean to not be in breach or default of any or all of the terms of this agreement.

G-1 The term "Trade Secrets" shall mean the whole or any portion or phrase of any scientific or technical information, design, process, procedure, formula, or improvement that is valuable and not generally known to competitors of **MPI**. Trade Secrets shall include, without limitation, the specialized information and technology **MPI** may develop or acquire with respect to computer software programs, including without limitations all computer programs, source code, object code, listings, print-outs, flow charts, written algorithms, research materials, programming notes, programming aids, data specifications, test results and related documentation (all of the foregoing hereinafter referred to as "software products").

G-2 The term "Confidential Information" shall mean any data or information, other than Trade Secrets, that is important to **MPI**, and not generally known by the public. To the extent consistent with the foregoing definition, Confidential Information includes without limitation the following: (1) the sales records, profit and performance reports, pricing manuals, sales manuals, training manuals, selling and pricing procedures and financing methods of **MPI;** (2) strategic data, including marketing and development plans, forecasts and forecast assumptions and volumes, and future plans and potential strategies of **MPI;** and (3) customer data, including customer lists, names of customers and their representatives, data provided by or about prospective, existing or past customers, customer service materials, and the type, quantity and specifications of products purchased, leased or licensed by customers of **MPI**.

G-3 Notwithstanding the definitions set forth above, "Trade Secrets" and Confidential Information does not include: (1) that which is or becomes generally known to the public; (2) that which is already known or is developed after termination by the **IA** or Associated Sales Personnel through entirely independent efforts; (3)

IA Initials _____        MPI Initials _____

Mercantile Processing Inc. | 302-524-8000 | partnersupport@mpiprocessing.com



### Mercantile Processing Inc. (MPI) 1099 Agent Agreement (2023)

that which the **IA** or Associated Sales Personnel obtains through an entirely independent source having a bona fide right to use and disclose such information; (4) that which is required to be disclosed by law, except to the extent eligible for special treatment under an appropriate protective order; or (5) that which is approved by the company for unrestricted release by express authorization.

### 2. Terms **and Renewal.**

2-1  The term of this Agreement shall be two (2) years. This Agreement shall be renewed upon the expiration of the term hereof for successive one (1) year periods, unless notice of a termination is given (i) by **IA** or **MPI** within (30) days of the expiration of the initial, or any renewal term or (ii) pursuant to Sections 2.2.

2-2 **MPI** may immediately terminate this agreement at any time by giving written notice to the IA for any one of the following reasons:

A. Fraud, or misrepresentation by the **IA** or Associated Sales Personnel to **MPI** clients, potential clients, merchants or any other related parties either prior to the execution of this agreement to induce its execution, or during its term, including attempts to induce **MPI** to execute or continue performance of merchant agreements whether or not in collusion with merchant clients by making false representations.

B. Non-compliance by the **IA** or Associated Sales Personnel with applicable Credit/Debit Card Company bylaws, rules and regulations, state or federal laws and regulations.

C. Impossibility or impracticability of performance by **MPI** due to changes: in Credit/Debit Card Company bylaws, rules and regulations; in bylaws, rules and regulations of any other provider of services to **MPI;** or in federal, state or local laws, regulations, or ordinances which this agreement cannot reasonably be modified to accommodate.

D. The violation, omission, or breach by the IA or Associated Sales Personnel of any provision, duty, or obligation required of it under this agreement.

E. The **IA** makes any attempt to convert any Merchant Client Account relationship from **MPI** to any other entity performing services similar to **MPI**.

F. **MPI** may, within 10 days written notice, terminate this agreement if **MPI,** in its sole and exclusive judgment, determines that its business reputation is negatively affected by the quality of services rendered by

IA Initials _____          MPI Initials _____

Mercantile Processing Inc. | 302-524-8000 | partnersupport@mpiprocessing.com



the **IA**.

G. The **IA** fails to present itself to the marketplace as **MPI** when soliciting **MPI** Merchant Client Accounts.

## 3. Consideration.

3-1 The IA acknowledges that each term of this agreement constitutes adequate consideration for all other terms.

## 4. Force Majeure.

4-1 The performance of **MPI** hereunder is subject to interruption and delay due to causes beyond its control such as acts of God, acts of any government, war or other hostility, civil disorder, weather, fire, power failure, equipment failure, labor dispute, and like causes. Said interruption or delay shall not be deemed to be a breach hereunder.

## 5. Duties and Responsibilities of IA.

5-1 The **IA** shall use its best efforts to solicit merchant client applications and agreements for the credit card transaction processing services of **MPI** and the sale or lease of the related equipment to merchant clients. The **IA** shall assist in the execution and distribution by the merchant client of the appropriate merchant agreement and any modifications thereof. Upon completion of these requirements, the merchant client shall become a Merchant Client Account.

5-2 The **IA** shall be responsible for the initial setup of the equipment used in providing the processing services for Merchant Client Accounts, including but not limited to the installation of the equipment, the initial training of merchant and merchant personnel, and the delivery of operating and training manuals to the merchant.

5-3 The IA shall at **IA's** expense recruit, hire, train, and supervise a staff of sales and customer service representatives to solicit and service the merchant applications in compliance with requirements of **MPI** and its financial institution for establishing new Merchant Client Accounts.

5-4 The **IA** shall be responsible for the collection and disbursement of all applicable sales tax due upon

IA Initials _____          MPI Initials _____



## MERCANTILE PROCESSING INC.

**Mercantile Processing Inc. (MPI) 1099 Agent Agreement (2023)**

the sale of equipment to any Merchant Client Accounts and any and all reporting requirements thereof.

5-5 The **IA** and **MPI** shall communicate to all Merchant Client Accounts any and all necessary information including but not limited to changes in pricing and service from **MPI**, its financial institutions, or network providers.

5-6 The **IA** shall ensure that its Associated Sales Personnel are properly trained and supervised so as to act at all times in a professional manner while marketing the services and products of **MPI**.

5-7 The **IA** shall properly adhere to any and all government regulations including but not limited to reporting of any and all appropriate tax, the acquisition of any and all documents of employment insurance including but not limited to workers compensation, unemployment insurance, and state disability insurance.

5-8 The **IA** shall, throughout the term of this agreement, obtain and maintain at its own cost and expense from a qualified insurance company, a comprehensive commercial general liability insurance policy naming **MPI** as an additional insured.

5-9 The **IA** shall ensure that its Associated Sales Personnel have been subject to review for exclusion by **MPI**, both prior to and during their employment or association with the **IA,** from the marketing of MPI services or products for reasons including but not limited to felony convictions, discharge from previous employment for cause, or any other indication of moral turpitude which would render the Associated Sales Personnel to be an unacceptable representative of **MPI** and the **IA**.

5-10 The IA shall be responsible for the initial customer contact concerning maintenance and service (if so contacted by the merchant), the ongoing servicing and replacement of the Merchant Client Accounts' equipment and software, and shall, upon request by **MPI**, act as lialAn between **MPI** and the Merchant Client Accounts in handling equipment maintenance and servicing.

5-11 The **IA** shall submit a resale Tax ID number as well as any tax exempt certificate/resale certificate, etc. required by their respective state of business.

5-12 The IA must have prior written approval before any reproduction of any and all marketing materials including but not limited to any and all of the corporate identities or logos of **MPI,** its processors, and Credit/Debit Card Companies.

IA Initials _____          MPI Initials _____

Mercantile Processing Inc. | 302-524-8000 | partnersupport@mpiprocessing.com



**Mercantile Processing Inc. (MPI) 1099 Agent Agreement (2023)**

5-13 The **IA** shall provide MPI with a written list of all proposed associated personnel and current Associated Sales Personnel, their social security numbers and the addresses and telephone numbers of the principal office of itself and all Associated Sales Personnel regardless of whether said sales personnel are employees of the IA or independent contractors providing services to the IA. Furthermore the IA shall provide MPI with any other information which is reasonably necessary for the performance of this agreement or compliance with Credit/Debit Card Company bylaws, rules ands regulations, upon request and within a reasonable time thereof.

5-14 The **IA** shall permit **MPI** to check the credit of the **IA** and/or any of its Associated Sales Personnel and shall execute any all documents, consents or authorizations necessary to facilitate the performance of said credit check.

5-15 **IA** represents that it does not have a contractual relationship for the placement of credit card transaction processing services or for the sale or lease of equipment related to said services with any entity providing services similar to those to be performed by **MPI** under the terms of this Agreement which would bar **IA** from entering into this Agreement.

5-16 The **IA** shall be responsible for notifying in writing to MPI any and all residual discrepancies or errors in residual reporting within 60 days of original receipt of such residual report identifying such discrepancy or error. **MPI** will not be responsible to **IA** for any discrepancies or errors in residual reporting which have not been notified to **MPI** and which exceed the 60 day notification period.

6. Duties **and Responsibilities** of MPI.

6-1 **MPI** shall sell equipment, software, supplies and Merchant Client Account leasing services to IA at contract stipulated prices. IA may use alternate suppliers of equipment, software, leasing and supplies at the discretion of the IA.

6-2 **MPI** shall provide pricing of its electronic processing services to **IA**, as specified in your Pricing Addendum Schedule and any addenda thereto, which is annexed hereto and made a part hereof.

6-3 **MPI** shall provide the following to **IA**, including but not limited to, merchant application forms, promotional material, certain technical support and training for its personnel, monthly residual reporting including monthly transactional volume, average ticket information, the discount rate charged, and the

IA Initials _____

MPI Initials _____

Mercantile Processing Inc. | 302-524-8000 | partnersupport@mpiprocessing.com



### Mercantile Processing Inc. (MPI) 1099 Agent Agreement (2023)

commission earned, by the **IA**, certain on line electronic mail reporting, customer service and support, equipment maintenance, new and innovative value added products and services, merchant status reporting, fully integrated payment capabilities, and electronic ACH products.

## 7. Compensation/Base Commission of **IA**.

7-1 The **IA** shall be entitled to retain fees collected by it in excess of the pricing it obtains from **MPI** for on site inspection, equipment setup, and merchant client applications fees. Pricing may be amended or modified from time to time within the discretion of **MPI** and its financial institutions, and the **IA** shall be bound by such change upon written notice by **MPI**.

7-2 The IA may be entitled to a monthly residual base commission above the price it obtains from **MPI** for the credit card processing of Merchant Client Accounts. This **IA** residual base commission shall be calculated by subtracting the buy rate price the **IA** obtains from **MPI** from the price received from the Merchant Client Accounts multiplied by the monthly Merchant Client Accounts monthly credit card processing volume. The buy rate price **IA** obtains from **MPI** may be amended from time to time within the discretion of **MPI** and its financial institution, and the IA shall be bound by such change upon written notice by **MPI**.

7-3 Residual base commissions shall be payable by **MPI** to the IA approximately one month after the commissions are earned, subject to **MPI's** right to setoff any amount owed to it by the **IA.**

7-4 The **IA** acknowledges that **MPI** may be subject to price changes in its clearing, settlement, interchange and communication transactions that are beyond its control. MPI shall use its best efforts to provide written explanation of any price change to the extent that such price change is the result of changes in the direct costs of **MPI's** processing services. **IA** shall be bound by such change upon written notice by **MPI**

## 8. Ongoing Commissions to IA.

8-1 Upon the expiration of this agreement, if the **IA** is in Good Standing, the **IA** shall be entitled to ongoing commissions from the processing of Merchant Client Account transactions subject to paragraph **8-3.**

8-2 If **IA** defaults in the performance of any of the terms or conditions of this agreement or materially breaches this agreement and said default or breach continues uncured for a period of thirty (30) days from the date **MPI** gives notice to the IA in the manner set forth below of said default or breach, this agreement shall

IA Initials _____     MPI Initials _____



**MERCANTILE PROCESSING INC.**

**Mercantile Processing Inc. (MPI) 1099 Agent Agreement (2023)**

automatically terminate, the IA shall forfeit any right to any payment hereunder and **MPI** shall be entitled to all rights, privileges, and interest of IA in Merchant Client Accounts, without further notice to **IA. MPI** in addition shall be entitled to protect and enforce all of its rights, remedies and interest hereunder to the fullest extent permissible at law and in equity.

8-3 Upon the expiration of this agreement, IA agrees and acknowledges that if IA's compensation for any monthly period is less than $200.00 and/or new merchant account have not been submitted, by **IA,** for two consecutive years, **IA** relinquishes any and all right to payment or to the carryover to future periods of such amounts.

## 9. Merchant Client Applications.

9-1 The **IA** agrees to submit all merchant client applications as provided herein. The **IA** shall use the merchant application forms and merchant agreement forms, which **MPI** shall provide from time to time and shall not modify or alter such forms in any way without the express written permission of the president of **MPI**. The parties agree that any application may within the sole discretion of **MPI** be denied for any reason whatsoever. All agreements with Merchant Client Accounts for processing services shall be between the Merchant Client Account and **MPI** its successors or assigns and **MPI's** settling bank. Any failure on the part of the **IA** to perform any or all of the terms and conditions set forth in this Section 9-1 shall constitute a material breach of this agreement.

## 10. Confidential Information and Trade Secrets.

10-1 The **IA** acknowledges that during the performance of this agreement, it may acquire Trade Secrets and Confidential Information of **MPI** and its affiliates, and further that the disclosure of said Trade Secrets and Confidential Information to competitors of **MPI** or the public would be damaging to **MPI** its affiliates, successors, and assigns.

10-2 The **IA** shall not at any time during or after the termination of this agreement disclose to any third party any Trade Secrets or Confidential Information it obtained as a result of this agreement.

10-3 All sales manuals, customer lists, software and other media including trademarks provided to the **IA** by **MPI** shall at all times remain the property of **MPI**. Upon termination or expiration of this agreement, the **IA** shall immediately return all sales manuals, price lists, customer lists, mailing lists, and any and all other

IA Initials _____          MPI Initials _____



## MERCANTILE PROCESSING INC.

**Mercantile Processing Inc. (MPI) 1099 Agent Agreement (2023)**

documents, materials, and media however recorded. The **IA** shall ensure that said proprietary items are properly protected from disclosure, damage, or theft.

### 11. Disclaimer of Warranties.

11-1 The parties acknowledge that **MPI** is not the manufacturer of any equipment provided to the IA for sale or lease. Unless otherwise expressly contained in an extended warranty or maintenance agreement provided by **MPI**, all equipment of any kind is sold "as is", there are no warranties which extend beyond the face of this agreement, and **MPI** expressly disclaims all warranties, express or implied, of any kind including warranties of merchantability and fitness for a particular purpose.

### 12. Covenant not to Compete.

12-1 The **IA** acknowledges that during the performance of this agreement, it will acquire information and contacts which are valuable to **MPI**. The **IA** further acknowledges that it is necessary to protect the interest of **MPI** and its merchant base by entering into the following covenant not to compete, as provided herein.

12-2 The **IA** covenants, represents, acknowledges and agrees that for a period of five (5) years following the termination of this agreement, neither the **IA**, its successors or assigns, any individual owning an equity interest in the **IA** nor its Associated Sales Personnel, either, individually or through any other entity for which he, she, or it works or from which he, she, or it would receive financial remuneration for the placement of Merchant Client Accounts, will not solicit merchant applications anywhere in the United States of America from Merchant Client Accounts. Agent will have 60 days of training during which Agent will have option to opt out of regional non-compete. Regardless of the result the remainder of contract will stay in effect to its term.

12-3 The **IA** acknowledges, agrees and understands that any violation of Section 10, 12-1, or 12-2 herein above shall cause **MPI** immediate and irreparable harm for which there is no adequate remedy at law. **IA** further acknowledges, agrees and understands that in the event **IA** or any of its Associated Sales Personnel breaches any of these covenants, notwithstanding any other remedy at law or equity, **MPI** may protect its right of property and good will by seeking injunctive relief and related damages as well as capturing all residuals that **IA** would otherwise be entitled to.

IA Initials _____

MPI Initials _____



### MERCANTILE PROCESSING INC.

**Mercantile Processing Inc. (MPI) 1099 Agent Agreement (2023)**

## 13. Transfer of Merchant Client Accounts.

13-1 The parties agree that their relationship is based upon the unique capabilities of the **IA** and its Associated Sales Personnel and therefore the **IA** may not transfer or assign any right, duty, obligation, or interest in Merchant Client Accounts without the written consent of **MPI** which shall not be unreasonably withheld.

13-2 The **IA** shall have the right to solicit offers for the sale of its interest in Merchant Client Accounts. Upon receipt of a written offer to purchase all or a portion of the Merchant Client Accounts ("Written Offer"), **MPI** shall have forty-five (45) days from notice thereof to match the terms and conditions of the Written Offer, by giving notice to the **IA** within the aforementioned forty-five (45) day period. In the event **MPI** does not match the Written Offer, the **IA** may sell the Merchant Client Accounts to the entity making the Written Offer under the same terms and conditions as the Written Offer.

13-3 **MPI** may sell Merchant Client Accounts without the consent of **IA**. If the sale's price for the Merchant Client Accounts is predicated on a multiple of monthly commissions received by **MPI** and at the option of **IA**, **IA** chooses to participate in said sale with **MPI** for its share of Merchant Client Accounts in which said sale terminates the interest of **IA** in the Merchant Client Accounts, the sale's price payable to **IA** from **MPI** for **IA's** interest in said Merchant Client Accounts shall be determined by the same multiple of monthly commissions that **MPI** received for said Merchant Client Accounts. Payment of the sale's price to the **IA** shall be under the same terms and conditions as agreed to by **MPI**.

13-4 If the sale of the Merchant Client Accounts by **MPI** does not terminate the interest of the **IA** in the Merchant Client Accounts, or the sale's price is not based on a multiple of earnings, the **IA** shall have the option of continuing the relationship with the purchaser of the Merchant Client Accounts or forcing said purchaser to pay a one-time fee to **IA** for its interest in the Merchant Client Accounts equal to fifteen (15) times the average monthly commissions earned by the **IA** on the Merchant Client Accounts for the three (3) month period immediately preceding the date of the sale of **MPI's** interest in the Merchant Client Accounts. For purposes of this paragraph, the sale or transfer of Merchant Client Accounts to the spouse, or the lineal descendants or ascendants of a stockholder of **MPI**, or an entity in which a stockholder or **MPI** has an equitable or beneficial interest shall not entitle **IA** to any payment hereunder.

13-5Payment under this Article "13" shall release and discharge **MPI** from any further payment under

IA Initials _____

MPI Initials _____



**MERCANTILE PROCESSING INC.**

Mercantile Processing Inc. (MPI) 1099 Agent Agreement (2023)

any other paragraph of this agreement.

**14. Jurisdiction and Venue of Disputes.**

14-1 The parties agree that with respect to any dispute concerning this agreement, the state or federal court in Delaware shall have exclusive subject matter jurisdiction.

**15. Non-Waiver of Rights and Obligations.**

15-1 Failure on the part of **MPI** to exercise any right or privilege granted to it or to insist upon the full performance of any obligation assumed by the **IA** shall not be construed as waiving any such right, privilege, obligation, or duty, or as creating any custom contrary thereto. Any waiver of any right, privilege, obligation, or duty by **MPI** must be in writing, and if not in writing shall not be binding in any way and the written waiver of any right, obligation, or duty by **MPI** shall not operate beyond its terms. Any modification to this agreement must be in writing, and this provision may not be modified except in writing.

**16. Governing Law.**

16-1 The parties agree that except insofar as federal law may preempt, the laws of the State of Delaware shall govern this agreement.

**17. Further Assurances and Survival of Covenants.**

17-1 The IA shall execute all additional instruments and other documents, perform all additional acts and cooperate with **MPI** in every other way, which may be requested by **MPI** to carry out this agreement or the intent hereof.

17-2 All covenants of the **IA** shall survive the expiration or termination of this agreement to the extent required for their full observance and performance.

**18. Severance/Savings Clause.**

18-1 Any provision of this agreement held to be void, invalid, or unenforceable in any way shall be deemed to be severed, and the remainder of this agreement shall remain in full force and effect as if the severed portion had never been included.

IA Initials _____   MPI Initials _____

Mercantile Processing Inc. | 302-524-8000 | partnersupport@mpiprocessing.com



**MERCANTILE PROCESSING INC.**

### Mercantile Processing Inc. (MPI) 1099 Agent Agreement (2023)

19. Merger **and Modification**.

19-1 This agreement shall supersede and replace any and every existing contract and agreement between the **IA** and **MPI**, which is not specifically incorporated herein.

**20.** Written **Notice.**

20-1 All notices required by this agreement are to be in writing and shall be deemed to have been properly given, in the absence of rebutting evidence, upon the placing for delivery by certified mail, return receipt requested to the address below within the time period required by this agreement. Notice by facsimile machine must be memorialized by certified mail as provided herein:

MPI address:

> **Mercantile Processing Inc**
>
> 32695 Roxana Rd.
>
> Millville, DE 19967

IA address:     *Authentic Merchant Solutions*

*21379 Treeview Ln*

*Millsboro DE 19966*

**21.** Title **and Headings.**

21-1 The title and headings in this agreement exist solely for the convenience of the reader and do not limit the subject matter or effect of any term hereof.

**22. Indemnity for Actions/Omissions.**

22-1 The IA, its successors and/or assigns agrees to defend, indemnify, and hold harmless **MPI** its successors and/or assigns, its directors, officers, employees, its settling bank, its leasing companies and its

IA Initials _____     MPI Initials _____



### MERCANTILE PROCESSING INC.

**Mercantile Processing Inc. (MPI) 1099 Agent Agreement (2023)**

shareholders (all of whom are hereinafter referred to as "Indemnities") from, for, and against any and all liability, loss, and expense (including reasonable attorney fees) whether or not presently known, discovered or contemplated and regardless of when discovered by anyone, which any Indemnity has incurred or may incur at any time during the performance of this agreement or thereafter which either wholly or partly arises as a result of any actual or alleged act, omission, transaction, or occurrence of the **IA**, its successors and/or assigns, its Associated Sales Personnel, its directors, officers, employees and subcontractors regardless of whether the **IA** is ultimately absolved of any liability.

### 23. Setoff.

23-1 **MPI** may at any time without notice apply any commissions or other credit balance owed to the **IA** by **MPI** to reduce any past due amounts of any kind whatsoever.

### 24. Limitations of Claims and Damages.

24-1 Any claim by IA which arises out of this agreement, or the performance thereof must be brought against **MPI** within one year after the basis for the claim becomes known to **IA**.

24-2 **MPI** shall not be liable to the IA for any consequential damages caused by its failure to perform under this agreement including, but not limited to, lost profits or damage to goodwill regardless of whether the claim arises in contract or in tort.

### 25. Construction.

25-1 Whenever the context so requires, the male gender when used herein shall be deemed to include the female gender, the female gender shall be deemed to include the male gender, the singular shall be deemed to include the plural and the plural shall be deemed to include the singular.

### 26. Representation by Counsel.

26-1 Each party has had the opportunity to have this agreement reviewed by counsel of his choosing prior to signing, and represents that he has reviewed this agreement with counsel, or hereby knowingly waives the right to have counsel review this agreement.

IA Initials _____

MPI Initials _____

Mercantile Processing Inc. | 302-524-8000 | partnersupport@mpiprocessing.com



**MERCANTILE PROCESSING INC.**

### Mercantile Processing Inc. (MPI) 1099 Agent Agreement (2023)

**IN WITNESS WHEREOF, the parties hereto enter into this agreement this 11th day of February, 2023.**

**IA Business Name:** Authentic Merchant Solutions

**Name of Owner:** Jeremy Brown

**Signature of Owner:** Jeremy J Brown

**Title:** Member

**Owner SS#:** 234- 35- 6671

**Federal Tax ID:** _____

**Address:** 21379 Treeview Ln  Millsboro DE 19966

**Tel. #:** 302- 858- 7141

**Email:** JBrown @ Authentic merchantsolutions.com

**Fax #:** N/A

---

***MPI Staff Use Only***

**Accepted By:** _____

**Title:** _____

**Printed Name:** Kyle Morgan

IA Initials _____

MPI Initials _____

Mercantile Processing Inc. | 302-524-8000 | partnersupport@mpiprocessing.com

# TAB 4

EFiled:  Aug 21 2023 05:10PM EDT
Transaction ID 70683025
Case No. 2023-0859-

# Exhibit 11



Jeremy Brown <jbrown@authenticmerchantsolutions.com>

## Tomorrow's Meeting
13 messages

---

**Jeremy Brown** <jbrown@authenticmerchantsolutions.com>                    Mon, Mar 20, 2023 at 10:01 AM
To: Kyle Morgan <kmorgan@mpiprocessing.com>
Cc: Benjamin Gray <bgray@mpiprocessing.com>, Kathryn McMillan <kmcmillan@mpiprocessing.com>

Good Morning Kyle,

I have a board meeting in the morning from 8-10am. I wanted to let you know I am available from 11:00 to 4:00 to finalize our discussions.

Please let me know your availability.



**JEREMY BROWN**
Owner/Member

📞 302-858-7141
✉ jbrown@authenticmerchantsolutions.com
21379 treeview lane Millsboro De 19966

---

**Kyle Morgan** <kmorgan@mpiprocessing.com>                    Mon, Mar 20, 2023 at 2:47 PM
To: Jeremy Brown <jbrown@authenticmerchantsolutions.com>
Cc: Benjamin Gray <bgray@mpiprocessing.com>, Kathryn McMillan <kmcmillan@mpiprocessing.com>

Jeremy -

        I have had time to review and think through next steps and the relationship that will continue for you and MPI. In reviewing the implied intent of the negotiation and other historical items I have decided it would be best if we did not pursue making you an independent sales rep. We would treat our relationship as we do all current past employees. You will receive residuals and can continue to help service and retain the accounts that are personally assigned to you, but we do not want you in the market representing yourself with the ability to sell within the industry. We would like you to honor the employment agreement and honor your non compete, non solicit and non disclosures. I understand that this is a change from the original plan, but I feel that the transition to and supporting you as a 1099 agent will not be in the best interest of our organization.  We do want to get you paid for your February residuals as soon as possible. To make that happen we need a fresh signature for your entity on the IA agreement that you signed when you first started. This makes it clear we are both honoring all original obligations when you started your employment. No redlines by either party. By executing this agreement you understand and agree to honor your non compete, non solicit and non disclosures.
        Just to be clear on these sections. Non compete means you will not represent yourself in the market as a merchant services company or provider to any non-existing clients. You will not work for a competing entity  selling merchant services or similar products. Non solicit; You will not solicit MPI clients you were assigned to for any products or services. Non disclosure; you will not talk to any current employees, former employees, partners, organizations, or the public about any of these agreements, buyouts, or confidential information learned while working at MPI. Any violation of these sections would have financial implications on your residuals.

---

I am Flying for another 2 hours then I will be traveling home. I can make some time to talk about this tomorrow. Please advise if you are continuing to retain representation as they would need to be on the call.

Best Regards,
Kyle Morgan
CEO and Head of Product
Office: 877-508-2831 ext 100
kmorgan@mpiprocessing.com

**2022 Winner Better Business of Delaware Torch Award For Ethics**



**MPI | More Than Payments**

Did you know that MPI offers more than just an outstanding payments experience?

Our robust suite of business services can help you save time and save money!

Payroll | Gift Cards | Paper Program | POS | Mobile Payments

Shop online or ask our team about special bundles for your business!

877-508-2831, Option 2 | sales@mpiprocessing.com

Need help filing a claim for the Visa & MasterCard settlement? We can help!

https://www.mpiprocessing.com/settle/



*This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the system manager. This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.*

[Quoted text hidden]

---

**Jeremy Brown** <jbrown@authenticmerchantsolutions.com>                    Mon, Mar 20, 2023 at 4:17 PM
To: Chris Dryden <cdryden@attorneygl.com>

Hey man.

Just received this email. It looks like he wants me to sign a new agreement to make my residuals.

[Quoted text hidden]
--



**JEREMY BROWN**
Owner/Member

302-858-7141
jbrown@authenticmerchantsolutions.com
21379 treeview lane Millsboro De 19966

---

**Chris Dryden** <cdryden@attorneygl.com>                    Mon, Mar 20, 2023 at 4:22 PM
To: Jeremy Brown <jbrown@authenticmerchantsolutions.com>

He owes you for January not just February. Also, if you sign this agreement, he believes it will resurrect your non-compete and non-solicit obligations. If you do decide to sign, I would tell him that you are doing so under duress to get paid what you are owed. You are not required to sign a new agreement to get paid under the old agreement. That is horseshit and you can quote me.


Christopher R. Dryden, Esq.




322 Encinitas Blvd., Ste 200

Encinitas, CA 92024

Main Line: 888-846-8901

Direct Line: 858-500-3632

Cell: 858-337-2881


This is an email from Global Legal Resources, LLP, doing business as Global Legal Law Firm. This email and any attachments hereto may contain information that is confidential and/or protected by the attorney-client privilege and attorney work product doctrine. This email is not intended for transmission to, or receipt by, any unauthorized persons. Inadvertent disclosure of the contents of this email or its attachments to unintended recipients is not intended to and does not constitute a waiver of attorney-client privilege or attorney work product protections. If you have received this email in error, immediately notify the sender of the erroneous receipt and destroy this email, any attachments, and all copies of same, either electronic or printed. Any disclosure, copying, distribution, or use of the contents or information received in error is strictly prohibited.

[Quoted text hidden]

---

**Jeremy Brown** <jbrown@authenticmerchantsolutions.com>                    Mon, Mar 20, 2023 at 5:30 PM
To: Chris Dryden <cdryden@attorneygl.com>

Give me a ring when you get a second. I have 3 quick questions.



[Quoted text hidden]

---

**Jeremy Brown** <jbrown@authenticmerchantsolutions.com>                    Tue, Mar 21, 2023 at 8:45 AM
To: Kyle Morgan <kmorgan@mpiprocessing.com>
Cc: Kathryn McMillan <kmcmillan@mpiprocessing.com>, Benjamin Gray <bgray@mpiprocessing.com>

Good Morning Kyle,

Please forgive the delay but your previous email came as a surprise and I needed to sleep on it.

As I have currently gone without pay for over a month (February 15th) this option doesn't leave me a choice given the bill cycle I have set up personally. You have made it clear that I have to sign the original agreement to start and continue receiving my residual income. For the health and well being of myself and my family, that is what I will do.

I'm sorry it has come to this. However, there is one last clarification needed. You stated you want to " get you paid for your February residuals as soon as possible" but, January that is owed as well. Please clarify those payments and provide me with the document.

I will have it signed and returned today!



[Quoted text hidden]

---

**Kyle Morgan** <kmorgan@mpiprocessing.com>                    Tue, Mar 21, 2023 at 9:05 PM
To: Jeremy Brown <jbrown@authenticmerchantsolutions.com>
Cc: Kathryn McMillan <kmcmillan@mpiprocessing.com>, Benjamin Gray <bgray@mpiprocessing.com>

The document was in the 1099 folder, but I have attached it for convenience.

Also attached is your March 1 and Feb 15th pay stubs. These show payment for Jan Residuals and your final paycheck. This matches the reporting. (Actually overpaid your final pay period by mistake after I reviewed this, will leave that alone)

Currently you are owed the money matching the Feb residual reports in IRIS.

I still need you to confirm if you are or are not under representation as he should be included on these emails if you are. Also I need you to confirm you understand the implications of signing and agreeing to the Non Solicit, Nondisclosure and Noncompete which are outlined in both the employment and IA agreements.

Best Regards,
Kyle Morgan
CEO and Head of Product
Office: 877-508-2831 ext 100
kmorgan@mpiprocessing.com

**2022 Winner Better Business of Delaware Torch Award For Ethics**



**MPI | More Than Payments**

Did you know that MPI offers more than just an outstanding payments experience?

Our robust suite of business services can help you save time and save money!

Payroll | Gift Cards | Paper Program | POS | Mobile Payments

Shop online or ask our team about special bundles for your business!

877-508-2831, Option 2 | sales@mpiprocessing.com

Need help filing a claim for the Visa & MasterCard settlement? We can help!

https://www.mpiprocessing.com/settle/



*This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the system manager. This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.*

[Quoted text hidden]

---

**3 attachments**

 **PayStub (75).pdf**
103K

 **PayStub (76).pdf**
103K

📄 **Copy of Independent Agent Agreement - Jeremy Brown 1099 - January 30, 2_54 PM.pdf**
171K

---

**Jeremy Brown** <jbrown@authenticmerchantsolutions.com>                    Wed, Mar 22, 2023 at 8:55 AM
To: Kyle Morgan <kmorgan@mpiprocessing.com>
Cc: Kathryn McMillan <kmcmillan@mpiprocessing.com>, Benjamin Gray <bgray@mpiprocessing.com>
Bcc: Chris Dryden <cdryden@attorneygl.com>

Kyle,

To confirm, with the transition in pay timing February residuals should have been paid on February 28th which I can expect immediately upon signing the IA. March residuals can be expected on the 28th of March.

It's also important to note that the password has been changed on my Surepayroll account for some reason. I will need that to be resolved.

I am handling all communication with my representation accordingly and my signature on the document is all of the confirmation necessary.

Attached is the signed document. Please send me the fully executed document back for my records.



**JEREMY BROWN**
Owner/Member

📞 302-858-7141
✉ jbrown@authenticmerchantsolutions.com
21379 treeview lane Millsboro De 19966

[Quoted text hidden]

📄 **Independent Agent Agreement - New 2023 Signed.pdf**
15492K

---

**Chris Dryden** <cdryden@attorneygl.com>                                    Wed, Mar 22, 2023 at 11:27 AM
To: Jeremy Brown <jbrown@authenticmerchantsolutions.com>

Just an FYI, if he failed to timely pay you W2 wages upon the employment termination he was likely in violation of a Delaware employment law which entitles you to penalties and interest.  It is likely nominal but you should remember because if things go sideways later you want to hit him with an administrative claim with relevant the labor board and in civil court.


Christopher R. Dryden, Esq.



322 Encinitas Blvd., Ste 200

Encinitas, CA 92024

Main Line: 888-846-8901

Direct Line: 858-500-3632

Cell: 858-337-2881


This is an email from Global Legal Resources, LLP, doing business as Global Legal Law Firm. This email and any attachments hereto may contain information that is confidential and/or protected by the attorney-client privilege and attorney work product doctrine. This email is not intended for transmission to, or receipt by, any unauthorized persons. Inadvertent disclosure of the contents of this email or its attachments to unintended recipients is not intended to and does not constitute a waiver of attorney-client privilege or attorney work product protections. If you have received this email in error, immediately notify the sender of the erroneous receipt and destroy this email, any attachments, and all copies of same, either electronic or printed. Any disclosure, copying, distribution, or use of the contents or information received in error is strictly prohibited.

---

**From:** Jeremy Brown <jbrown@authenticmerchantsolutions.com>
**Sent:** Wednesday, March 22, 2023 5:56 AM
**To:** Kyle Morgan <kmorgan@mpiprocessing.com>

**Cc:** Kathryn McMillan <kmcmillan@mpiprocessing.com>; Benjamin Gray <bgray@mpiprocessing.com>
**Subject:** Re: Tomorrow's Meeting

Kyle,

[Quoted text hidden]
[Quoted text hidden]

---

**Kyle Morgan** <kmorgan@mpiprocessing.com>                                    Wed, Mar 22, 2023 at 2:38 PM
To: Jeremy Brown <jbrown@authenticmerchantsolutions.com>
Cc: Kathryn McMillan <kmcmillan@mpiprocessing.com>, Benjamin Gray <bgray@mpiprocessing.com>

Corect. If IA was signed before Feb 28th residuals would have been paid then. With the attached executed agreement we will be paying this out this week to the checking account on file. All future residuals will be paid by the last business day of the month.

Ben please work with Teresa to resolve the surepayroll issue and to update his email in the system so you can have access.

Best Regards,
Kyle Morgan
CEO and Head of Product
Office: 877-508-2831 ext 100
kmorgan@mpiprocessing.com

### 2022 Winner Better Business of Delaware Torch Award For Ethics



### MPI | More Than Payments

Did you know that MPI offers more than just an outstanding payments experience?
Our robust suite of business services can help you save time and save money!

Payroll | Gift Cards | Paper Program | POS | Mobile Payments

Shop online or ask our team about special bundles for your business!
877-508-2831, Option 2 | sales@mpiprocessing.com

Need help filing a claim for the Visa & MasterCard settlement? We can help!
https://www.mpiprocessing.com/settle/



*This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the system manager. This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.*

[Quoted text hidden]

---


**0111_001 (1).pdf**
839K

---

**Benjamin Gray** <bgray@mpiprocessing.com>                    Wed, Mar 22, 2023 at 2:39 PM
To: Kyle Morgan <kmorgan@mpiprocessing.com>
Cc: Jeremy Brown <jbrown@authenticmerchantsolutions.com>, Kathryn McMillan <kmcmillan@mpiprocessing.com>

Jeremy,

I'm working with Teresa directly to get you access ASAP.

Benjamin Gray
Chief Operating Officer
Mercantile Processing Inc.
877-508-2831 ext 133| f. 888-406-6926
2022 Winner, Better Business of Delaware Torch Award For Ethics


MPI | More Than Payments

Did you know that MPI offers more than just an outstanding payments experience?

Our robust suite of business services can help you save time and save money!

Payroll | Gift Cards | Paper Program | POS | Mobile Payments

Shop online or ask our team about special bundles for your business!

877-508-2831, Option 2 | sales@mpiprocessing.com

Need help filing a claim for the Visa & MasterCard settlement? We can help!

https://www.mpiprocessing.com/settle/

This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the system manager. This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.
[Quoted text hidden]

---

**Jeremy Brown** <jbrown@authenticmerchantsolutions.com>                    Wed, Mar 22, 2023 at 2:54 PM
To: Kyle Morgan <kmorgan@mpiprocessing.com>
Cc: Kathryn McMillan <kmcmillan@mpiprocessing.com>, Benjamin Gray <bgray@mpiprocessing.com>

Thanks,

Please use the AMS checking account on the w9 that was provided on my last day. Last 4 of the account # 5442



JEREMY BROWN
Owner/Member

302-858-7141
jbrown@authenticmerchantsolutions.com
21379 treeview lane Millsboro De 19966

[Quoted text hidden]

---

**Jeremy Brown** <jbrown@authenticmerchantsolutions.com>                    Wed, Mar 22, 2023 at 2:54 PM
To: Benjamin Gray <bgray@mpiprocessing.com>
Cc: Kyle Morgan <kmorgan@mpiprocessing.com>, Kathryn McMillan <kmcmillan@mpiprocessing.com>

Thanks Ben



**JEREMY BROWN**
Owner/Member

📞 302-858-7141
✉ jbrown@authenticmerchantsolutions.com
21379 treeview lane Millsboro De 19966

[Quoted text hidden]

# Exhibit 12



**Jeremy Brown <jbrown@authenticmerchantsolutions.com>**

---

# Non Compete Violation
6 messages

---

**Kyle Morgan** <kmorgan@mpiprocessing.com>                                    Wed, May 24, 2023 at 5:08 PM
To: Jeremy Brown <jbrown@authenticmerchantsolutions.com>
Cc: Benjamin Gray <bgray@mpiprocessing.com>

Jeremy -
   I need to review the violation of your non compete (Section 4.2 Head of Bank Partnerships Agreement)  and how it will affect your residuals and relationship to MPI going forward. I am available between 10 and noon on Friday for a call.

Best Regards,



**Kyle Morgan**
CEO

Mercantile Processing Inc
Office: 877-508-2831 ext 100
kmorgan@mpiprocessing.com

 

**Ask us how we can help you save time and money today!**

Our Services | Contact Us | Shop Online

*This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error, please notify the sender immediately by e-mail and delete this e-mail from your system. If you are not the intended recipient, you are hereby notified that disclosing, copying, distributing, or taking any action in reliance on the contents of this information is strictly prohibited.*

---

**Jeremy Brown** <jbrown@authenticmerchantsolutions.com>                        Wed, May 24, 2023 at 5:17 PM
To: Kyle Morgan <kmorgan@mpiprocessing.com>
Cc: Benjamin Gray <bgray@mpiprocessing.com>

I am familiar with section 4.2 and just reviewed it again.

I have not violated the agreement in any way. I am not and have not ever worked for a competing entity at any time. I have not and have no intentions to sell any products related to merchant services. I have in fact turned down offers to do so citing this specific non compete. It seems you may have some false information.



**JEREMY BROWN**
Owner/Member

📞 302-858-7141
✉ jbrown@authenticmerchantsolutions.com
21379 treeview lane Millsboro De 19966

[Quoted text hidden]

---

**Jeremy Brown** <jbrown@authenticmerchantsolutions.com>                        Wed, May 24, 2023 at 5:24 PM
To: Kyle Morgan <kmorgan@mpiprocessing.com>
Cc: Benjamin Gray <bgray@mpiprocessing.com>

Kyle,

Please provide specific details.



**JEREMY BROWN**
Owner/Member

☎ 302-858-7141
✉ jbrown@authenticmerchantsolutions.com
21379 treeview lane Millsboro De 19966

[Quoted text hidden]

---

**Kyle Morgan** <kmorgan@mpiprocessing.com>                    Thu, May 25, 2023 at 6:36 AM
To: Jeremy Brown <jbrown@authenticmerchantsolutions.com>
Cc: Benjamin Gray <bgray@mpiprocessing.com>

You are actively marketing a merchant services company in clear violation of the non compete. I will discuss it with you tomorrow. Are you available at 10?

Best Regards,



**Kyle Morgan**
CEO

Mercantile Processing Inc
Office: 877-508-2831 ext 100
kmorgan@mpiprocessing.com

On Wed, May 24, 2023 at 5:17 PM Jeremy Brown <jbrown@authenticmerchantsolutions.com> wrote:
[Quoted text hidden]
[Quoted text hidden]

---

**Jeremy Brown** <jbrown@authenticmerchantsolutions.com>                    Thu, May 25, 2023 at 9:40 AM
To: Kyle Morgan <kmorgan@mpiprocessing.com>
Cc: Benjamin Gray <bgray@mpiprocessing.com>

Kyle,

I hope you understand that I will not be having any discussions via phone as all things at this point need to be documented. I also want to assure you that I have completely cleared AMS with my legal team to ensure that there are no violations of the non compete.

Authentic Merchant Solutions is not a merchant services company or merchant services provider.

Please review the disclaimer at the bottom of my website in relation to this claim provided in the screenshot below.

www.authenticmerchantsolutions.com



If there is any wording on the site that has led you to believe this is a merchant services company that you would like to recommend I change I am happy to consider it. I also made some updates to the wording on the site already that may help rectify any confusion as to the nature of business AMS is doing.



**JEREMY BROWN**
Owner/Member

📞 302-858-7141
✉️ jbrown@authenticmerchantsolutions.com
21379 treeview lane Millsboro De 19966

[Quoted text hidden]

---

**Kyle Morgan** <kmorgan@mpiprocessing.com>                    Thu, May 25, 2023 at 9:45 AM
To: Jeremy Brown <jbrown@authenticmerchantsolutions.com>
Cc: Benjamin Gray <bgray@mpiprocessing.com>

Any operation of a merchant services company of any type is a violation of non compete. The call is to tell you what to expect out of courtesy. We will be pursuing this and seeking remedies for damages to our brand and partnerships. Now that you have referenced a legal team I need all correspondence about this to come from them.

Best Regards,



**Kyle Morgan**
CEO

Mercantile Processing Inc
Office: 877-508-2831 ext 100
kmorgan@mpiprocessing.com

[Quoted text hidden]

Exhibit 13



Catherine M. Cramer
(302) 327-1100
ccramer@bmbde.com

May 25, 2023

<u>Sent via Email and U.S. Mail</u>
Jeremy Brown
21379 Treeview Lane
Millsboro, DE 19966
*jbrown@authenticmerchantsolutions.com*

RE:    Mercantile Processing, Inc

Dear Mr. Brown:

My firm represents Mercantile Processing, Inc. ("MPI"). It has come to MPI's attention that your company, Authentic Merchant Solutions ("AMS"), is actively marketing the sale of certain products and services that MPI offers. This is in direct violation of a certain document titled "Head of Bank Partnerships Employment Agreement" that you signed on or about October 1, 2018 (the "Agreement"). I have included the Agreement for your reference. This letter hereby directs you and AMS to immediately cease and desist competition with MPI. If you are represented, please provide this letter to your counsel.

You executed the Agreement on or about October 1, 2018. Section 2.1 of the Agreement identifies your compensation. It advises that in addition to a salary, you will be entitled to receive residual commissions on accounts obtained as a sales agent and 15% of net residual commissions from subordinate employees and portfolio banks. It also advises that you may take 50% of direct sales.

The Agreement also contains a series of restrictive covenants. Indeed, it states that you will forfeit your rights to residuals or compensation under the Agreement and be liable to damages incurred by the company if you violate such covenants. Section 4.1, titled "Non Solicitation" prohibits, among of things, your solicitation of company merchants within the United States from merchant accounts of MPI, including bank partnerships of MPI for a period of five (5) years. While AMS's website explicitly states that it cannot do business with any MPI customer, my client is investigating whether AMS has retained MPI clients.

Section 4.2, titled "Non-Compete," states "MPI has a regional advantage" and that you agree "for a term of one year not to work for a competing entity within 100 miles of an MPI Office." As you are aware, MPI's flagship office is located at 32695 Roxana Road, Millville, Delaware 19967. AMS, according to its website, is located in Millsboro, Delaware — approximately 11 miles away. Section 4.2 does not limit the type of services and products subject to the non-compete covenant.

AMS's website articulates its step-by-step process to the services it offers:

Baird Mandalas Brockstedt, LLC
Page 2

First, AMS reviews a merchant's statement and point of sale ("POS") contract to determine if hidden fees are charged to a merchant, or if the POS provider is inflating rates. Second, AMS negotiates with the POS provider (or gives guidance with the merchant regarding the negotiation process) to reduce the merchant's rates and eliminate certain fees. Finally, AMS audits the merchant's bills and statements to identify future rate increases or new charges related to unnecessary fees.

The website goes on to state:

> We specialize in the analysis and tracking of credit card processing and point of sale solutions, ensuring that our clients have the most reliable and efficient payment processing systems in place for their respective industry.
> AMS understands the challenges that businesses face in the merchant services industry, and we work closely with our clients to identify their unique needs and goals. By providing guidance with their existing merchant services relationships, we help our clients improve their cash flow, reduce costs, and increase profitability.

A major component of MPI's business is the sale and servicing of POS systems. It should come as no surprise that MPI actively engages in the same process, in addition to others, for the merchants it serves. This is clear competition.

On May 16, 2023, you shared a link to AMS's website on Facebook. Ironically, your Facebook page identified you as the Bank Relationship Manager for MPI. On May 22, 2023, the Greater Millsboro Chamber of Commerce published an advertisement for AMS. That advertisement similarly articulated AMS's services to merchants. There are several other posts on social media that confirm your involvement and ownership of AMS.

Pursuant to Section 4 of the Agreement, MPI will immediately cease payment of any residuals owed to you under the Agreement until you come back into compliance with your obligations. MPI is evaluating other agreements it has with you to assess whether you are in violation of any other duty you agreed to perform and will make an appropriate decision as to those agreements. Failure to come into compliance with your obligations under the Agreement may result in MPI taking additional action to enforce its rights and seek redress before a court of law or equity.

Very truly yours,

Catherine M. Cramer

Exhibit 14



**Christopher R. Dryden, Esq.**
cdryden@attorneygl.com
**James C. Huber, Esq.**
jhuber@attorneygl.com

May 31, 2023

**<u>Via Email Only (ccramer@bmbde.com)</u>**
Catherine M. Cramer. Esq.
2711 Centerville Road, Suite #401
Wilmington, DE 19808

>       RE:     <u>Jeremy Brown and Authentic Merchant Solutions; Response to Claim of Breach of</u>
>               <u>Non-Compete and Demand to Restart Residual Payments</u>

Dear Ms. Cramer:

We represent Mr. Jeremy Brown and his company, Authentic Merchant Solutions ("AMS") (collectively, hereafter referred to herein as "Mr. Brown"). We are in receipt of your May 25, 2023, letter to Mr. Brown sent on behalf of your client Mercantile Processing, Inc. ("MPI"), and respond hereby.

It appears from your missive that MPI has taken the position that Mr. Brown has somehow violated restrictive covenants prohibiting Mr. Brown from soliciting MPI merchants or otherwise competing with MPI in the marketplace by offering competing services and/or products. MPI indicates Mr. Brown is in breach of these restrictive covenants and therefore Mr. Brown's residual payments "will immediately cease" until he is "back into compliance" with these covenants.

There appears to be some confusion on MPI's end concerning the services Mr. Brown currently offers and supplies within the merchant services marketplace. Mr. Brown is a consultant to merchants offering consulting services relating to such merchants' processing charges and assists them with recapturing fee overcharges while monitoring ongoing contract compliance by their respective service providers, services which MPI does not offer, nor has it ever offered. Mr. Brown is neither engaged in any business which competes with MPI nor has Mr. Brown attempted to acquire any MPI merchant with replacement processing services by wrongful solicitation.

Mr. Brown provides the following basic services to merchants:

- Review of merchant processing statements.
- Comparison of those statements to the agreements that merchants have entered for processing.
- Identifying overcharges or other improperly charged fees for which merchants should  be credited.
- Negotiating payment of the credits for overcharges and/or future reductions in charges  so the charges align with the parties' contract terms; and

Catherine M. Cramer. Esq.
May 31, 2023
Page 2

- Oversight of ongoing billing practices and review of future statements to ensure ongoing compliance by processors concerning the merchant fees.

The fee Mr. Brown charges any merchant for his services is derived from the savings produced by his consultation, auditing, negotiation, and oversight duties. Mr. Brown does not acquire merchants (or assist in the process of acquiring merchants) for processing services and Mr. Brown does not sell or provide servicing for any POS equipment. His conduct does not violate any non-compete duty he may owe to MPI, and he is not engaging in any wrongful solicitation of MPI merchants.

We hope this letter will assist in resolving MPI's concerns regarding any potential breach that MPI asserts against Mr. Brown and by which MPI claims an ability to withhold any residual payments from him.

Should any residual payments be withheld due to the alleged breaches as set forth in your recent letter, Mr. Brown will pursue any and all legal remedies against MPI to correct such action. If you wish to discuss this letter or any other issue, please do not hesitate to contact me.

For the Firm,

Christopher Dryden

# Exhibit 15



Mercantile Processing Inc.
32695 Roxana Road, Floor 3
Millville, DE 19967
302-524-8000 | 877-508-2831
www.mpiprocessing.com
sales@mpiprocessing.com

August 7, 2023

**Via EMAIL And U.S. Mail**

Mr. Jeremy Brown

21379 Treeview Lane

Millsboro, DE 19966

jbrown@authenticmerchantsolutions.com

RE:     Servicing of Accounts – Mercantile Processing, Inc.

Dear Mr. Brown:

It has come to our attention that you have now made it clear that you no longer have any interest in servicing Mercantile Processing, Inc. (MPI) accounts.  Accordingly, effective immediately, you should no longer service any MPI accounts and MPI will make no request for you to do so. This notice includes your recent communication regarding Maryland Paving. If you are contacted by a merchant directly, please refer all such inquiries to your counsel who will then pass them on to us.

Very truly yours,

Kyle Morgan

# TAB 5

EFiled:  Aug 21 2023 05:10PM EDT
Transaction ID 70683025
Case No. 2023-0859-

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| JEREMY BROWN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. |
| | ) |
| MERCANTILE PROCESSING, INC., a | ) |
| Delaware corporation, KYLE MORGAN, | ) |
| and KATHRYN McMILLAN, | ) |
| | ) |
| Defendants. | ) |

## VERIFICATION

I, Jeremy Brown, being duly sworn according to law, depose and say:

I have read the foregoing Verified Complaint and know the contents thereof.

The allegations contained in the Verified Complaint are, of my own personal

knowledge, true and correct, except that, as to those allegations upon information

and belief, I believe them to be true.

August 20, 2023

_____
JEREMY BROWN

SWORN TO AND SUBSCRIBED before me, a Notary Public, in and for
the State and County below, on this _20_ day of August 2023

_____
Notarial Officer

# TAB 6

EFiled: Aug 21 2023 05:10PM EDT
Transaction ID 70683025
Case No. 2023-0839-

**SUPPLEMENTAL INFORMATION PURSUANT TO RULE 3(a)**
**OF THE RULES OF THE COURT OF CHANCERY**

The information contained herein is for the use by the Court for statistical and administrative purposes only. Nothing stated herein shall be deemed an admission by or binding upon any party.

1.  Caption of Case:  **Jeremy Brown v. Mercantile Processing, Inc., Kyle Morgan, and Kathryn McMillan**

2.  Date filed:  **August 21, 2023**

3.  Name and address of counsel for Plaintiff:  **Margaret M. DiBianca, Esq. (Bar ID No. 4539), Clark Hill, PLC, 824 N. Market Street, Suite 710, Wilmington, DE 19801.**

4.  Short statement and nature of claim asserted:  **Plaintiff seeks an order enjoining Defendants from enforcing certain restrictive covenants, from continuing to prevent him from performing his contractual obligations upon which his future earnings are based, and from continuing to withhold his wages.**

5.  Substantive field of law involved (check one):

| | | |
|---|---|---|
| __ Administrative Law | __ Labor Law | __ Trusts, Wills and Estates |
| X  **Commercial Law** | __ Real Property | __ Consent Trust Petitions |
| __ Constitutional Law | __ 348 Deed Restriction | __ Partition |
| __ Corporation Law | __ Zoning | __ Rapid Arbitration (R.96, 97) |
| __ Trade Secrets/Trade Mark/or Other Intellectual Property | | __ Other |

6.  Related case(s), including any Register of Wills matters (which requires copies of all documents in this matter to be field with the Register of Wills).  ***Brown v. Mercantile Processing, Inc., et al.,*** **Del. Super., Case No. N23C-07-172 DJB.**

7.  Basis of court's jurisdiction (including the citation of any statute conferring jurisdiction): **10** *Del. C.* **§ 341 and 10** *Del. C.* **§ 6501.**

8.  If the complaint seeks preliminary equitable relief, state the specific preliminary relief sought:

9.  If the complaint seeks a TRO, summary proceedings, a Preliminary Injunction, or Expedited Proceedings, check here.  **X**   (If #9 is checked, a Motion to Expedite must accompany the transaction.)

10.  If the complaint is one that in the opinion of counsel should not be assigned to a Master in the first instance, check here and attach a statement of good cause.  **X**

*/s/ Margaret M. DiBianca, Esq.*
Signature of Attorney of Record (No. 4539)

Dated:  August 21, 2023

222726084

## STATEMENT OF GOOD CAUSE

It is the opinion of counsel for Plaintiff that this action should not be assigned to a Master in the first instance.  Given the equitable relief sought, this action may require the immediate attention of the Court and may result in expedited proceedings and, therefore, should proceed directly before the Chancellor or a Vice Chancellor.  Moreover, this action will involve issues relating to the equitable enforcement of agreements that are familiar to the Chancellor and Vice Chancellors from prior actions, and Plaintiff therefore submits that the matter should proceed directly before the Chancellor or a Vice Chancellor.

CLARK HILL PLC

*/s/ Margaret M. DiBianca*

Margaret M. DiBianca, Esq. (No. 4539)
824 N. Market Street, Ste. 710
Wilmington, DE  19801
Telephone:  302-250-4748
Email:  mdibianca@clarkhill.com

Dated:   August 21, 2023                    *Attorneys for Plaintiff*

# TAB 7

EFiled:  Aug 21 2023 05:10PM EDT
Transaction ID 70683025
Case No. 2023-0859-



Margaret M. DiBianca                                    Clark Hill
T (302) 250-4748                                       824 N. Market Street, Suite 710
F (302) 421-9439                                       Wilmington, DE 19801
Email:mdibianca@ClarkHill.com                          T (302) 250-4750
                                                       F (302) 421-9439

August 21, 2023

## VIA FILE & SERV*EXPRESS*

Register in Chancery
Delaware Court of Chancery
500 N. King Street
Wilmington, DE  19801

Re:  *Jeremy Brown v. Mercantile Processing, Inc.*
     C.A. No. 2023-
     Summons Instruction

Dear Register in Chancery:

A registered process server will be making service of Plaintiffs' Verified

Complaint.  Accordingly, we request that your office prepare the summons at your

earliest convenience as follows:

**Pursuant to 8 *Del. C.* § 321, via Plaintiff's Counsel:**

Mercantile Processing, Inc.
32695 Roxana Rd.
Millville, DE 19967

Please notify my paralegal Felicia Grimes at (302) 250-4784 when the

summons is ready.

clarkhill.com

272917154.v1

August 21, 2023
Page 2

    If you have any questions, please do not hesitate to contact me.  Thank you
for your assistance in this matter.

                Respectfully submitted,

                Margaret M. DiBianca, Esq. (Bar No. 4539)
**WORDS:  80**

# TAB 8

**EFiled:  Aug 21 2023 05:10PM EDT**
**Transaction ID 70683025**
**Case No. 2023-0859-**

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| JEREMY BROWN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   C.A. No. |
| | ) |
| MERCANTILE PROCESSING, INC., a | ) |
| Delaware corporation, KYLE MORGAN, | ) |
| and KATHRYN McMILLAN, | ) |
| | ) |
| | ) |
| Defendants. | ) |

## PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER

Pursuant to Court of Chancery Rule 65, Plaintiff Jeremy Brown hereby moves for a Temporary Restraining Order enjoining Defendants Mercantile Processing, Inc. ("MPI"), Kyle Morgan, and Kathryn McMillan from interfering with Plaintiff's ability to perform his contractual obligations under his employment agreement with MPI and thereby interfering with his right to earn future residuals, from seeking enforcement of the restrictive covenants in Plaintiff's agreements with MPI, and from continuing to unlawfully withhold his wages.

The grounds for this Motion are set forth in Plaintiff's Verified Complaint and Opening Brief in Support of Plaintiff's Motion for a Temporary Restraining Order and Memorandum in Support of Plaintiff's Motion to Expedite filed contemporaneously herewith.

WHEREFORE, Plaintiff respectfully requests that this Court enter an Order in the form submitted with this Motion, and for such other and further relief as the Court deems just.

CLARK HILL PLC

/s/ Margaret M. DiBianca
Margaret M. DiBianca, Esq. (No. 4539)
824 N. Market Street, Ste. 710
Wilmington, DE  19801
Telephone:  302-250-4748
Email:  mdibianca@clarkhill.com
**WORDS: 140**

Dated:   August 21, 2023              *Attorneys for Plaintiff*

# TAB 9

EFiled:  Aug 21 2023 05:10PM EDT
Transaction ID 70683025
Case No. 2023-0859-

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JEREMY BROWN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. |
| | ) | |
| MERCANTILE PROCESSING, INC., a | ) | |
| Delaware corporation, KYLE MORGAN, | ) | |
| and KATHRYN McMILLAN, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S OPENING BRIEF IN SUPPORT OF
## HIS MOTION FOR TEMPORARY RESTRAINING ORDER

Margaret M. DiBianca, Esq. (No. 4539)
CLARK HILL PLC
824 N. Market Street, Ste. 710
Wilmington, DE  19801
Telephone:  302-250-4748
Email:  mdibianca@clarkhill.com

Dated:   August 21, 2023          *Attorneys for Plaintiff*

# TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................. i

TABLE OF AUTHORITIES ........................................................................... ii

TABLE OF EXHIBITS .................................................................................. v

INTRODUCTORY STATEMENT ........................................................... 1

NATURE AND STAGE OF PROCEEDINGS ........................................ 3

FACTUAL BACKGROUND ..................................................................... 4

ARGUMENT ............................................................................................... 11

   I.     The Applicable Legal Standards ............................................. 12

   II.    Plaintiff Has a Colorable Claim Enjoining MPI from Enforcing the Restrictive Covenants ......................................................................... 14

      A.   MPI Is Barred From Enforcing the Covenants Because It Failed to Pay Plaintiff All Promised Compensation ...................................... 14

      B.   The Forfeiture Provision Is *Per Se* Unlawful Under Delaware Law ....... 16

      C.   The Covenants Are Unenforceable As Written ...................................... 18

      D.   The Covenants Are Unenforceable Because They Do Not Protect Any Legitimate Economic Interest of MPI ...................................... 23

      E.   The Covenants Are Unenforceable Because the Balance of the Equities Weighs Heavily in Favor of Plaintiff ...................................... 24

   III.   Plaintiff Will Suffer Irreparable Harm If a TRO Is Not Entered ............ 26

CONCLUSION ............................................................................................. 28

# TABLE OF AUTHORITIES

**Cases**

*ACE Ltd. v. Capital Re Corp.*,
  747 A.2d 95 (Del. Ch. 1999) ..........................................................................13, 14

*Ainslie v. Cantor Fitzgerald, L.P.*,
  No. 9436-VCZ,
  2023 WL 106924 (Del. Ch. Jan. 4, 2023) ...........................................................19

*All Pro Maids, Inc. v. Layton*,
  No. 058-N,
  2004 WL 1878784 (Del. Ch. Aug. 9, 2004)...................................................15, 20

*Bathla v. 913 Market, LLC*,
  200 A.3d 754 (Del. 2018)....................................................................................21

*Bernard Personnel Consultants, Inc. v. Mazarella*,
  No. 11660,
  1990 WL 124969 (Aug. 28, 1990) .......................................................................24

*Brooklyn Savings Bank v. O'Neil*,
  324 U.S. 697 (1945) ............................................................................................17

*Burris Foods, Inc. v. Razzano*,
  No. 1077,
  1984 WL 8230 (Del. Ch. July 18, 1984) .............................................................25

*Caras v. Am. Original Corp.*,
  1987 WL 15553 (Del. Ch. July 31, 1987) ...........................................................20

*CBOT Holdings, Inc. v. Chicago Bd. Options Exch., Inc.*,
  No. 2369-VCN,
  2007 Del. Ch. LEXIS 114 (Del. Ch. Aug. 3, 2007) ...........................................12

*Cottle v. Carr*,
  No. 9612,
  1988 WL 10415 (Del. Ch. Feb. 9, 1988)........................................................26, 27

*Cox Comms., Inc. v. T-Mobile US, Inc.*,
  273 A.3d 752 (Del. 2022)....................................................................................21

*D.A. Shulte, Inc. v. Gangi*,
   328 U.S. 108 (1946) .......................................................................17

*Del. Elevator, Inc. v. Williams*,
   No. 5596–VCL,
   2011 WL 1005181 (Del. Ch. Mar. 16, 2011) .......................................23

*Deloitte & Touche USA LLP v. Lamela*,
   No. 1542–VCP,
   2007 WL 1114075 (Del. Ch. Apr. 6, 2007).........................................20

*Dickinson Med. Gp., P.A. v. Foote*,
   No. 84C-JL-22,
   1989 WL 40965 (Del. Super. Mar. 23, 1989).......................................15

*Dize v. Maddrix*,
   324 U.S. 697 (1945) .......................................................................17

*FP UC Holdgs., LLC, v. Hamilton*,
   No. 2019-1029-JRS,
   2020 WL 1492783 (Del. Ch. Mar. 27, 2020) ..................................22, 23

*G.B.C., Inc. v. United States*,
   302 F. Supp. 1283 (E.D. Tenn. 1969) .................................................26

*Giammargo v. Snapple Beverage Corp.*,
   No. 13845,
   1994 WL 672698 (Del. Ch. Nov. 15, 1994).........................................12

*Gomi Inv'rs, LLC v. Schimmell Holdings, Inc.*,
   No. 2278-N,
   2006 WL 2304035 (Del. Ch. July 27, 2006) .......................................12

*Hecco Ventures v. Sea-Land Corp.*,
   No. 8486,
   1986 WL 5840 (Del. Ch. May 19, 1986) .............................................27

*Intertek Testing Servs. NA, Inc. v. Eastman*,
   No. 2022-0853-LWW,
   2023 WL 2544236 (Del. Ch. Mar. 16, 2023) ...................................20, 23

*Kodiak Bldg. Ptrs., LLC v. Adams*,
   No. 2022-0311-MTZ,
   2022 WL 5240507 (Del. Ch. Oct. 6, 2022) ..................................................19, 22

*L&W Ins., Inc. v. Harrington*,
   No. 2730-VCP,
   2007 WL 2753006  (Del. Ch. Mar. 12, 2007) ......................................................13

*LewMore, Inc .v. Fleming*,
   1986 WL 1244 (Del. Ch. Jan. 29, 1986) ............................................................24

*McCann Surveyors, Inc. v. Evans*,
   611 A.2d 1 (Del. Ch. 1987) ...................................................................15, 24, 25

*Meyer Ventures, Inc. v. Barnak*,
   No. 11502,
   1990 WL 172648 (Del. Ch. Nov. 2, 1990) .........................................................25

*Newman v. Warren*,
   684 A.2d 1239 (Del. Ch. 1996) ..........................................................................13

*Physiotherapy Corp. v. Moncure*,
   No. 2017-0396-TMR,
   2018 WL 1256492 (Del. Ch. Mar. 12, 2018) ....................................................15

*Raymond Revocable Tr. v. MAT Five LLC*,
   No. 3843-VCL,
   2008 WL 2673341 (Del. Ch. June 26, 2008) ....................................................12

*Research & Trading Corp. v. Pfuhl,* No. 12527,
   1992 WL 345465,  (Del. Ch. Nov. 18, 1992).................................................15, 24

*Take-A-Break Coffee Servs., Inc. v. Grose*,
   No. 11217,
   1990 WL 67392 (Del. Ch. May 15, 1990) .........................................................25

*UIS, Inc. v. Walbro Corp.*,
   No. 9323,
   1987 WL 18108 (Del. Ch. Oct. 5, 1987) ......................................................13, 27

**Statutes**

19 *Del. C.* § 1110...............................................................................................17

iv

# TABLE OF EXHIBITS[1]

| Exhibit | Description |
|---------|-------------|
| 1 | 2015 EA |
| 2 | 2015 IAA |
| 3 | 2018 EA |
| 4 | 2019 Amendment |
| 5 | Woodsboro Transition Plan & Timeline |
| 6 | 2022.09.22 Email from McMillan to Plaintiff |
| 7 | 2022.12.15 Email from Plaintiff to McMillan |
| 8 | MPI LinkedIn page |
| 9 | Performance Improvement Plan (PIP) |
| 10 | 2023 IAA |
| 11 | 2023.03.22 Email from Morgan to Plaintiff (releasing residuals) |
| 12 | 2023.05.24 Emails between Morgan and Plaintiff (re: 4.2 and AMS) |
| 13 | 2023.05.25 Ltr. from MPI Counsel |
| 14 | 2023.05.31 Response Ltr. to MPI Counsel |
| 15 | 2023.08.07 Ltr from MPI to Plaintiff |

---

[1]    All exhibits referenced herein are numbered consistently with the exhibit numbering in the Verified Complaint.

## INTRODUCTORY STATEMENT

This is a straightforward motion for emergency relief.  The facts are not in dispute.  Plaintiff Jeremey Brown was employed by Defendant Mercantile Processing, Inc. ("MPI") and, pursuant to the employment agreement governing his employment, was to be paid certain residuals.  In late 2022, MPI unilaterally and over the objection of Mr. Brown, stopped paying him his full residuals.  After three months, MPI released the unpaid residuals but put Mr. Brown on a performance improvement plan in retaliation for his complaint.  When Mr. Brown pushed back against the unwarranted discipline, he was told to resign his employment and sign on as an independent contractor agreement.  Mr. Brown agreed to this request and formed a separate entity.  However, MPI claimed that this new entity was too physically close to MPI and therefore constituted a competing entity and again held Mr. Brown's residuals and threatened suit repeatedly.

There can be no enforceable restrictive covenants as a matter of law.  There is no dispute that MPI withheld Residuals—both while Mr. Brown was employed and after he transitioned to a 1099 contractor.  Thus, there can be no enforceable covenants.  MPI should be enjoined from continuing to threaten Mr. Brown by claiming it will sue him for competing if he works in any capacity in this industry and Mr. Brown should be permitted to work in any capacity he chooses.

1

Mr. Brown seeks an emergency injunction to prevent MPI and two of its officers, Chief Executive Officer Kyle Morgan and Chief Revenue Officer Kathryn McMillan (together, Morgan and McMillan, the "Individual Defendants" and each, an "Individual Defendant") (MPI and the Individual Defendants, collectively, the "Defendants") and all persons acting on behalf of Defendants from: (1) taking any action seeking to enforce certain unenforceable restrictive covenants (the "Covenants") contained in the 2018 Employment Agreement (the "2018 EA"), (2) taking any action interfering with Plaintiff's ability to perform consulting services for his entity, AMS, or other employer; (3) taking any action interfering with Plaintiff's ability to perform the services required under his 2018 Employment Agreement; and (4) withholding any residual payment, including those already due and owing and such future payments as may be earned in accordance with the 2018 EA.

## NATURE AND STAGE OF PROCEEDINGS

Plaintiff filed his first Complaint against Defendants in the Delaware Superior Court seeking to recover his unpaid Residuals when MPI engaged its present counsel and threatened suite while preventing Plaintiff from performing services as he is contractually obligated to do.  Plaintiff dismissed his Complaint and filed his Verified Complaint (the "Complaint") in this Court on August 21, 2023, along with a Motion for a Temporary Restraining Order ("TRO") and a Motion for Expedited Proceedings.  Counsel for Defendants has been provided with a copy of the papers via email.  Thus, Plaintiff seeks to have his Motion for TRO and Motion to Expedite heard at the Court's earliest convenience.

## FACTUAL BACKGROUND[2]

Defendant MPI is a merchant-services business with offices in Millville, Delaware, and Havre de Grace, Maryland.  MPI sells point-of-sale ("POS") systems, credit-card processing, gift and loyalty cards, and ATM services.  MPI advertises to the Delmarva region but does have a few accounts outside the region.

Plaintiff Jeremy Brown was initially hired by MPI in 2015 as a sales agent. He was paid a salary of $40,000 per year plus residual payments ("Residuals") for certain future periods for accounts he brought on or "boarded."

In 2018, Mr. Brown and MPI executed an Employment Agreement (the "2018 EA").[3]  Pursuant to the 2018 EA, Mr. Brown's salary was increased to $48,000, and his right to future Residuals was reconfirmed.

In September 2022, MPI informed Mr. Brown that it had hired a new employee to manage the Woodsboro Bank portfolio of accounts (the "Woodsboro Portfolio").  Defendant McMillan notified Mr. Brown in writing that, unless he made in-person introductions of the new employee to *all of the more than 100* accounts in the Woodsboro Portfolio, his Residuals for that account would be

---

[2]    The Facts as stated are a brief summary of the much more detailed (albeit lengthy) Factual Background set forth in the Verified Complaint and Plaintiff's Affidavit, which is attached hereto as Exhibit A.  Plaintiff incorporates by reference both the factual allegations in the Verified Complaint and the averments of his Affidavit as if set forth fully herein.

[3]    Exhibit 3.

reduced from 15% to 5%.[4]  This threat by Ms. McMillan was in direct violation of the 2018 EA, which expressly provides that Mr. Brown will be paid 15% Residuals on all bank partnerships.[5]

Nevertheless, MPI withheld 75% of his Residuals for the Woodsboro Portfolio, approximately $2,000 per month, for November 2022, December 2022, and January 2023.  The withheld Residuals were finally released to Mr. Brown in February 2023, thanks to the company's newly hired COO, Benjamin Gray.

In retaliation for complaining to Mr. Gray about his unpaid Residuals, Mr. Brown was issued a performance improvement plan by Defendant McMillan. When Mr. Brown pushed back, Mr. Gray suggested that Mr. Brown become a 1099 contractor instead of a W2 employee but Defendant McMillan said that he would have to form his own entity.

At their suggestion, Mr. Brown tendered his resignation effective February 10, 2023, in favor of becoming an independent contractor through his entity, Authentic Merchant Services ("AMS").  At all times since, Defendants have been aware that Mr. Brown was servicing his MPI accounts through AMS because they paid his AMS bank account.

---

[4]      Exhibit 7.

[5]      Exhibit 7.

Defendant Morgan, contrary to the agreement reached, again withheld Mr. Brown's Residuals, saying that MPI would not pay further Residuals until Mr. Brown executed a new Independent Agent Agreement.

Left with no alternative, Mr. Brown signed a new agreement on or about March 22, 2023 (the "2023 IAA"). Upon receiving the executed 2023 IAA, Defendant Morgan assured Mr. Brown that MPI would release the Residuals that had been withheld and that "[a]ll future residuals will be paid by the last business day of the month."[6]

Thereafter, MPI paid Mr. Brown the unpaid 10% Residuals owed from 2022.

MPI paid Mr. Brown Residuals for April 2023 in his May 2023 pay totaling approximately $12,000. But MPI's adherence to its contractual obligations was short lived. On May 24, 2023, Defendant Morgan sent an email to Mr. Brown, stating that Morgan wanted to "review the violation of [Brown's] noncompete (Section 4.2 Head of Bank Partnerships Agreement)". *See* Exhibit 12. Section 4.2 of the 2018 EA contains only a single sentence:

> Head of Bank Partnerships Acknowledges that MPI has a regional advantage and agrees that for the term of one year not to work for a competing entity within 100 miles of an MPI Office. [Exhibit 3 at § 4.2].

---

[6]     Exhibit 4.

Most obviously, the term of Section 4.2 is "one year" as plainly stated.  One year expired on October 19, 2019, *one year* after the agreement was signed.

The 2018 EA contains no definition of "competing entity."  Because there is no limitation of the type of work Mr. Brown is allegedly prohibited from performing, as written, Section 4.2 would prohibit Mr. Brown from working as a janitor at a company if MPI determines that company to be a "competing entity."

MPI has an office in Sussex County, Delaware, and in Havre de Grace, Maryland.  Thus, as written, this covenant would prevent Mr. Brown from working in Delaware, Maryland, Washington, DC, significant portions of New Jersey and Pennsylvania, and parts of Virginia, effectively barring him from employment without relocating.

Mr. Brown responded, explaining that Section 4.2 of the 2018 EA provides only that he cannot work for a "competing entity" and that he was *not, in any way or in any capacity, working for a competing entity.*

Claiming that Mr. Brown's operation of AMS (which he did while employed by MPI) with MPI's knowledge and for MPI' benefit is a violation of Section 4.2, MPI again withheld Residuals, claiming Mr. Brown had "forfeited" his earned wages by working for "a competing entity" even though AMS *is in no way a competing entity*.

7

Mr. Brown formed AMS for the purpose of servicing his MPI book of business.  AMS does not compete and has never competed with MPI.  AMS does not sell credit-card processing services, does not sell POS systems, gift or loyalty cards, or ATM services.  Other than MPI, AMS has never had a single client and has never earned a single cent other than from MPI.

After resigning from MPI, Mr. Brown continued to service his MPI accounts as the 2018 EA requires in order to receive the Residuals.  He also attempted to expand AMS's offerings to including consulting services for clients who wish to negotiate their merchant-services contracts.  A possible client for AMS would be a merchant, such as a retailer or restaurant, who wishes assistance in negotiating or renegotiating a merchant-services contracts.

To ensure there is no confusion to the public, AMS's website contains the express disclaimer that AMS "cannot work with any customers of Mercantile Processing Inc."  *See* Exhibit 7.  Thus, AMS is in no way a "competing entity" to MPI because, although the two are in the same industry, they are not providing the same products or services.

By way of analogy, consider a recruiter who worked in house for a widget manufacturer.  If the recruiter left and went to work for another widget manufacturer, this could arguably be considered a "competing entity" under the appropriate set of facts.  However, if the recruiter formed a new entity for the

purpose of helping manufacturers of all types negotiate their contracts with outside

recruiting firms, there would be no competition or harm to the former employer.

Pursuant to the 2018 EA, Mr. Brown is to continue to provide service to his

MPI accounts—either at the request of the account or at the request of MPI's

Customer Service Department.  Mr. Brown has consistently performed as required

and has responded to all requests in a timely and professional manner.

Nevertheless, MPI and the Individual Defendants have refused and continue to

refuse to pay Mr. Brown his full Residuals due for May 2023 and have not paid

any Residuals for June or July 2023.  MPI, through its counsel, has informed Mr.

Brown that it will not pay the Residuals now owing or going forward.

On August 2, 2023, Mr. Brown, through counsel, notified MPI that he was

still receiving and responding to inquiries from his accounts but was still not being

paid.  In retaliation, MPI wrote a letter to Mr. Brown on August 7, 2023.  The

letter, delivered to Mr. Brown's counsel via email that evening, stated:

> It has come to our attention that you have now made it
> clear that you no longer have any interest in servicing
> Mercantile Processing, Inc. (MPI) accounts.
> Accordingly, effective immediately, you should no
> longer service any MPI accounts and MPI will make no
> request for you to do so. This notice includes your recent
> communication regarding [Redacted Client Name].  If
> you are contacted by a merchant directly, please refer all
> such inquires to your counsel who will then pass them on
> to us.  [Exhibit 15]

At no time did Mr. Brown or his counsel imply, suggest, or state that Mr. Brown "no longer ha[s] any interest in servicing" his MPI accounts as is falsely stated in MPI's letter.

Mr. Brown's counsel responded to MPI's counsel immediately upon receipt and insisted that Mr. Brown had never impliedly or expressly stated that he was "refusing to service" MPI accounts; he had been servicing the accounts consistently since his separation date.

MPI's counsel failed to respond to this request and, as it stands, Mr. Brown is left in an impossible situation yet again—being instructed by MPI not to service accounts but if he fails to do so, he could be jeopardizing his future Residuals.  In the meantime, as he is being paid *nothing* by MPI despite having been working for the accounts since July in order to prevent them from leaving MPI for a competitor.  And, now, since July, Mr. Brown being threatened by MPI that it will sue him for violating the so-called "covenants."

**ARGUMENT**

During his employment with MPI, Mr. Brown was entitled to be paid

Residuals equal to 15% of net revenue for the Woodsboro Portfolio.[7]  MPI

unilaterally and intentionally underpaid Mr. Brown only 5% of net revenue for that

account instead of the 15% he was contractually owed for November and

December 2022.  Thereafter, MPI has refused to pay Mr. Brown his earned

Residuals since May 2023.

The Residuals constitute "wages" under Delaware law and an employee may

not waive or "forfeit" his wages by private agreement with his employer.  Thus,

MPI's failure to pay Mr. Brown's Residuals constitute a material breach of the

2018 EA that excuses Mr. Brown from performance of the Covenants.

Even if MPI had timely paid all wages owed, which it did not, the Covenants

still are not enforceable because they are unreasonably overly broad and fail to

protect any legitimate interest of MPI.  Mr. Brown will be immediately and

irreparably harmed if he is not permitted to work without the threat of baseless

threats of suit.  For the reasons set forth below, Mr. Brown seeks to enjoin

Defendants from taking or threatening to take action against him based on the

covenants which are unenforceable.

---

[7]     Exhibit 3.

## I.    The Applicable Legal Standards

This Court will grant expedited proceedings where the movant

(1) demonstrates a "sufficiently colorable claim" and (2) shows a "sufficient

possibility of threatened irreparable injury" to justify the costs involved.[8]  The

pleading standard for a colorable claim is liberal.  A claim is colorable where the

movant has asserted facts that, if true, suffice to establish all elements of the claim

at issue.[9]  This Court must accept the allegations in the Complaint as true for the

purposes of this motion.[10]  In evaluating motions to expedite proceedings, this

Court "has followed the practice of erring on the side of more [expedited] hearings

rather than fewer."[11]

The standard for entry of a temporary restraining order ("TRO") overlaps

significantly with the standard for expedition.[12]  A TRO is a special remedy of

short duration designed primarily to prevent imminent irreparable injury.  Plaintiff

---

[8]     *Gomi Inv'rs, LLC v. Schimmell Holdings, Inc.*, No. 2278-N, 2006 WL 2304035, at *1 (Del. Ch. July 27, 2006).

[9]     *See Raymond Revocable Tr. v. MAT Five LLC*, No. 3843-VCL, 2008 WL 2673341, at *4 (Del. Ch. June 26, 2008).

[10]    *See, e.g.*, *id.*

[11]    *Giammargo v. Snapple Beverage Corp.*, No. 13845, 1994 WL 672698, at *2 (Del. Ch. Nov. 15, 1994).

[12]    *Compare Gomi*, 2006 WL 2304035, at *3; *CBOT Holdings, Inc. v. Chicago Bd. Options Exch., Inc.*, No. 2369-VCN, 2007 Del. Ch. LEXIS 114, at *3 (Del. Ch. Aug. 3, 2007).

is entitled to a TRO if he can demonstrate that: (i) he has a colorable claim on the merits; (ii) he will suffer irreparable harm if relief is not granted; and (iii) the balance of hardships favors Plaintiff.[13]  Although the test is conjunctive, a strong demonstration of one element may outweigh the weakness of another.[14]  This Court has discretion in balancing the importance of each of the three factors in a particular case.[15]

In deciding this Motion, the primary focus is on the threatened injury to Plaintiff, rather than the probability of ultimate success:

> [W]hen this court determines whether to grant a TRO, it usually has little time to digest the merits.  It therefore rightly concentrates on whether the absence of a TRO will permit imminent, irreparable injury to occur to the applicant and whether that possibility of injury outweighs the injury that the TRO itself might inflict on the defendants.  In a case where this balance tilts in favor of the applicant and where a responsible consideration of the merits cannot be had, this court will issue a TRO even though the applicant has only raised claims that are

---

[13]  *See UIS, Inc. v. Walbro Corp.*, No. 9323, 1987 WL 18108, *4 (Del. Ch. Oct. 5, 1987); *ACE Ltd. v. Capital Re Corp.*, 747 A.2d 95, 102 (Del. Ch. 1999) ("A TRO is an injunction, and the factors relevant to determining whether to issue a TRO are similar to those relevant when determining whether to grant a preliminary injunction.  But these factors are ordinarily given different weight in the TRO context.").

[14]  *L&W Ins., Inc. v. Harrington*, No. 2730-VCP, 2007 WL 2753006 , at *7 (Del. Ch. Mar. 12, 2007).

[15]  *Newman v. Warren*, 684 A.2d 1239, 1244-45 (Del. Ch. 1996).

colorable, litigable, or raise questions that deserve serious attention.[16]

As discussed below, Defendants should be enjoined from seeking to enforce the Covenants or otherwise attempting to prevent Plaintiff from performing the services required to continue to receive Residuals into the future.

## II.  Plaintiff Has a Colorable Claim Enjoining MPI from Enforcing the Restrictive Covenants

As set forth below, Mr. Brown is excused from performance under the Covenants due to MPI's prior material breach in failing to pay all Residuals.   Even if MPI had timely paid all Residuals (which, indisputably, it did not), the Covenants are grossly overly broad, unenforceable restraints on Mr. Brown's ability to work and should not be blue-penciled but should be declared invalid and unenforceable.  Finally, the "forfeiture" provision that Defendants claim justified MPI's failure to pay the Residuals is absolutely and unequivocally unlawful as a matter of Delaware law and cannot be used to excuse MPI's failure to perform (*i.e.*, pay the Residuals).

### A.  MPI Is Barred From Enforcing the Covenants Because It Failed to Pay Plaintiff All Promised Compensation

The Covenants are not enforceable in all events because MPI failed to pay Mr. Brown all promised compensation. Delaware law is well settled on this issue:

---

[16]     *ACE Ltd.*, 747 A.2d at 102 (internal quotations omitted).

An employer who fails to pay its employee all promised compensation may not seek to enforce a covenant not to compete or other restrictive covenant. [17]

Here, the 2018 EA guarantees that Mr. Brown would be paid certain Residuals for certain periods into the future. For example, the Woodsboro Account was to be paid Residuals in 15% of the net revenue. MPI had a contractual obligation to pay Mr. Brown those Residuals. But, when Defendant McMillan grew displeased with Mr. Brown, she instructed MPI to change the payments from 15% to 5% of net revenue and MPI complied, failing to pay Mr. Brown the remaining Residuals for *months*.

Incredibly, MPI continues this course of conduct even now, still refusing to pay Mr. Brown his Residuals now due for May, June, and July 2023, with August's Residuals due in just weeks.

MPI does not, and cannot, deny that it failed to pay the Woodsboro Residuals for several months and certainly does not deny that it is continuing to

---

[17]    *See Physiotherapy Corp. v. Moncure*, No. 2017-0396-TMR, 2018 WL 1256492 (Del. Ch. Mar. 12, 2018) (finding that the plaintiff-employer's failure to pay the defendant-employee wages owed excused the defendant-employee's performance of the restrictive covenants at issue). *See also All Pro Maids, Inc. v. Layton,* No. 058-N, 2004 WL 1878784, at *6 (Del. Ch. Aug. 9, 2004); *Research & Trading Corp. v. Pfuhl,* No. 12527, 1992 WL 345465, at *6 (Del. Ch. Nov. 18, 1992); *Dickinson Med. Gp., P.A. v. Foote*, No. 84C-JL-22, 1989 WL 40965, at *8 (Del. Super. Mar. 23, 1989); *McCann Surveyors, Inc. v. Evans*, 611 A.2d 1, 3 (Del. Ch. 1987).

refuse to pay Residuals since May 2023. Thus, as a matter of law, MPI is prohibited from enforcing the Covenants in the 2018 EA. Mr. Brown has established that he has a colorable claim that MPI should be enjoined from enforcing the Covenants.

### B. The Forfeiture Provision Is *Per Se* Unlawful Under Delaware Law

Defendants contend that, by creating AMS, and by offering consulting services through AMS *that do not compete with MPI*, despite the fact that AMS has never actually serviced *any client* and has never received a single cent in revenue, Mr. Brown has forfeited his already earned and contractually guaranteed Residuals and is disqualified from receiving Residual payments into the future. Defendants base this contention on the following language from the 2018 EA:

> In the case of any violation of section 4, during or after employment, Head of Bank Partnerships forfeits their rights to residuals or compensation under the schedule A, and is liable to damages to Company.[18]

This "forfeiture" provision is *per se* unlawful under Delaware law and cannot, as a matter of law, excuse MPI's failure to pay Mr. Brown.

Delaware's Wage Payment and Collection Act ("DWPCA") requires all wages be promptly paid and expressly provides that no provision of the Act "may

---

[18]     Exhibit 3 at § 4.

16

in any way be contravened or set aside by private agreement."[19]  Under the Act,

"wages" are defined as "compensation due to an employee by reason of the

employee's employment."  Without a doubt, the Residuals constitute "wages"

under the DWPCA.  Thus, they cannot be "waived" or "forfeited" as Defendants

claim even if Mr. Brown *had* competed (which he has not).

The federal wage law, the Fair Labor Standards Act (the "FLSA"), also

contains a prohibition against a private agreement waiving wages.  As the United

States Supreme Court has explained, private waiver of the right to wages or

liquidated damages "would nullify the purposes of the act."[20]

Thus, the so-called "forfeiture provision" in Section 4 of the 2018 EA is

unlawful as a matter of law and cannot be used as a justification for the failure of

MPI to timely pay the Residuals.[21]  MPI's undisputed failure to pay the Residuals

(including for the Woodsboro Portfolio in 2022 and for all accounts for May-July

2023), constitutes a prior material breach of the 2018 EA excusing Mr. Brown

---

[19]   19 *Del. C.* § 1110.

[20]   *Brooklyn Savings Bank v. O'Neil*, 324 U.S. 697, 706 (1945).  *See also Dize v. Maddrix*, 324 U.S. 697 (1945) (companion case to *Brooklyn Savings*); *D.A. Shulte, Inc. v. Gangi*, 328 U.S. 108 (1946).

[21]   The Court should not entertain an argument by MPI that it "believed" the forfeiture provision to be valid.  If MPI truly had believed Mr. Brown had forfeited his Residuals, it would have paid *nothing* instead of 5% of net revenue.  Instead, by paying just 5% instead of the 15% owed, MPI demonstrated that it used Mr. Brown's wages as leverage to get him to sign the 2023 IAA.

from performance with the Covenants, even if those Covenants were enforceable, which they are not as explained below.  Without a doubt, Mr. Brown has established that he has a colorable claim for an injunction preventing MPI from enforcing the Covenants.

### C.    The Covenants Are Unenforceable As Written

To be clear, Mr. Brown contends that the Court need not analyze the Covenants for validity as MPI's prior material breach excused performance in any event.  Nevertheless, even if all Residuals, including for the Woodsboro Portfolio, had been paid and paid timely (which, indisputably, they were not), the Covenants are not enforceable as a matter of law.

### 1.    The "Nonsolicit" Is a Thinly Veiled and Unenforceable Noncompete

Section 4.1 of the 2018 EA is titled "Non Solicitation" but the first paragraph makes clear that it is actually intended to be a noncompete:

> [Mr. Brown] further acknowledges that it is necessary to protect the interest of MPI and its merchant base by entering into the following **covenant not to compete**, as provided herein.

(Exhibit 3 at § 4.1) (emphasis supplied).  The so-called "non-solicitation" provision provides, in relevant part:

> . . . **for a period of five (5) years following the termination of this agreement**, neither **[Mr. Brown],** its successors or assigns, nor its Associated Sales Personnel, either, individually or through any other entity for which he, she, or it works or from which he, she or it would

18

receive financial renumerations for the placement of Merchant Client Accounts, **will not solicit company merchant applications anywhere in the United States of America from Merchant Client Accounts and will not solicit bank partnerships for any competing entity**.

(*Id.*) (emphasis supplied).  The language is, to say the least, inartful.  But the key points are that: (1) for five (5) years from the termination of the 2018 EA; (2) Mr. Brown may not, anywhere in the U.S. (a) "solicit company merchant applications . . . from Merchant Client Accounts; or (b) "solicit bank partnerships for any competing entity."

This Covenant is unenforceable.  First, the worldwide geographic scope is unreasonable.  Although the absence of a geographic limitation does not render a covenant unenforceable *per se*, it cannot be enforced unless narrowly tailored to serve the employer's interests in the circumstances of the case.[22]  Here, there can be no legitimate interest of MPI to prevent Mr. Brown from soliciting merchant accounts or banks *anywhere in the U.S.* when MPI's business is limited to the "Delmarva Region."[23]

---

[22]     *Ainslie v. Cantor Fitzgerald, L.P.*, No. 9436-VCZ, 2023 WL 106924, *17 (Del. Ch. Jan. 4, 2023).

[23]     *See Kodiak Bldg. Ptrs., LLC v. Adams*, No. 2022-0311-MTZ, 2022 WL 5240507, at *12 (Del. Ch. Oct. 6, 2022) (finding provision that prohibited competition within 100-miles of any [of the buyer's] location" was enforceable as overbroad because it covered areas not essential to protect the business's legitimate interest); *see also Intertek Testing Servs. NA, Inc. v. Eastman*, No. 2022-0853-

Second, the five-year duration far exceeds the two-year maximum under Delaware law for any employment-related noncompete (which, as stated in 4.1, this section actually is).[24]

Third, the Covenant purports to prevent Mr. Brown from soliciting *any* bank partnerships, regardless of whether MPI *ever* solicited or serviced that bank and regardless of whether Mr. Brown himself ever even heard of the bank when he worked at MPI. Thus, as written, the Covenant would prohibit Mr. Brown from working as a relationship manager for a non-profit community theater in Utah that has "community partnerships" with local business, including banks. The Covenant is grossly unreasonable.[25]

### 2.   The Noncompete Is Unenforceable

The single-sentence paragraph that purports to be a covenant not to compete also is unenforceable. The single sentence reads:

---

LWW, 2023 WL 2544236, at *4 (Del. Ch. Mar. 16, 2023) (finding unreasonable a covenant that extended beyond the states where the employer operated).

[24]   *All Pro Maids, Inc. v. Layton,* 2004 WL 1878784, at *5 [n.23] (Del. Ch. Aug. 9, 2004) (finding noncompetes "covering limited areas for two or fewer years generally have been held to be reasonable"); *Deloitte & Touche USA LLP v. Lamela*, No. 1542–VCP, 2007 WL 1114075, at *6-10 (Del. Ch. Apr. 6, 2007) (finding two-year covenant reasonable as to some partnership clients but not others).

[25]   *See Caras v. Am. Original Corp.*, 1987 WL 15553, at *2 (Del. Ch. July 31, 1987) (finding that the covenantor was reasonably likely to prevail where the covenant had no geographic restriction)

> [Mr. Brown] Acknowledges that MPI has a regional advantage and agrees that for the term of one year not to work for a competing entity within 100 miles of an MPI office.

(Exhibit 3 at § 4.2). As an initial matter, the duration of this provision has long expired. "One year" concluded on October 19, 2019, *one year* after the 2018 EA was executed.

Defendants may now *wish* that they had written this provision to extend for one year *from the date of separation* instead of simply "one year." But a mere wish does not alter the plain language. The agreement plainly and unambiguously states that the term of the noncompete covenant in § 4.2 was for a one-year term; that year has long expired. The Court should not interpret the plain language of the agreement differently than as written merely because Defendants want a "do-over."[26] Mr. Brown's livelihood (and, frankly, the future of his family) is at stake. MPI's dissatisfaction with the contract it drafted does not render the terms ambiguous.[27]

---

[26] *See generally Cox Comms., Inc. v. T-Mobile US, Inc.*, 273 A.3d 752 (Del. 2022) (courts interpret clear and unambiguous terms in a contract according to their ordinary meaning); *Bathla v. 913 Market, LLC*, 200 A.3d 754 (Del. 2018) (clear and unambiguous terms must be interpreted in accordance with their ordinary meaning).

[27] *See Cox Comms., Inc.*, 273 A.3d at 760.

Moreover, the restriction is unreasonable as it is, again, not limited to the geographic areas where Mr. Brown himself actually worked on behalf of MPI.  In fact, it has no connection at all to Mr. Brown's employment.  This is unreasonable.[28]

Finally, the Covenant, again, has no limitation on the type of work Mr. Brown can do.  Instead, it prohibits him from working for any "competing entity" although, again, that term is not defined and MPI appears to believe it is the trier of fact on the question.  This means Mr. Brown could not work as a janitor for a "competing entity" assuming Mr. Brown was even able to figure out what constitutes a "competing entity."[29]  This demonstrates that the restriction is unreasonable and that Mr. Brown has a colorable claim that the covenant is unenforceable.

### 3.    The Court Should Not Blue Pencil the Covenants

The Covenants are unreasonable as written and should be declared unenforceable.  The Court should not blue pencil the unreasonable Covenants because to do so would be to reward MPI, a sophisticated business that has been in

---

[28]    *See, e.g., Kodiak Bldg. Ptrs., LLC v. Adams*, 2022 WL 5240507 at *12.

[29]    *See FP UC Holdgs., LLC, v. Hamilton,* No. 2019-1029-JRS, 2020 WL 1492783 at *7 (Del. Ch. Mar. 27, 2020) (finding that the noncompete was so broad that there was no way for the employee *not* to breach it).

22

litigation before and that has been represented by multiple law firms, for crafting grossly overbroad covenants and holding those covenants over Mr. Brown's head to keep him from earning a living in his chose profession only out of spite and not because Mr. Brown is (or ever has) competing or even threatening to compete. And, for the past six (6) months, MPI's tactic has worked—it has threatened to sue Mr. Brown anytime he asks for the Residuals, leaving Mr. Brown paralyzed.

Consistent with the precedent of this Court, the Covenants should not be blue penciled and should, instead, be declared unenforceable.[30]  Mr. Brown has established a colorable claim that the Covenants are unenforceable.

### D.    The Covenants Are Unenforceable Because They Do Not Protect Any Legitimate Economic Interest of MPI

MPI will suffer no harm if it is enjoined from suing to enforce the Covenants against Mr. Brown.  Mr. Brown is not and never has competed with MPI.  His consulting business, AMS, does not compete with MPI.  Mr. Brown had hoped to expand AMS to a consulting business that helps its customers negotiate their

---

[30]     *See Intertek Testing Servs NA, Inc.*, 2023 WL 2544236, at *; *FP UC Holdgs., LLC v. Hamilton*, 2020 WL 1492783, at *7-8 (Del. Ch. Mar. 27, 2020) ("If the employer overreaches by imposing an obviously overbroad restriction on its employee's ability to seek employment after separation, this court wil readily decline to enforce the restriction); *Del. Elevator, Inc. v. Williams*, No. 5596–VCL, 2011 WL 1005181, at *10-11 (Del. Ch. Mar. 16, 2011); *Kodiak*, 2022 WL 5240507, at *4 ("Where noncompete or nonsolicit covenants are unreasonable in part, Delaware courts are hesitant to blue pencil such agreements to make them reasonable").

contracts with merchant-service providers.  AMS does not, and has always expressly refused to, service any MPI account out of fear that MPI will file suit arbitrarily and without any basis merely because Mr. Brown would be engaging with an MPI customer.  But MPI will not—cannot be—harmed by the type of work AMS does as it in no way competes with (or even provides any of the same products or services as) MPI.  And, even though AMS has never had a single paying client, MPI continues even now to threaten suit.

### E.  The Covenants Are Unenforceable Because the Balance of the Equities Weighs Heavily in Favor of Plaintiff

The Court is reluctant to enforce a covenant that would preclude the employee from gainful employment.[31]  "Where a restriction on the ability to be gainfully employed is involved, the customary sensitivity of a court of equity to the particular interest affected by its remedies is heightened."[32]  In balancing the equities, the Court will analyze whether the consequences of enforcement to the employee are grave and/or whether the interests of the employer are "slight or ephemeral."[33]  "Disproportionate hardship" is a reason to refuse to enforce a

---

[31]  *Pfuhl*, 1992 WL 345464, at *15.

[32]  *LewMore, Inc .v. Fleming*, 1986 WL 1244, at *2 (Del. Ch. Jan. 29, 1986).

[33]  *McCann Surveyors, Inc.*, 611 A.2d at 9; *Bernard Personnel Consultants, Inc. v. Mazarella*, No. 11660, 1990 WL 124969 (Aug. 28, 1990).

24

restrictive covenant.[34]  If the equities balance in the employee's favor, even a well-drafted covenant will not be enforced.

Only actual harm is relevant to this determination.  Actual harm requires there to be specific economic harm.[35]  Potential or future harm will not be considered.[36]  The amount of actual harm is also considered.  Taking one or two customers may not be enough.[37]  If a former employee has a job and is not using the employer's customer lists or other proprietary information, a request for an injunction will likely fail.[38]

Here, Mr. Brown's work for AMS will cause *no harm* to MPI.  AMS has never and has no intention of offering any of the same products or services as MPI.  Any claim by MPI of potential harm is both factually incorrect and, in any event, insufficient.

Moreover, due to MPI's continued threats of suit, Mr. Brown has had to take a job in a totally different industry and has faced *significant* financial hardship as a

---

[34]  *McCann Surveyors, Inc.*, 611 A.2d at 4.

[35]  *Burris Foods, Inc. v. Razzano*, No. 1077, 1984 WL 8230 (Del. Ch. July 18, 1984).

[36]  *Take-A-Break Coffee Servs., Inc. v. Grose*, No. 11217, 1990 WL 67392 (Del. Ch. May 15, 1990).

[37]  *See Meyer Ventures, Inc. v. Barnak*, No. 11502, 1990 WL 172648 (Del. Ch. Nov. 2, 1990).

[38]  *McCann Surveyors, Inc.*, 611 A.2d at 4.

result.  There can be no doubt that Mr. Brown, a young family man and sole

breadwinner, who has had no income in months and who has had to drain his entire

savings, has and will continue to suffer tremendous harm if MPI is not enjoined

from suing Mr. Brown seeking to enforce the unlawful and unenforceable

covenants. The equities weigh in Mr. Brown's favor.

### III.    Plaintiff Will Suffer Irreparable Harm If a TRO Is Not Entered

Mr. Brown will suffer immediate and irreparable harm unless MPI is

enjoined from its ongoing interference with his ability to work in this industry and

to operate AMS.  Where, as here, the balance of hardships tips decidedly towards

the plaintiff, "it is ordinarily sufficient that the plaintiff has raised questions going

to the merits which are so serious, substantial, difficult and doubtful, as to make

them fair ground for litigation and thus, for more deliberative investigation."[39]  In

contrast to an application for a preliminary injunction, which is heard after the

record has been developed through discovery, an assessment of the probability of

the ultimate success is not the critical question.  Instead, the present Motion is

determined "primarily upon the injury to plaintiff that is threatened and the

---

[39]    *G.B.C., Inc. v. United States*, 302 F. Supp. 1283 (E.D. Tenn. 1969) (cited by
*Cottle v. Carr*, No. 9612, 1988 WL 10415 (Del. Ch. Feb. 9, 1988)).

possible injury to defendant if the remedy is improvidently granted."[40]  As

Chancellor Allen explained:

> The essential predicate for issuance of the remedy is a
> threat of imminent, irreparable injury.  Once that is
> shown, the remedy ought ordinarily to issue unless the
> Court is persuaded (1) that the claim asserted on the
> merits is frivolous or not truly litigable, (2) that the risk
> of harm in granting the remedy is greater than the risk to
> plaintiff of denying it, or (3) that plaintiff has not
> proceeded as promptly as it might, and has therefore
> contributed to the emergency nature of the application
> and is guilty of laches.[41]

Similarly, then-Vice Chancellor Jacobs explained that the standard on a TRO

Motion is whether the moving party has made a showing "sufficient to justify

holding up the challenged act or transaction for the brief period required to develop

an evidentiary record and to make an orderly presentation of a preliminary

injunction motion."[42]

Thus, a TRO should issue, as the harm to Mr. Brown is imminent,

irreparable, and significant. Without a TRO, he is unable to operate AMS and work

as a consultant in merchant services *or to work in any employment* in merchant

services.

---

[40]     *Cottle*, 1988 WL 10415, at *2 (citing *UIS, Inc. v. Walbro Corp.*, No. 9323-
CA, 1987 WL 18108, at *3 (Oct. 6, 1987)).

[41]     *Id*. (internal citations omitted).

[42]     *Hecco Ventures v. Sea-Land Corp.*, No. 8486, 1986 WL 5840 at *3 (Del.
Ch. May 19, 1986) (relied upon by *Cottle*, 1998 WL 10415 at *3).

## CONCLUSION

For the foregoing reasons, as well as those presented in the Verified Complaint, Plaintiff respectfully requests that this Court grant his Motion for a Temporary Restraining Order in the proposed form of order submitted herewith.

CLARK HILL PLC

/s/ Margaret M. DiBianca
Margaret M. DiBianca, Esq. (No. 4539)
824 N. Market Street, Ste. 710
Wilmington, DE  19801
Telephone:  302-250-4748
Email:  mdibianca@clarkhill.com
**WORDS:  6,153**

Dated:   August 21, 2023          *Attorneys for Plaintiff*

# TAB 10

EFiled:  Aug 21 2023 05:10PM EDT
Transaction ID 70683025
Case No. 2023-0859-

# Exhibit 1

## BANK RELATIONSHIP MANAGER EMPLOYMENT AGREEMENT

This Bank Relationship Manager Employment Agreement ("**Agreement**") is entered into as of Sept 15th, 2015 by and between Jeremy Brown ("**Bank Relationship Manager**") and Mercantile Processing Inc., a Delaware corporation (the "**Company**"), this Agreement shall supersede any verbal or written offer previously entered into by the parties.

## 1. EMPLOYMENT

The Company agrees to continue to employ Bank Relationship Manager, and Bank Relationship Manager agrees to continue to accept employment by the Company as its Head of Sales and report to the Company's Chief Executive Officer. Changes may be made from time to time by the Company in its sole discretion to the duties, reporting relationships and title of Bank Relationship Manager. Bank Relationship Manager will perform the duties as are commensurate and consistent with Bank Relationship Manager's position and will devote Bank Relationship Manager's working time, attention and efforts to the Company and to discharging the responsibilities of Bank Relationship Manager's position, and such other duties as may be assigned from time to time by the Company, which relate to the business of the Company and are reasonably consistent with Bank Relationship Manager's position. During Bank Relationship Manager's employment, Bank Relationship Manager will not engage in any business activity that, in the reasonable judgment of the Board of Directors, conflicts with the duties of Bank Relationship Manager under this Agreement, whether or not such activity is pursued for gain, profit or other advantage.

## 2. COMPENSATION AND BENEFITS

### 2.1   Annual Salary

Bank Relationship Manager's compensation shall consist of an annual base salary (the "**Salary**") of $40,000 payable in semi-monthly installments in accordance with the payroll practices of the Company. The salary is directly comparable with the sales quotas outlined in the schedule A.  In addition to the salary the Bank Relationship Manager shall be entitled to residuals on previous accounts obtained as a sales agent and commissions outlined in the Quota Calculator. The Salary shall be reviewed, and shall be subject to change, by the Chief Executive Officer and/or the Board of Directors, as applicable, at least annually while Bank Relationship Manager is employed hereunder.

### 2.3   Benefits

Bank Relationship Manager shall be responsible for all his own benefits. Including but not limited to; health, dental, eye, car insurance, and life insurance.

### 2.4   Vacation and Other Paid Time-Off Benefits

Bank Relationship Manager shall be entitled to paid time-off and sick leave as laid out in the employee hand book.

## 3. TERMINATION

### 3.1   Employment At Will

Bank Relationship Manager acknowledges and understands that employment with the Company is at will and can be terminated by either party for no reason or for any reason not otherwise specifically prohibited by law. Nothing in this Agreement is intended to alter Bank

Relationship Manager's at-will employment status or obligate the Company to continue to employ Bank Relationship Manager for any specific period of time, or in any specific role or geographic location. Except as expressly provided for in this Agreement, upon any termination of employment, Bank Relationship Manager shall not be entitled to receive any payments or benefits under this Agreement other than unpaid Salary earned through the date of termination and unused vacation that has accrued as of the date of Bank Relationship Manager's termination of employment that would be payable under the Company's standard policy.

### 3.2   Automatic Termination on Death or Total Disability

This Agreement and Bank Relationship Manager's employment hereunder shall terminate automatically upon the death or Total Disability of Bank Relationship Manager. "***Total Disability***" shall mean Bank Relationship Manager's inability, with reasonable accommodation, to perform the duties of Bank Relationship Manager's position for a period or periods aggregating ninety (90) days in any period of one hundred eighty (180) consecutive days as a result of physical or mental illness, loss of legal capacity or any other cause beyond Bank Relationship Manager's control. Bank Relationship Manager and the Company hereby acknowledge that Bank Relationship Manager's ability to perform Bank Relationship Manager's duties is the essence of this Agreement. Termination hereunder shall be deemed to be effective (a) at the end of the calendar month in which Bank Relationship Manager's death occurs or (b) immediately upon a determination by the Board of Directors (or the Compensation Committee thereof) of Bank Relationship Manager's Total Disability. In the case of termination of employment under this Section 3.2, Bank Relationship Manager shall not be entitled to receive any payments or benefits under this Agreement other than residuals as outlined in the independent agent contract. In the case of death Bank Relationship Managers residual will be pass to next of kin or transferred as stated by his will.

### 4.   Non-Solicitation, Non Complete, Non Disclosure

In the case of any violation of section 4, during or after employment; Bank Relationship Manager forfeits their rights to residuals or compensation under the schedule A and is liable for any damage to Company.

### 4.1   Non Solicitation

The Bank Relationship Manager acknowledges that during the performance of this agreement, it will acquire information and contacts which are valuable to MPI. The Bank Relationship Manager further acknowledges that it is necessary to protect the interest of MPI and its merchant base by entering into the following covenant not to compete, as provided herein.

The Bank Relationship Manager covenants, represents, acknowledges and agrees that for a period of five (5) years following the termination of this agreement, neither the Bank Relationship Manager, its successors or assigns, nor its Associated Sales Personnel, either, individually or through any other entity for which he, she, or it works or from which he, she, or it would receive financial remuneration for the placement of Merchant Client Accounts, will not solicit company merchant applications anywhere in the United States of America from Merchant Client Accounts.

The Bank Relationship Manager acknowledges, agrees and understands that any violation of this Section shall cause MPI immediate and irreparable harm for which there is no adequate

remedy at law.  Sales Manger further acknowledges, agrees and understands that in the event Bank Relationship Manager breaches any of these covenants, notwithstanding any other remedy at law or equity, MPI may protect its right of property and good will by seeking injunctive relief and related damages.

### 4.1   Non Compete

Bank Relationship Manager Acknowledges that MPI has a regional advantage and agrees that for the term of one year not to work for a competing entity or financial institution within 250 miles.

### 4.1   Non Disclosure

The Bank Relationship Manager acknowledges that during the performance of this agreement, it may acquire Trade Secrets and Confidential Information of MPI and its affiliates, and further that the disclosure of said Trade Secrets and Confidential Information to competitors of MPI or the public would be damaging to MPI its affiliates, successors, and assigns.
The Bank Relationship Manager shall not at any time during or after the termination of this agreement disclose to any third party any Trade Secrets or Confidential Information it obtained as a result of this agreement.
All sales manuals, customer lists, software and other media including trademarks provided to the Bank Relationship Manager by MPI shall at all times remain the property of MPI. Upon termination or expiration of this agreement, the Bank Relationship Manager shall immediately return all sales manuals, price lists, customer lists, mailing lists, and any and all other documents, materials, and media however recorded.  The Bank Relationship Manager shall ensure that said proprietary items are properly protected from disclosure, damage, or theft.

### 5.   Continuation of Payment

Upon termination or resignation of Bank Relationship Manager, Bank Relationship Manager is entitled to ongoing residuals as outlined in Independent Agent Agreement and schedule A. Upon termination or resignation Bank Relationship Manager will not be entitled to any right or benefit that is outline in the employee handbook. Bank Relationship Manager will become a subcontractor as outline in the Independent Agent Agreement.

Accounts boards by agent or agent's referral partners will pay residuals for life of the account as dictated in Independent agent agreement. Accounts boards through Bank of Delmarva will be for 3 years after termination or resignation.

### 4.   ASSIGNMENT

This Agreement is personal to Bank Relationship Manager and shall not be assignable by Bank Relationship Manager. The Company may assign its rights hereunder to (a) any Successor Employer; (b) any other corporation resulting from any merger, consolidation or other reorganization to which the Company is a party; (c) any other corporation, partnership, association or other person to which the Company may transfer all or substantially all of the assets and business of the Company existing at such time; or (d) any subsidiary, parent or other affiliate of the Company. All of the terms and provisions of this Agreement shall be binding upon and shall inure to the benefit of and be enforceable by the parties hereto and their respective successors and permitted assigns.

## 5.  AMENDMENTS IN WRITING

No amendment, modification, waiver, termination or discharge of any provision of this Agreement, or consent to any departure therefrom by either party hereto, shall in any event be effective unless the same shall be in writing, specifically identifying this Agreement and the provision intended to be amended, modified, waived, terminated or discharged and signed by the Company and Bank Relationship Manager, and each such amendment, modification, waiver, termination or discharge shall be effective only in the specific instance and for the specific purpose for which given. No provision of this Agreement shall be varied, contradicted or explained by any oral agreement, course of dealing or performance or any other matter not set forth in an agreement in writing and signed by the Company and Bank Relationship Manager.

## 6.  NOTICES

Every notice relating to this Agreement shall be in writing and shall be given by personal delivery, by a reputable same-day or overnight courier service (charges prepaid), by registered or certified mail (postage prepaid, return receipt requested) or by facsimile to the recipient with a confirmation copy to follow the next day to be delivered by personal delivery or by a reputable same-day or overnight courier service to the appropriate party's address or fax number below (or such other address and fax number as a party may designate by notice to the other parties):

7

If to the Company:     Mercantile Processing Inc
                       32695 Roxana  Rd
                       Millville, DE 19967
                       Attn: Chief Executive Officer

If to the Bank
Relationship
Manager:               Jeremy Brown
                       21379 Tree View
                       Millsboro, DE 19966

## 7.  APPLICABLE LAW

This Agreement shall in all respects, including all matters of construction, validity and performance, be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without regard to any rules governing conflicts of laws.

## 8.  ENTIRE AGREEMENT

This Agreement, on and as of the Effective Date, constitutes the entire agreement between the Company and Bank Relationship Manager with respect to the subject matter hereof, and all prior or contemporaneous oral or written communications, understandings or agreements between the Company and Bank Relationship Manager with respect to such subject matter are hereby superseded in their entirety, except as otherwise provided herein.

## 9.  SEVERABILITY

If any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement or any action in any other

jurisdiction, but this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

## 10. WAIVERS

No delay or failure by any party hereto in exercising, protecting, or enforcing any of its rights, titles, interests, or remedies hereunder, and no course of dealing or performance with respect thereto, shall constitute a waiver thereof. The express waiver by a party hereto of any right, title, interest, or remedy in a particular instance or circumstance shall not constitute a waiver thereof in any other instance or circumstance. All rights and remedies shall be cumulative and not exclusive of any other rights or remedies.

## 11. HEADINGS

All headings used herein are for convenience only and shall not in any way affect the construction of, or be taken into consideration in interpreting, this Agreement.

## 12. COUNTERPARTS

This Agreement, and any amendment or modification entered into pursuant to Section 5 hereof, may be executed in any number of counterparts, each of which counterparts, when so executed and delivered, shall be deemed to be an original and all of which counterparts, taken together, shall constitute one and the same instrument.

**IN WITNESS WHEREOF**, the parties have executed and entered into this Agreement effective on the date first set forth above.

**BANK RELATIONSHIP MANAGER**

**Mercantile Processing INC**

By /

Its CEO

# Exhibit 2

# INDEPENDENT AGENT AGREEMENT

**THIS AGREEMENT** dated _____, 20___, between **MPI (Mercantile Processing Inc)**

and; _Jeremy Brown_____ located at _21379  Freeview Lane_____

_Millsboro  De  19966_____ (Hereinafter referred to as **IA**) has been entered into between the parties as follows:

**WHEREAS MPI** is in the business of providing certain electronic payment services to the business community including but not limited to the electronic capture of transactions utilizing VISA U.S.A., Inc. (hereinafter referred to as VISA), MasterCard International, Inc. (hereinafter referred to as MasterCard), Discover Card, and American Express (including any other credit card or debit card company, collectively referred to herein as "Credit/Debit Card Companies"); the sale of electronic draft capture equipment; and the marketing on behalf of several financial institutions;

**WHEREAS MPI** is desirous of allowing the independent marketing of its services under a basis limited as specified herein;

**WHEREAS** the **IA** is an independent sales organization willing to market the services and equipment of **MPI** within the limitations specified herein; and

**WHEREAS** the parties intend to revoke all previous agreements between the parties unless specifically incorporated herein;

**NOW THEREFORE,** to evidence the aforementioned intent of the parties and in consideration of the foregoing premises, and of the mutual covenants and conditions hereinafter set forth, the parties hereto intending to be legally bound agree as follows:

1. **Definitions.**

1-1 Except as provided below; for purposes of interpretation of this agreement the following terms shall be construed as follows:

A.   "Associated Sales Personnel" shall include any and all employees, independent contractors, agents or any other person who acts for or on behalf of the **IA**, or is controlled to any extent whatsoever by the **IA** in the solicitation of merchant applications to be submitted to **MPI** or in any other marketing activity undertaken on behalf of **MPI**.

B.   **MPI** shall include the corporation and its successors, assigns, subsidiaries and affiliates.

C.   "Cause" shall mean to be in default or material breach of any term of the agreement.

D.   "The **IA**" is the above named entity which may be a corporation, partnership, sole proprietorship doing business under an assumed name, an individual or any other entity.

E.   "Merchant Client Accounts" are those accounts, which originate from merchant clients solicited by the **IA** and placed through **MPI**.

_____MPI Initials          _____IA Initials

F.   "Good Standing" shall mean to not be in breach or default of any or all of the terms of this agreement.

G-1  The term "Trade Secrets" shall mean the whole or any portion or phrase of any scientific or technical information, design, process, procedure, formula, or improvement that is valuable and not generally known to competitors of **MPI**. Trade Secrets shall include, without limitation, the specialized information and technology **MPI** may develop or acquire with respect to computer software programs, including without limitations all computer programs, source code, object code, listings, print-outs, flow charts, written algorithms, research materials, programming notes, programming aids, data specifications, test results and related documentation (all of the foregoing hereinafter referred to as "software products").

G-2  The term "Confidential Information" shall mean any data or information, other than Trade Secrets, that is important to **MPI**, and not generally known by the public. To the extent consistent with the foregoing definition, Confidential Information includes without limitation the following: (1) the sales records, profit and performance reports, pricing manuals, sales manuals, training manuals, selling and pricing procedures and financing methods of **MPI**; (2) strategic data, including marketing and development plans, forecasts and forecast assumptions and volumes, and future plans and potential strategies of **MPI**; and (3) customer data, including customer lists, names of customers and their representatives, data provided by or about prospective, existing or past customers, customer service materials, and the type, quantity and specifications of products purchased, leased or licensed by customers of **MPI**.

G-3  Notwithstanding the definitions set forth above, "Trade Secrets" and Confidential Information does not include: (1) that which is or becomes generally known to the public; (2) that which is already known or is developed after termination by the **IA** or Associated Sales Personnel through entirely independent efforts; (3) that which the **IA** or Associated Sales Personnel obtains through an entirely independent source having a bona fide right to use and disclose such information; (4) that which is required to be disclosed by law, except to the extent eligible for special treatment under an appropriate protective order; or (5) that which is approved by the company for unrestricted release by express authorization.

**2.   Terms and Renewal.**

2-1   The term of this Agreement shall be two (2) years. This Agreement shall be renewed upon the expiration of the term hereof for successive one (1) year periods, unless notice of a termination is given (i) by **IA** or **MPI** within (30) days of the expiration of the initial, or any renewal term or (ii) pursuant to Sections 2.2.

2-2   **MPI** may immediately terminate this agreement at any time by giving written notice to the **IA** for any one of the following reasons:

A.    Fraud, or misrepresentation by the **IA** or Associated Sales Personnel to **MPI** clients, potential clients, merchants or any other related parties either prior to the execution of this agreement to induce its execution, or during its term, including attempts to induce **MPI** to execute or continue performance of merchant agreements whether or not in collusion with merchant clients by making false representations.

B.   Non-compliance by the **IA** or Associated Sales Personnel with applicable Credit/Debit Card Company bylaws, rules and regulations, state or federal laws and regulations.

C.   Impossibility or impracticability of performance by **MPI** due to changes: in Credit/Debit Card Company bylaws, rules and regulations; in bylaws, rules and regulations of any other provider of services to **MPI**; or in federal, state or local laws, regulations, or ordinances which this agreement cannot reasonably be modified to accommodate.

**MPI** Initials                                    **IA** Initials

D.   The violation, omission, or breach by the **IA** or Associated Sales Personnel of any provision, duty, or obligation required of it under this agreement.

E.   The **IA** makes any attempt to convert any Merchant Client Account relationship from **MPI** to any other entity performing services similar to **MPI**.

F.   **MPI** may, within 10 days written notice, terminate this agreement if **MPI**, in its sole and exclusive judgment, determines that its business reputation is negatively affected by the quality of services rendered by the **IA**.

G.   The **IA** fails to present itself to the marketplace as **MPI** when soliciting **MPI** Merchant Client Accounts.

### 3.   Consideration.

3-1 The **IA** acknowledges that each term of this agreement constitutes adequate consideration for all other terms.

### 4.   Force Majeure.

4-1   The performance of **MPI** hereunder is subject to interruption and delay due to causes beyond its control such as acts of God, acts of any government, war or other hostility, civil disorder, weather, fire, power failure, equipment failure, labor dispute, and like causes.  Said interruption or delay shall not be deemed to be a breach hereunder.

### 5.   Duties and Responsibilities of IA.

5-1   The **IA** shall use its best efforts to solicit merchant client applications and agreements for the credit card transaction processing services of **MPI** and the sale or lease of the related equipment to merchant clients.  The **IA** shall assist in the execution and distribution by the merchant client of the appropriate merchant agreement and any modifications thereof.  Upon completion of these requirements, the merchant client shall become a Merchant Client Account.

5-2   The **IA** shall be responsible for the initial setup of the equipment used in providing the processing services for Merchant Client Accounts, including but not limited to the installation of the equipment, the initial training of merchant and merchant personnel, and the delivery of operating and training manuals to the merchant.

5-3     The **IA** shall at **IA's** expense recruit, hire, train, and supervise a staff of sales and customer service representatives to solicit and service the merchant applications in compliance with requirements of **MPI** and its financial institution for establishing new Merchant Client Accounts.

5-4   The **IA** shall be responsible for the collection and disbursement of all applicable sales tax due upon the sale of equipment to any Merchant Client Accounts and any and all reporting requirements thereof.

5-5     The **IA** and **MPI** shall communicate to all Merchant Client Accounts any and all necessary information including but not limited to changes in pricing and service from **MPI**, its financial institutions, or network providers.

5-6   The **IA** shall ensure that its Associated Sales Personnel are properly trained and supervised so as to act at all times in a professional manner while marketing the services and products of **MPI**.

**MPI** Initials          **IA** Initials

5-7   The IA shall properly adhere to any and all government regulations including but not limited to reporting of any and all appropriate tax, the acquisition of any and all documents of employment insurance including but not limited to workers compensation, unemployment insurance, and state disability insurance.

5-8   The IA shall, throughout the term of this agreement, obtain and maintain at its own cost and expense from a qualified insurance company, a comprehensive commercial general liability insurance policy naming MPI as an additional insured.

5-9   The IA shall ensure that its Associated Sales Personnel have been subject to review for exclusion by MPI, both prior to and during their employment or association with the IA, from the marketing of MPI services or products for reasons including but not limited to felony convictions, discharge from previous employment for cause, or any other indication of moral turpitude which would render the Associated Sales Personnel to be an unacceptable representative of MPI and the IA.

5-10   The IA shall be responsible for the initial customer contact concerning maintenance and service (if so contacted by the merchant), the ongoing servicing and replacement of the Merchant Client Accounts' equipment and software, and shall, upon request by MPI, act as liaIAn between MPI and the Merchant Client Accounts in handling equipment maintenance and servicing.

5-11   The IA shall submit a resale Tax ID number as well as any tax exempt certificate/resale certificate, etc. required by their respective state of business.

5-12   The IA must have prior written approval before any reproduction of any and all marketing materials including but not limited to any and all of the corporate identities or logos of MPI, its processors, and Credit/Debit Card Companies.

5-13   The IA shall provide MPI with a written list of all proposed associated personnel and current Associated Sales Personnel, their social security numbers and the addresses and telephone numbers of the principal office of itself and all Associated Sales Personnel regardless of whether said sales personnel are employees of the IA or independent contractors providing services to the IA.  Furthermore the IA shall provide MPI with any other information which is reasonably necessary for the performance of this agreement or compliance with Credit/Debit Card Company bylaws, rules ands regulations, upon request and within a reasonable time thereof.

5-14   The IA shall permit MPI to check the credit of the IA and/or any of its Associated Sales Personnel and shall execute any all documents, consents or authorizations necessary to facilitate the performance of said credit check.

5-15   IA represents that it does not have a contractual relationship for the placement of credit card transaction processing services or for the sale or lease of equipment related to said services with any entity providing services similar to those to be performed by MPI under the terms of this Agreement which would bar IA from entering into this Agreement.

5-16   The IA shall be responsible for notifying in writing to MPI any and all residual discrepancies or errors in residual reporting within 60 days of original receipt of such residual report identifying such discrepancy or error. MPI will not be responsible to IA for any discrepancies or errors in residual reporting which have not been notified to MPI and which exceed the 60 day notification period.

_____ MPI Initials          _____ IA Initials

## 6. Duties and Responsibilities of MPI.

6-1 **MPI** shall sell equipment, software, supplies and Merchant Client Account leasing services to **IA** at contract stipulated prices. **IA** may use alternate suppliers of equipment, software, leasing and supplies at the discretion of the **IA**.

6-2 **MPI** shall provide pricing of its electronic processing services to **IA**, as specified in your Pricing Addendum Schedule and any addenda thereto, which is annexed hereto and made a part hereof.

6-3 **MPI** shall provide the following to **IA**, including but not limited to, merchant application forms, promotional material, certain technical support and training for its personnel, monthly residual reporting including monthly transactional volume, average ticket information, the discount rate charged, and the commission earned, by the **IA**, certain on line electronic mail reporting, customer service and support, equipment maintenance, new and innovative value added products and services, merchant status reporting, fully integrated payment capabilities, and electronic ACH products.

## 7. Compensation/Base Commission of IA.

7-1 The **IA** shall be entitled to retain fees collected by it in excess of the pricing it obtains from **MPI** for on site inspection, equipment setup, and merchant client applications fees. Pricing may be amended or modified from time to time within the discretion of **MPI** and its financial institutions, and the **IA** shall be bound by such change upon written notice by **MPI**.

7-2 The **IA** may be entitled to a monthly residual base commission above the price it obtains from **MPI** for the credit card processing of Merchant Client Accounts. This **IA** residual base commission shall be calculated by subtracting the buy rate price the **IA** obtains from **MPI** from the price received from the Merchant Client Accounts multiplied by the monthly Merchant Client Accounts monthly credit card processing volume. The buy rate price **IA** obtains from **MPI** may be amended from time to time within the discretion of **MPI** and its financial institution, and the **IA** shall be bound by such change upon written notice by **MPI**.

7-3 Residual base commissions shall be payable by **MPI** to the **IA** approximately one month after the commissions are earned, subject to **MPI**'s right to setoff any amount owed to it by the **IA**.

7-4 The **IA** acknowledges that **MPI** may be subject to price changes in its clearing, settlement, interchange and communication transactions that are beyond its control. **MPI** shall use its best efforts to provide written explanation of any price change to the extent that such price change is the result of changes in the direct costs of **MPI**'s processing services. **IA** shall be bound by such change upon written notice by **MPI**

## 8. Ongoing Commissions to IA.

8-1 Upon the expiration of this agreement, if the **IA** is in Good Standing, the **IA** shall be entitled to ongoing commissions from the processing of Merchant Client Account transactions subject to paragraph **8-3.**

8-2 If **IA** defaults in the performance of any of the terms or conditions of this agreement or materially breaches this agreement and said default or breach continues uncured for a period of thirty (30) days from the date **MPI** gives notice to the **IA** in the manner set forth below of said default or breach, this agreement shall automatically terminate, the **IA** shall forfeit any right to any payment hereunder and **MPI** shall be entitled to all rights, privileges, and interest of **IA** in Merchant Client Accounts, without further notice to **IA**. **MPI** in addition shall be entitled to protect and enforce all of its rights, remedies and interest hereunder to the fullest extent permissible at law and in equity. _____MPI Initials          _____IA Initials

8-3 Upon the expiration of this agreement, **IA** agrees and acknowledges that if **IA's** compensation for any monthly period is less than $200.00 and/or new merchant account have not been submitted, by **IA**, for two consecutive years, **IA** relinquishes any and all right to payment or to the carryover to future periods of such amounts.

## 9.   Merchant Client Applications.

9-1 The **IA** agrees to submit all merchant client applications as provided herein.  The **IA** shall use the merchant application forms and merchant agreement forms, which **MPI** shall provide from time to time and shall not modify or alter such forms in any way without the express written permission of the president of **MPI**. The parties agree that any application may within the sole discretion of **MPI** be denied for any reason whatsoever.  All agreements with Merchant Client Accounts for processing services shall be between the Merchant Client Account and **MPI** its successors or assigns and **MPI's** settling bank.  Any failure on the part of the **IA** to perform any or all of the terms and conditions set forth in this Section 9-1 shall constitute a material breach of this agreement.

## 10.   Confidential Information and Trade Secrets.

10-1 The **IA** acknowledges that during the performance of this agreement, it may acquire Trade Secrets and Confidential Information of **MPI** and its affiliates, and further that the disclosure of said Trade Secrets and Confidential Information to competitors of **MPI** or the public would be damaging to **MPI** its affiliates, successors, and assigns.

10-2 The **IA** shall not at any time during or after the termination of this agreement disclose to any third party any Trade Secrets or Confidential Information it obtained as a result of this agreement.

10-3 All sales manuals, customer lists, software and other media including trademarks provided to the **IA** by **MPI** shall at all times remain the property of **MPI**.  Upon termination or expiration of this agreement, the **IA** shall immediately return all sales manuals, price lists, customer lists, mailing lists, and any and all other documents, materials, and media however recorded.  The **IA** shall ensure that said proprietary items are properly protected from disclosure, damage, or theft.

## 11.   Disclaimer of Warranties.

11-1 The parties acknowledge that **MPI** is not the manufacturer of any equipment provided to the **IA** for sale or lease. Unless otherwise expressly contained in an extended warranty or maintenance agreement provided by **MPI**, all equipment of any kind is sold "as is", there are no warranties which extend beyond the face of this agreement, and **MPI** expressly disclaims all warranties, express or implied, of any kind including warranties of merchantability and fitness for a particular purpose.

## 12.   Covenant not to Compete.

12-1 The **IA** acknowledges that during the performance of this agreement, it will acquire information and contacts which are valuable to **MPI**.  The **IA** further acknowledges that it is necessary to protect the interest of **MPI** and its merchant base by entering into the following covenant not to compete, as provided herein.

12-2 The **IA** covenants, represents, acknowledges and agrees that for a period of five (5) years following the termination of this agreement, neither the **IA**, its successors or assigns, any individual owning an equity interest in the **IA** nor its Associated Sales Personnel, either, individually or through any other entity for which he, she, or it works or from which he, she, or it would receive financial remuneration for the placement of Merchant Client Accounts, will not solicit merchant applications anywhere in the United States of America from Merchant Client

_____ **MPI** Initials                                    _____ **IA** Initials

Accounts.  Agent will have 60 days of training during which Agent will have option to opt out of regional non-compete.  Regardless of the result the remainder of contract will stay in effect to its term.

12-3 The **IA** acknowledges, agrees and understands that any violation of Section 10, 12-1, or 12-2 herein above shall cause **MPI** immediate and irreparable harm for which there is no adequate remedy at law.  **IA** further acknowledges, agrees and understands that in the event **IA** or any of its Associated Sales Personnel breaches any of these covenants, notwithstanding any other remedy at law or equity, **MPI** may protect its right of property and good will by seeking injunctive relief and related damages as well as capturing all residuals that **IA** would otherwise be entitled to.

## 13.  Transfer of Merchant Client Accounts.

13-1 The parties agree that their relationship is based upon the unique capabilities of the **IA** and its Associated Sales Personnel and therefore the **IA** may not transfer or assign any right, duty, obligation, or interest in Merchant Client Accounts without the written consent of **MPI** which shall not be unreasonably withheld.

13-2 The **IA** shall have the right to solicit offers for the sale of its interest in Merchant Client Accounts. Upon receipt of a written offer to purchase all or a portion of the Merchant Client Accounts ("Written Offer"), **MPI** shall have forty-five (45) days from notice thereof to match the terms and conditions of the Written Offer, by giving notice to the **IA** within the aforementioned forty-five (45) day period.  In the event **MPI** does not match the Written Offer, the **IA** may sell the Merchant Client Accounts to the entity making the Written Offer under the same terms and conditions as the Written Offer.

13-3 **MPI** may sell Merchant Client Accounts without the consent of **IA**.  If the sale's price for the Merchant Client Accounts is predicated on a multiple of monthly commissions received by **MPI** and at the option of **IA**, **IA** chooses to participate in said sale with **MPI** for its share of Merchant Client Accounts in which said sale terminates the interest of **IA** in the Merchant Client Accounts, the sale's price payable to **IA** from **MPI** for **IA's** interest in said Merchant Client Accounts shall be determined by the same multiple of monthly commissions that **MPI** received for said Merchant Client Accounts.  Payment of the sale's price to the **IA** shall be under the same terms and conditions as agreed to by **MPI**.

13-4 If the sale of the Merchant Client Accounts by **MPI** does not terminate the interest of the **IA** in the Merchant Client Accounts, or the sale's price is not based on a multiple of earnings, the **IA** shall have the option of continuing the relationship with the purchaser of the Merchant Client Accounts or forcing said purchaser to pay a one-time fee to **IA** for its interest in the Merchant Client Accounts equal to fifteen (15) times the average monthly commissions earned by the **IA** on the Merchant Client Accounts for the three (3) month period immediately preceding the date of the sale of **MPI**'s interest in the Merchant Client Accounts.  For purposes of this paragraph, the sale or transfer of Merchant Client Accounts to the spouse, or the lineal descendants or ascendants of a stockholder of **MPI**, or an entity in which a stockholder or **MPI** has an equitable or beneficial interest shall not entitle **IA** to any payment hereunder.

13-5Payment under this Article "13" shall release and discharge **MPI** from any further payment under any other paragraph of this agreement.

## 14.  Jurisdiction and Venue of Disputes.

14-1 The parties agree that with respect to any dispute concerning this agreement, the state or federal court in Delaware shall have exclusive subject matter jurisdiction.

**MPI** Initials                                    **IA** Initials

**15.** **Non-Waiver of Rights and Obligations.**

15-1 Failure on the part of **MPI** to exercise any right or privilege granted to it or to insist upon the full performance of any obligation assumed by the **IA** shall not be construed as waiving any such right, privilege, obligation, or duty, or as creating any custom contrary thereto. Any waiver of any right, privilege, obligation, or duty by **MPI** must be in writing, and if not in writing shall not be binding in any way and the written waiver of any right, obligation, or duty by **MPI** shall not operate beyond its terms. Any modification to this agreement must be in writing, and this provision may not be modified except in writing.

**16.** **Governing Law.**

16-1 The parties agree that except insofar as federal law may preempt, the laws of the State of Delaware shall govern this agreement.

**17.** **Further Assurances and Survival of Covenants.**

17-1 The **IA** shall execute all additional instruments and other documents, perform all additional acts and cooperate with **MPI** in every other way, which may be requested by **MPI** to carry out this agreement or the intent hereof.

17-2 All covenants of the **IA** shall survive the expiration or termination of this agreement to the extent required for their full observance and performance.

**18.** **Severance/Savings Clause.**

18-1 Any provision of this agreement held to be void, invalid, or unenforceable in any way shall be deemed to be severed, and the remainder of this agreement shall remain in full force and effect as if the severed portion had never been included.

**19.** **Merger and Modification.**

19-1 This agreement shall supersede and replace any and every existing contract and agreement between the **IA** and **MPI**, which is not specifically incorporated herein.

**20.** **Written Notice.**

20-1 All notices required by this agreement are to be in writing and shall be deemed to have been properly given, in the absence of rebutting evidence, upon the placing for delivery by certified mail, return receipt requested to the address below within the time period required by this agreement. Notice by facsimile machine must be memorialized by certified mail as provided herein:

MPI address:  **Mercantile Processing Inc**
35129 Roxana Rd
Frankford, DE 19945

IA address:  21379  Tree view Lane

Millsboro De , 19966

_____  MPI Initials

_____  IA Initials

## 21. Title and Headings.

21-1 The title and headings in this agreement exist solely for the convenience of the reader and do not limit the subject matter or effect of any term hereof.

## 22. Indemnity for Actions/Omissions.

22-1 The **IA**, its successors and/or assigns agrees to defend, indemnify, and hold harmless **MPI** its successors and/or assigns, its directors, officers, employees, its settling bank, its leasing companies and its shareholders (all of whom are hereinafter referred to as "Indemnities") from, for, and against any and all liability, loss, and expense (including reasonable attorney fees) whether or not presently known, discovered or contemplated and regardless of when discovered by anyone, which any Indemnity has incurred or may incur at any time during the performance of this agreement or thereafter which either wholly or partly arises as a result of any actual or alleged act, omission, transaction, or occurrence of the **IA**, its successors and/or assigns, its Associated Sales Personnel, its directors, officers, employees and subcontractors regardless of whether the **IA** is ultimately absolved of any liability.

## 23. Setoff.

23-1 **MPI** may at any time without notice apply any commissions or other credit balance owed to the **IA** by **MPI** to reduce any past due amounts of any kind whatsoever.

## 24. Limitations of Claims and Damages.

24-1 Any claim by **IA** which arises out of this agreement, or the performance thereof must be brought against **MPI** within one year after the basis for the claim becomes known to **IA**.

24-2 **MPI** shall not be liable to the **IA** for any consequential damages caused by its failure to perform under this agreement including, but not limited to, lost profits or damage to goodwill regardless of whether the claim arises in contract or in tort.

## 25. Construction.

25-1 Whenever the context so requires, the male gender when used herein shall be deemed to include the female gender, the female gender shall be deemed to include the male gender, the singular shall be deemed to include the plural and the plural shall be deemed to include the singular.

## 26. Representation by Counsel.

26-1 Each party has had the opportunity to have this agreement reviewed by counsel of his choosing prior to signing, and represents that he has reviewed this agreement with counsel, or hereby knowingly waives the right to have counsel review this agreement.

**IN WITNESS WHEREOF, the parties hereto enter into this agreement this** 25ᵗʰ **day of** September **, 20** 15 **:**

IA Business Name: _Jeremy J. Brown_

Name of Owner: _Jeremy J. Brown_

Signature of Owner: _Jeremy J. Brown_

Title: _Mr_

_____ **MPI** Initials          _____ **IA** Initials

**Owner SS#:** 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

**Federal Tax ID:**

**Address:** 21379 Tree view Lane

Millsboro De, 19966

**Tel. #:** (888) 443-0018

**Email:** brownjj-87@yahoo.com

**Fax #:**

**\*INTERNAL USE\***

**Accepted By:**

**Printed Name** Kyle Morgan Pres

MPI Initials

IA Initials

# MERCANTILE PROCESSING INC.

## Schedule A - Revenue Split Pricing (BOD @ 15%)

Gross Interchange Pass-Through + Dues and Assessments

Effective 2/14/12

| | Buy Rate | ISO/IA |
|---|---|---|
| **Interchange** | | |
| VISA/MC/DISC Associations Fees and Other Charges | Pass-Through | 50% over |
| **Network/Risk Fees** | **Buy Rate** | **ISO/IA** |
| Risk Monitoring Fee | 0.02% | N/A |
| VISA/MC/DISC Authorzation Fee; Dial/IP VITAL Network | $0.04 | 50% over |
| VISA/MC/DISC DEBIT (Regulated/Unregulated) Authorzation Fee; Dial/IP VITAL Network | $0.04 | 50% over |
| Voice Authorizations | $0.52 | 50% over |
| ARU | $0.52 | 50% over |
| **Monthly/One Time Fees** | **Buy Rate** | **ISO/IA** |
| Monthly Support Fee Vital | $10.00 | 50% over |
| Monthyl Support Fee First Data | $10.00 | 50% over |
| Charge Back Fee | $25.00 | 50% over |
| Retrival Fee | $15.00 | 50% over |
| DDA Change/Return Fee | $15.00 | 50% over |
| Batch Fee | $0.00 | 50% over |
| IRS Administration Fee | $59.95 | 50% over |
| Monthly Account on File Fee | $0.00 | 50% over |
| Monthly Minimum (optional) | $0.00 | 50% over |
| Application Fee (optional) | $0.00 | 50% over |
| **Other Services** | **Buy Rate** | **ISO/IA** |
| Gift Card | Varies | 50% over |
| Equipment Pricing and leasing(See Terminal Pricing Schedule) | Varies | 50% over |
| Payroll | Varies | 50% over |
| Cash Advance | Varies | 50% Payback AMt |
| PCI Compliance (Mandatory) - billed quarterly (18.80 compliant/ 28.80 noncompliant) | $0.00 | $0.00 |

_Jeremy Brown_
Agent Name (Print)

_Jeremy Brown_ (signature)
Agent Signature

_9 - 25 - 15_
Date

_Kyle Milqn_
MPI Officer (Print)

_(signature)_
Authorized Signature

_(date)_
Date

## MERCANTILE PROCESSING INC.

### Schedule B - Additional Service Pricing
Value Added Services
Shipping additional
Effective 2/14/12

| Payroll | Buy Rate | ISO/IA |
|---|---|---|
| Monthly - Retail, MOTO, Wholesale, Government | $35 | 50% over |
| Monthly - Restaurant, Adjusted Tip, Job Costing | $60.00 | 50% over |
| Per employee per pay period | $1.00 | 50% over |
| Check Delivery per pay run | $5.00 | 50% over |
| W2 | $3.50 | 50% over |
| **Gift Card / Loyalty Program** | **Buy Rate** | **ISO/IA** |
| Monthly Support | $7.50 | 50% over |
| Charge Back Fee | $25.00 | 50% over |
| Per Item | $0.14 | 50% over |
| Text(Per text number) | $0.35 | 50% over |
| Email Blast (To enire loyalty list) | $5.00 | 50% over |
| Art fee (1 hr min) | $145 hr | 50% over |
| 100 Cards | $99.00 | 50% over |
| 250 Cards | $200.00 | 50% over |
| 500 Cards | $300.00 | 50% over |
| 1000 Cards | $500.00 | 50% over |
| 2500 Cards | $1,000.00 | 50% over |
| **ATM Services** | **Buy Rate** | **ISO/IA** |
| ATM - Surcharge | $0.25 | 50% over |
| ATM- Monthly | $5.00 | 50% over |
| ATM Equipment Sales | $0.00 | 50% over |

Jeremy Brown
Agent Name (Print)

_(signature)_
Agent Signature

9-25-15
Date

Kyle Myers
MPI Officer (Print)

_(signature)_
Authorized Signature

_(date)_
Date

# MERCANTILE PROCESSING INC.

## Schedule C - POS Lavu
POS Lavu
Shipping additional
Effective 2/14/12

| POS Lavu License- One Time | Buy Rate | ISO/IA |
|---|---|---|
| Deal 1-4 Commission License Fees- Silver License- Cannot Increase Cost (One Time) | $895.00 | 50%over |
| Deal 5-9 Commission License Fees- Silver License- Cannot Increase Cost (One Time) | $895.00 | 50%over |
| Deal 10+ Commission License Fees- Silver License- Cannot Increase Cost (One Time) | $895.00 | 50%over |
| Deal 1-4 Commission License Fees- Gold License- Cannot Increase Cost (One Time) | $1,495.00 | 50%over |
| Deal 5-9 Commission License Fees- Gold License- Cannot Increase Cost (One Time) | $1,495.00 | 50%over |
| Deal 10+ Commission License Fees- Gold License- Cannot Increase Cost (One Time) | $1,495.00 | 50%over |
| Deal 1-4 Commission License Fees- Pro License- Cannot Increase Cost (One Time) | $2,495.00 | 50%over |
| Deal 5-9 Commission License Fees- Pro License- Cannot Increase Cost (One Time) | $2,495.00 | 50%over |
| Deal 10+ Commission License Fees- Pro License- Cannot Increase Cost (One Time) | $2,495.00 | 50%over |

| License Fee Monthly Cost Structure | Buy Rate | ISO/IA |
|---|---|---|
| Silver License- Cannot Increase Cost (Monthly) | $39.00 | N/A |
| Gold License- Cannot Increase Cost (Monthly) | $79.00 | N/A |
| Pro License- Cannot Increase Cost (Monthly) | $149.00 | N/A |
| Additional Terminal Cost for Pro License (Monthly) | $20.00 | N/A |

| Equipment Commission | Buy Rate | ISO/IA |
|---|---|---|
| Apple Product *Pricing of equipment indicated on POS Lavu Kit | N/A | 50%over |
| Non- Apple Product Accessories *Pricing of equipment indicated on POS Lavu Kit | N/A | 50%over |
| Installation/Setup Fee- Billed through MPI via credit card | 3% | 50%over |
| Installation/Setup Fee- Billed through Agent | $0.00 | 50%over |

Jeremy Brown
_____
Agent Name (Print)

_____
Agent Signature

9-25-15
_____
Date

Kyle Murray
_____
MPI Officer (Print)

_____
Authorized Signature

9/2/15
_____
Date

**MERCANTILE PROCESSING INC.**

**Schedule D - ePN Processing**
Virtual Terminal Options
Shipping additional
Effective 8/8/14

| | Buy Rate | ISO/IA |
|---|---|---|
| **Authorize.net** | | |
| Set Up Fee | $49.00 | 50%/Over |
| Monthly Fee | $10.00 | 50%/Over |
| Per Transaction Fee | $0.05 | 50%/Over |
| **Tgate/Bridgepay** | | |
| Set Up Fee | $29.00 | 50%/Over |
| Monthly Minimum | $20.00 | 50%/Over |
| Per Transaction Fee | $ 0.015 | 50%/Over |
| **ePN Set Up Fees (One Time)** | | |
| Online Terminal Only | $29.00 | 50%/Over |
| Internet Basic | $39.00 | 50%/Over |
| ePN Cart | $80.00 | 50%/Over |
| ePN BillPay | $50.00 | 50%/Over |
| ePN Mobile Pro | $49.00 | 50%/Over |
| ePN Plug In (For Quickbooks) | $100.00 | 50%/Over |
| ePN POS | $75.00 | 50%/Over |
| ePN Recur | $55.00 | 50%/Over |
| Customer Data Manager (CDM) | $5.00 | 50%/Over |
| **ePN Monthly Fees** | | |
| Online Terminal Only | $12.00 | 50%/Over |
| Internet Basic | $20.00 | 50%/Over |
| ePN Cart | $18.00 | 50%/Over |
| ePN BillPay | $15.00 | 50%/Over |
| ePN Mobile Pro | $8.00 | 50%/Over |
| ePN Plug In (For Quickbooks) | $0.00 | 50%/Over |
| ePN POS | $0.00 | 50%/Over |
| Customer Data Manager (CDM) | $15.00 | 50%/Over |
| **ePN Transaction Fees** | | |
| Online Terminal Only | $0.05 | 50%/Over |
| Internet Basic \| 1-250 Transactions | $0.00 | 50%/Over |
| Internet Basic \| 251+ Transactions | $0.05 | 50%/Over |
| ePN Cart | $0.05 | 50%/Over |
| ePN BillPay \| 1-250 Transactions | $0.00 | 50%/Over |
| ePN BillPay \| 251 + Transactions | $0.05 | 50%/Over |
| ePN Mobile Pro | $0.05 | 50%/Over |
| ePN Plug In (For Quickbooks) | $0.05 | 50%/Over |
| ePN POS | $0.00 | 50%/Over |
| ePN Recur | $0.00 | 50%/Over |

Jeremy Brown
Agent Name (Print)   Agent Signature   Date 9-25-15

MPI Officer (Print)   Authorized Signature   Date 9/25/15

Exhibit 3

**Head of Bank Partnerships EMPLOYMENT AGREEMENT**

This Head of Bank Partnerships Employment Agreement ("*Agreement*") is entered into as of Oct 1st, 2018 by and between Jeremy Brown ("***Head of Bank Partnerships***") and Mercantile Processing Inc., a Delaware corporation (the "*Company*"), this Agreement shall supersede any verbal or written offer previously entered into by the parties.

## 1.  EMPLOYMENT

The Company agrees to continue to employ Head of Bank Partnerships, and Head of Bank Partnerships agrees to continue to accept employment by the Company as its bank sales lead and report to the Director of Sales. Changes may be made from time to time by the Company in its sole discretion to the duties, reporting relationships and title of Head of Bank Partnerships. Head of Bank Partnerships will perform the duties as are commensurate and consistent with Head of Bank Partnerships' position and will devote Head of Bank Partnerships' working time, attention and efforts to the Company and to discharging the responsibilities of Head of Bank Partnerships' position, and such other duties as may be assigned from time to time by the Company, which relate to the business of the Company and are reasonably consistent with Head of Bank Partnerships' position. During Head of Bank Partnerships' employment, Head of Bank Partnerships will not engage in any business activity that, in the reasonable judgment of the CEO, conflicts with the duties of Head of Bank Partnerships under this Agreement, whether or not such activity is pursued for gain, profit or other advantage.

## 2.  COMPENSATION AND BENEFITS

### 2.1   Annual Salary

Head of Bank Partnerships compensation shall consist of an annual base salary (the "*Salary*") of $48,000 payable in semi-monthly installments in accordance with the payroll practices of the Company. The salary is directly comparable with the Bank quota outlined in the attached link.  In addition to the salary the Head of Bank Partnerships shall be entitled to residuals on previous accounts obtained as a sales agent and 15 % of net residual from subordinate employees and portfolio banks. Head of Partnerships may take residuals at 50% for direct sales per approval of Director of Sales. The Salary shall be reviewed, and shall be subject to change, by the Chief Executive Officer and/or the Board of Directors, as applicable, at least annually while Head of Bank Partnerships is employed hereunder. Annual review of salary will be completed in October of each year.

### 2.3   Benefits

Head of Bank Partnerships shall be responsible for all his own benefits. Including but not limited to; health, dental, eye, car insurance, and life insurance.

### 2.4   Vacation and Other Paid Time-Off Benefits

Head of Bank Partnerships shall be entitled to paid time-off and sick leave as laid out in the employee hand book.

## 3.  TERMINATION

### 3.1   Employment At Will

Head of Bank Partnerships acknowledges and understands that employment with the Company is at will and can be terminated by either party for no reason or for any reason not otherwise specifically prohibited by law. Nothing in this Agreement is intended to alter Head of Bank Partnerships' at-will employment status or obligate the Company to continue to employ Head of Bank Partnerships for any specific period of time, or in any specific role or geographic location. Except as expressly provided for in this Agreement, upon any termination of employment, Head of Bank Partnerships shall not be entitled to receive any payments or benefits under this Agreement other than unpaid Salary earned through the date of termination and unused vacation that has accrued as of the date of Head of Bank Partnerships' termination of employment that would be payable under the Company's standard policy.

### 3.2   Automatic Termination on Death or Total Disability

This Agreement and Head of Bank Partnerships' employment hereunder shall terminate automatically upon the death or Total Disability of Head of Bank Partnerships. *"Total Disability"* shall mean Head of Bank Partnerships' inability, with reasonable accommodation, to perform the duties of Head of Bank Partnerships' position for a period or periods aggregating ninety (90) days in any period of one hundred eighty (180) consecutive days as a result of physical or mental illness, loss of legal capacity or any other cause beyond Head of Bank Partnerships' control. Head of Bank Partnerships and the Company hereby acknowledge that Head of Bank Partnerships' ability to perform Head of Bank Partnerships' duties is the essence of this Agreement. Termination hereunder shall be deemed to be effective (a) at the end of the calendar month in which Head of Bank Partnerships' death occurs or (b) immediately upon a determination by the Board of Directors (or the Compensation Committee thereof) of Head of Bank Partnerships' Total Disability. In the case of termination of employment under this Section 3.2, Head of Bank Partnerships shall not be entitled to receive any payments or benefits under this Agreement other than residuals as outlined in the independent agent contract. In the case of death Head of Bank Partnerships residual will be pass to next of kin or transferred as stated by his will.

### 4.   Non-Solicitation, Non Complete, Non Disclosure

In the case of any violation of section 4, during or after employment; Head of Bank Partnerships forfeits their rights to residuals or compensation under the schedule A and is liable for any damage to Company.

### 4.1   Non Solicitation

The Head of Bank Partnerships acknowledges that during the performance of this agreement, it will acquire information and contacts which are valuable to MPI.  The Head of Bank Partnerships further acknowledges that it is necessary to protect the interest of MPI and its merchant base by entering into the following covenant not to compete, as provided herein.

The Head of Bank Partnerships covenants, represents, acknowledges and agrees that for a period of five (5) years following the termination of this agreement, neither the Head of Bank Partnerships, its successors or assigns, nor its Associated Sales Personnel, either, individually or

through any other entity for which he, she, or it works or from which he, she, or it would receive financial remuneration for the placement of Merchant Client Accounts, will not solicit company merchant applications anywhere in the United States of America from Merchant Client Accounts and will not solicit bank partnerships for any competing entity.

The Head of Bank Partnerships acknowledges, agrees and understands that any violation of this Section shall cause MPI immediate and irreparable harm for which there is no adequate remedy at law.  Head of Bank Partnerships further acknowledges, agrees and understands that in the event Head of Bank Partnerships breaches any of these covenants, notwithstanding any other remedy at law or equity, MPI may protect its right of property and good will by seeking injunctive relief and related damages.

### 4.2    Non Compete

Head of Bank Partnerships Acknowledges that MPI has a regional advantage and agrees that for the term of one year not to work for a competing entity within 100 miles of an MPI Office.

### 4.3    Non Disclosure

The Head of Bank Partnerships acknowledges that during the performance of this agreement, it may acquire Trade Secrets and Confidential Information of MPI and its affiliates, and further that the disclosure of said Trade Secrets and Confidential Information to competitors of MPI or the public would be damaging to MPI its affiliates, successors, and assigns.
The Head of Bank Partnerships shall not at any time during or after the termination of this agreement disclose to any third party any Trade Secrets or Confidential Information it obtained as a result of this agreement.
All sales manuals, customer lists, software and other media including trademarks provided to the Head of Bank Partnerships by MPI shall at all times remain the property of MPI. Upon termination or expiration of this agreement, the Head of Bank Partnerships shall immediately return all sales manuals, price lists, customer lists, mailing lists, and any and all other documents, materials, and media however recorded.  The Head of Bank Partnerships shall ensure that said proprietary items are properly protected from disclosure, damage, or theft.

### 5.    Continuation of Payment
Upon termination or resignation of Head of Bank Partnerships, Head of Bank Partnerships is entitled to ongoing residuals as outlined in Independent Agent Agreement and schedule A. Upon termination or resignation Head of Bank Partnerships will not be entitled to any right or benefit that is outline in the employee handbook. Head of Bank Partnerships will become a subcontractor as outline in the Independent Agent Agreement.

Accounts boarded by agent will pay residuals for life of the account as dictated in Independent agent agreement. Accounts boards through bank partnerships will pay for 5 years after termination or resignation or agent will be paid a 36 times (based on monthly average)  one time lump sum of bank partnerships value. Residual income is defined as recurring revenue generated by direct and indirect accounts for products and services including but not limited to

merchant services, payroll, ACH, Gift Card, Loyalty,Payroll, ATM, gateway and rentals.

## 4.  ASSIGNMENT

This Agreement is personal to Head of Bank Partnerships and shall not be assignable by Head of Bank Partnerships. The Company may assign its rights hereunder to (a) any Successor Employer; (b) any other corporation resulting from any merger, consolidation or other reorganization to which the Company is a party; (c) any other corporation, partnership, association or other person to which the Company may transfer all or substantially all of the assets and business of the Company existing at such time; or (d) any subsidiary, parent or other affiliate of the Company. All of the terms and provisions of this Agreement shall be binding upon and shall inure to the benefit of and be enforceable by the parties hereto and their respective successors and permitted assigns.

## 5.  AMENDMENTS IN WRITING

No amendment, modification, waiver, termination or discharge of any provision of this Agreement, or consent to any departure therefrom by either party hereto, shall in any event be effective unless the same shall be in writing, specifically identifying this Agreement and the provision intended to be amended, modified, waived, terminated or discharged and signed by the Company and Head of Bank Partnerships, and each such amendment, modification, waiver, termination or discharge shall be effective only in the specific instance and for the specific purpose for which given. No provision of this Agreement shall be varied, contradicted or explained by any oral agreement, course of dealing or performance or any other matter not set forth in an agreement in writing and signed by the Company and Head of Bank Partnerships.

## 6.  NOTICES

Every notice relating to this Agreement shall be in writing and shall be given by personal delivery, by a reputable same-day or overnight courier service (charges prepaid), by registered or certified mail (postage prepaid, return receipt requested) or by facsimile to the recipient with a confirmation copy to follow the next day to be delivered by personal delivery or by a reputable same-day or overnight courier service to the appropriate party's address or fax number below (or such other address and fax number as a party may designate by notice to the other parties):

7

| | |
|---|---|
| If to the Company: | Mercantile Processing Inc<br><br>32695 Roxana  Rd<br>Millville, DE 19967<br>Attn: Chief Executive Officer |
| Head of Bank Partnerships: | Jeremy Brown<br><br>21379 Tree View<br>Millsboro, DE 19966 |

## 7.  APPLICABLE LAW

This Agreement shall in all respects, including all matters of construction, validity and performance, be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without regard to any rules governing conflicts of laws.

## 8. ENTIRE AGREEMENT

This Agreement, on and as of the Effective Date, constitutes the entire agreement between the Company and Head of Bank Partnerships with respect to the subject matter hereof, and all prior or contemporaneous oral or written communications, understandings or agreements between the Company and Head of Bank Partnerships with respect to such subject matter are hereby superseded in their entirety, except as otherwise provided herein.

## 9. SEVERABILITY

If any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision of this Agreement or any action in any other jurisdiction, but this Agreement shall be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

## 10. WAIVERS

No delay or failure by any party hereto in exercising, protecting, or enforcing any of its rights, titles, interests, or remedies hereunder, and no course of dealing or performance with respect thereto, shall constitute a waiver thereof. The express waiver by a party hereto of any right, title, interest, or remedy in a particular instance or circumstance shall not constitute a waiver thereof in any other instance or circumstance. All rights and remedies shall be cumulative and not exclusive of any other rights or remedies.

## 11. HEADINGS

All headings used herein are for convenience only and shall not in any way affect the construction of, or be taken into consideration in interpreting, this Agreement.

## 12. COUNTERPARTS

This Agreement, and any amendment or modification entered into pursuant to Section 5 hereof, may be executed in any number of counterparts, each of which counterparts, when so executed and delivered, shall be deemed to be an original and all of which counterparts, taken together, shall constitute one and the same instrument.

**IN WITNESS WHEREOF**, the parties have executed and entered into this Agreement effective on the date first set forth above.

Head of Bank Partnerships

Jeremy S Brown

Mercantile Processing INC

B / 
y

Its  CEO  12/20/18

# Exhibit 4

**Changing Jeremy Brown to Bank Partnerships from Head of Bank Partnerships**

Current Bank value and Annualized Revenue even with direct sales quota: -$28,000
(Represents an Annualized revenue loss of $280,000 residual for MPI )

Current bank value based on true up+new accounts on 2019 but does not incorporate Tax, Car
or Marketing expense. Total MPI loss on JB for Oct-Oct term is $69,390

If JB had stayed as agent the variance for MPI gain would have been $107,025.

Items for consideration in removal from role include

- Bank Program production did not meet commitment in DOS Strategy for 2019
  - Bank partners did not provide commitment to DOS numbers
  - True Ups for 1880 and Jarretsville are vastly under what was projected for bank growth
- Lack of production impacting MPI's ability to continue to pay payroll as quotas are not being met.
  - Consistent issues with employees not meeting quotas for an extended amount of time
- Lack of production impacting other division (MPI POS Sales) and has lead to bandwidth issues of this team in an effort to make up the deficit.
  - Woodsboro Decrease in production after Conversion Bonus Year
  - Woodsboro Primary success with this bank partnership is associated with Conversion Bonus Year
- Employee unable to meet management and leadership expectations required for this role.
  - Consistent issues with training retention for both Sandy and Tom
  - Training and management of Lauran and Sandy
- Continuing in this role would be detrimental for the employee in measured performance and financially.
  - See October 2019 Evaluation
  - See CFO breakdown comparison

Current Cost
Salary: 48,00
Tax: $13,440
Car: $6,500
Health Insurance: $0
MBA Marketing: $21,450
**Total Cost:** $89,390

New Position Proposal:
Effective Oct 1 JB will have a personal quota with a .45 factor on salary. Like every other agent.
($(48,000/12 months+540 car) X1.45) = $6,583 monthly required quota.

JB will continue to receive 15% of all new Tom Murn and Casey Fitzgerald deals including subsequent banks through the end of 2019. Jeremy will receive in perpetuity any residuals earned during his tenure as head of bank partnerships through the end of 2019.

As of Jan 1 2020, Jeremy will no longer receive any residual for any new deals for bank partners assigned to MPI with exception of bank partners assigned to Jeremy as an agent.

Agent Responsibilities:
Agent for Bank of Delmarva
Agent for Liberty Bell
Agent for Virgina Bank of Commerce TBD
Any other partnerships as assigned and agreed upon by Agent and Director of sales..
Any existing merchant referrals
Any closed sales as a result of networking

**New Job as "Bank Partnerships"**
MPI recognizes value of Jeremy Brown as a valued member of the bank team. His services will be no longer required as the Head of Bank Partnerships where he is required to manage existing partners but will be incentivised to bring in new bank partners. Jeremy will be expected to represent MPI at MBA and other bank events.

New bank on quota:
- 100 < deal commitment (per year) $5,000 one time quota bonus  + 0% for three years
- 100-250 deal commitment (per year) $7,500 one time quota bonus + 3% for life of the bank partnership
- <250 deal commitment (per year) $10,000 one time quota bonus + 5% for life of the bank partnership

The percentage for on going and upfront will represent compensation and commitment for three years for a new relationships success and training. A penalty for bank not hitting the commitment must be committed to and the penalty must be equal to or greater than the upfront commission.

_____  Date 10-21-2019
Jeremy Brown

_____  Date 10/21/19
Katie McMillan

# Exhibit 5



MERCANTILE PROCESSING INC.

Woodsboro Transition Plan & Timeline | Jeremy Brown

The purpose of this document is to capture expectations centered around the transition of Bank Relationship Management from Jeremy Brown to Jake Vacura in regards to expectations of Jeremy Brown for continued residual income for the merchants on the Woodsboro Bank portfolio.

This document is being created with the basic expectations that are required from the CRO to continue earning residual income on all merchants post the transition from Jeremy Brown to the NEW RM.

Expectations for Jeremy Brown can be found on the "Woodsboro Transition Plan & Timeline | Jeremy Brown & Jake Vacura" document in Drive. All items listed under "Expectations of transfer of partner management information" are requirements for continued residual income on the accounts that have been boarded on Woodsboro Bank. All of these requirements must be complete by October 13, 2022.

After the transition deadline of October 13, 2022, Jeremy Brown will no longer be required or asked to continue service on the bank partner or merchants (new or existing).

Should all transition activities be completed by the deadline, Jeremy Brown will continue to receive residual income on the portfolio boarded under Woodsboro bank and the percentage of 15%.

Should some transition activities not be completed by the deadline, Jeremy Brown will receive a reduced percentage of residual income on the book at 5%.

A minimum requirement to keep any residual income on the accounts will be for an in person introduction to all merchants that are currently processing.

Transition activities will be tracked in the "Woodsboro Transition Plan & Timeline | Jeremy Brown & Jake Vacura" document in Drive and will require both the Existing RM and the NEW RM to sign and date upon completion.

This is an amendment that has been created to stress the importance of the transition timeline and requirements.

_____          _____
Employee Signature (Jeremy Brown)          Date
_____          _____
CRO Signature (Katie McMillan)          Date

# TAB 11

EFiled:  Aug 21 2023 05:10PM EDT
Transaction ID 70683025
Case No. 2023-0859-

# Exhibit 6

 Gmail

**Jeremy Brown <brownjjq87@gmail.com>**

---

## Woodsboro Book Final Response
2 messages

---

**Jeremy Brown** <jbrown@mpiprocessing.com>                                    Wed, Dec 21, 2022 at 9:14 AM
To: Kyle Morgan <kmorgan@mpiprocessing.com>, Kathryn McMillan <kmcmillan@mpiprocessing.com>
Bcc: brownjjq87@gmail.com

Good Morning,

On the heels of our communication last Friday I wanted to respond so there are no false expectations. I put some thought into what could be done to have the 10% that was taken away returned to me. As I took Kyle's advice and truly sat and thought about it I realized that the residual income is money that has already been earned over years of work. The reflection actually amplified the question as to why management would have me do more work to earn the money that is already mine.

I realized through that reflection process that I have more self respect and respect for my profession to do the same work over again and/or more work outside of my already loaded accountabilities. Only to "maybe" receive my rightfully earned residuals that are outlined through verbal agreements and contract agreements.

At this point I am focusing on new business and partnerships which are in line with the accountabilities of my Job. I can only hope that you will decide to do the right thing as the ownership of MPI, as managers of employees, and as people. In my educated opinion the right thing is to return the payroll percentage that I have earned through extensive hard work that has always been focused on the betterment of MPI.

I do not need nor expect a response.

Jeremy Brown
Bank Partnerships/Relationship Manager
Mercantile Processing Inc.
877-508-2831 x111 | f. 888-406-6926

### 2022 Winner, Better Business of Delaware Torch Award For Ethics



### MPI | More Than Payments

Our robust suite of business services can help you save time and save money!

Payroll | Gift Cards | Paper Program | POS | Mobile Payments

Shop online or ask our team about special bundles for your business!

877-508-2831, Option 2 | sales@mpiprocessing.com

Need help filling a claim for the Visa & MasterCard settlement ? We can help!

https://www.mpiprocessing.com/settle/



*This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the system manager. This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.*

**Jeremy Brown** <jbrown@mpiprocessing.com>                              Wed, Dec 21, 2022 at 10:14 AM
To: Jeremy Brown <brownjjq87@gmail.com>

Jeremy Brown
Bank Partnerships/Relationship Manager
Mercantile Processing Inc.
877-508-2831 x111 | f. 888-406-6926

### 2022 Winner, Better Business of Delaware Torch Award For Ethics



### MPI | More Than Payments

Our robust suite of business services can help you save time and save money!

Payroll | Gift Cards | Paper Program | POS | Mobile Payments

Shop online or ask our team about special bundles for your business!

877-508-2831, Option 2 | sales@mpiprocessing.com

Need help filling a claim for the Visa & MasterCard settlement ? We can help!

https://www.mpiprocessing.com/settle/



*This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the system manager. This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.*

---------- Forwarded message ---------
From: **Kyle Morgan** <kmorgan@mpiprocessing.com>
Date: Wed, Dec 21, 2022 at 10:11 AM
Subject: Re: Woodsboro Book Final Response

To: Jeremy Brown <jbrown@mpiprocessing.com>
Cc: Kathryn McMillan <kmcmillan@mpiprocessing.com>


I dont think that was the intention of the self reflection. I have scheduled a meeting for next Thursday in the office to provide some more clarity on the path forward.

Best Regards,
Kyle Morgan
CEO and Head of Product
Office: 877-508-2831 ext 100
kmorgan@mpiprocessing.com

**2022 Winner Better Business of Delaware Torch Award For Ethics**



**MPI | More Than Payments**

Did you know that MPI offers more than just an outstanding payments experience?

Our robust suite of business services can help you save time and save money!

Payroll | Gift Cards | Paper Program | POS | Mobile Payments

Shop online or ask our team about special bundles for your business!

877-508-2831, Option 2 | sales@mpiprocessing.com

Need help filing a claim for the Visa & MasterCard settlement? We can help!

https://www.mpiprocessing.com/settle/



*This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the system manager. This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.*

[Quoted text hidden]

# Exhibit 7



---------- Forwarded message ---------
From: **Jeremy Brown** <jbrown@mpiprocessing.com>
Date: Mon, Dec 19, 2022 at 7:59 AM
Subject: Fwd: Urgent Residual Mistake
To: Jeremy Brown <brownjjq87@gmail.com>


Jeremy Brown
Bank Partnerships/Relationship Manager
Mercantile Processing Inc.
877-508-2831 x111 | f. 888-406-6926

### 2022 Winner, Better Business of Delaware Torch Award For Ethics



### MPI | More Than Payments
Our robust suite of business services can help you save time and save money!

Payroll | Gift Cards | Paper Program | POS | Mobile Payments

Shop online or ask our team about special bundles for your business!
877-508-2831, Option 2 | sales@mpiprocessing.com

Need help filling a claim for the Visa & MasterCard settlement ? We can help!
https://www.mpiprocessing.com/settle/



*This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the system manager. This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.*

---------- Forwarded message ---------
From: **Kathryn McMillan** <kmcmillan@mpiprocessing.com>
Date: Fri, Dec 16, 2022 at 8:20 AM
Subject: Re: Urgent Residual Mistake
To: Jeremy Brown <jbrown@mpiprocessing.com>
Cc: MPI BIlling <billing@mpiprocessing.com>, Partner Support <partnersupport@mpiprocessing.com>

Jeremy,

The adjustment for the Woodsboro book as based on the transition plan that we discussed prior to the hand off to Jake. We can talk more about this during the one on one later today.

After the transition deadline of October 13, 2022, Jeremy Brown will no longer be required or asked to continue service on the bank partner or merchants (new or existing). Should all transition activities be completed by the deadline, Jeremy Brown will continue to receive residual income on the portfolio boarded under Woodsboro bank and the percentage of 15%. Should some transition activities not be completed by the deadline, Jeremy Brown will receive a reduced percentage of residual income on the book at 5%. A minimum requirement to keep any residual income on the accounts will be for an in person introduction to all merchants that are currently processing.

Thank you,
Katie

Kathryn McMillan
Chief Revenue Officer, CRO
Office | 302-524-8000, Ext. 115



**MPI | More Than Payments**
Did you know that MPI offers more than just an outstanding payments experience?
Our robust suite of business services can help you save time and save money!
Payroll | Gift Cards | Paper Program | POS | Mobile Payments

Shop online or ask our team about special bundles for your business!

877-508-2831, Option 2 | sales@mpiprocessing.com



*This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the system manager. This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.*

On Thu, Dec 15, 2022 at 3:40 PM Jeremy Brown <jbrown@mpiprocessing.com> wrote:

Good afternoon team. I have included billing, & partner support on this as you all work together on Iris as well residual reporting. I'm not privy to the exact process and wanted to keep this as efficient as possible.

I noticed a huge dip in my check this month. Even including the miss of quota for the payment period. Upon further review I found that all of the Woodsboro accounts agent % was reduced to 5%. This is about a $2000 a month difference. I respectfully request this is remedied as soon as possible and back pay provided prior to the end of the year.

--
Jeremy Brown
Head of Bank Partnerships
302-524-8000 x111
Mpiprocessing.com

Please excuse the brevity if this email as it is being sent using a mobile device.

# Exhibit 8





## Mercantile Processing, Inc. (MPI)

Provides the service you expect, at a rate that you can afford.

Financial Services · Millville, DE · 370 followers · 24 employees

**+ Follow**   **Visit website** ⧉   **More**

Home   **About**   Posts   Jobs   People

## Overview

Mercantile Processing Inc. is a locally owned Delaware company. Based in Sussex County, MPI's home office is in Frankford, Del. MPI serves the Delmarva area as a credit card processing broker, payroll solution provider, credit card terminal and ATM reseller and a gift/loyalty card program supplier.

Servicing small businesses, restaurants, hotels, and seasonal merchants, Mercantile Processing Inc. also has the ability to broker for state and federal institutions, large business, and cash advance companies. Customer service is most important to MPI. Mercantile Processing Inc. strives to provide local, helpful customer service to all of its customers.

Mercantile processing Inc. has also become a part of the local community. MPI is a member of several local BNI groups, chambers of commerces, and serves on the board of the Millsboro Chamber of Commerce.

Follow us on Twitter @MPIdelaware.

**Website**
http://www.mpiprocessing.com/

**Industry**
Financial Services

**Company size**
11-50 employees
24 on LinkedIn ⓘ

**Headquarters**
Millville, DE

**Founded**
2005

**Specialties**
Credit Card Processing, ACH, ATM, Payroll, Processing Loans, Gift Cards, and Loyalty Cards

## Locations (1)

**Primary**

32695 Roxana Road, Millville, DE 19967, US

**Get directions** ⧉



About
Community Guidelines
Privacy & Terms ▾
Sales Solutions
Safety Center

Accessibility
Careers
Ad Choices
Mobile

Talent Solutions
Marketing Solutions
Advertising
Small Business

Questions?
Visit our Help Center.

Manage your account and privacy
Go to your Settings.

Recommendation transparency
Learn more about Recommended Content.

Select Language
English (English)

LinkedIn Corporation © 2023

# Exhibit 9

| | |
|---|---|
| **TO:** | Jeremy Brown, Bank Partnerships |
| **FROM:** | Katie McMillan, CRO |
| **DATE:** | 01/27/2023 |
| | |
| **RE:** | **90-day Action/Performance Plan** |
| **CC:** | COO/CEO |

Jeremy, your performance as Bank Partnerships at MPI has recently raised concerns. Our findings have confirmed several areas requiring your immediate attention and course-correction. As a result, a time-critical path of action on your part is needed to correct the issues at hand. This matter is of extreme seriousness and warrants your unwavering commitment.

As an integral part of the Bank Partnerships role, you are expected to meet or exceed certain performance thresholds to ensure the success of the business and our merchants. At present, your performance is falling short in several critical areas, including but not limited to: **Following directives from supervisors, overall communication, team attitude and accountability, and adhering to MPI policies.**

Jeremy, you have positive qualities that you bring to our team. You are hardworking and bring strong energy to your role each day. However, we must see immediate and sustainable improvement from you in all the areas outlined below. The success of the business relies on every associate reviewing and executing all aspects of the role, and you are expected to drive that process. You have been provided with an outline of the daily, weekly, and monthly responsibilities that need to be met in order to improve your performance.  These objectives must be implemented within the next 90 days and adhered to consistently moving forward:

- **Following directives from supervisors**
    - o  Application count and monthly quota consistently met.
        - ▪  Monthly goal for <u>new business</u> to be met each month. ($6,956.70)
        - ▪  MID Count matching lead source expectations set forth in Agent Goals & Marketing Budget tab of <u>Quota</u>. (5)
        - ▪  This will be based on the performance of February, March and April 2023 Quota.
    - o  Selling POS in line with company strategy.
        - ▪  Required ride a long day with the POS specialist once a month.
            - ●  Employee must schedule appointments or demos for him and the POS Sales Specialist.
            - ●  Any time not filled with appointments or demos will turn into "drop ins" on prospects and/or existing merchants.
            - ●  Time in the field required is from 9 AM to 3 PM.
            - ●  Each ride a long day needs to be scheduled with the POS Sales specialist for the next 3 months. It must be scheduled with the POS Specialist no later than 2/3/2023.
    - o  Professional and consistent communication with bank branches
        - ▪  Updating the BOD Bank Tracker real time as the employee engages with branches to manage the relationship (not just to speak about a particular lead).
        - ▪  The BOD Bank Tracker is to be updated as each engagement occurs and all branches must have successful communication by the last day of each month.
            - ●  Successful communication is defined as via telephone or in person
            - ●  At least one successful communication is required each month.
        - ▪  Share the 2023 BOD Bank Tracker by 1/30/2023.

- o Completes tasks or directives given by CEO or CRO by the deadline established by leadership.
  - Leads provided by leadership need to be actively worked and followed up on weekly.
- o MBA Attendance and onboarding new bank partners (Bank Partnerships Role)
  - Updating lead sourcing associated with the MBA membership.
    - All MBA Group leads need to be updated in 30 day cycles.
    - All MBA group leads need to have an update in them for January by no later than 2/3/2023.
  - Formal presentation of bank partner program completed by no later than 2/10/2023.
    - Presentation must outline a plan of attendance for each MBA event.
    - A pipeline of potential banks to close in 2023-2024.
    - Information about each bank needs to be part of the presentation (i.e. asset size, footprint).
    - A monthly update to this presentation will be required as an update to CRO and CEO on progress in working this lead sourcing.
    - The employee is responsible for scheduling the 45 minute meeting with the CRO and CEO each month to provide this update.

- **Team attitude and accountability**
  - o Communicates with other staff members in a professional way.
    - No negative reports from other staff about employee's communication with them.
- **Overall Communication**
  - o Working in the Millville office full time when not scheduled to meet with merchants or partners.
    - Working remotely must be approved by management.
  - o Calendar must reflect all MPI business activities for each day during business hours (8AM to 5 PM).
- **Adhering to MPI policies**
  - o Engaging merchants in the book that is managed by the employee or that the employee receives residual income for that is also not linked to another active RM.
    - All merchants must have noted engagements at least twice a year.
      - Engagements are defined as in person or via phone.
      - Emails that were sent and not responded to need to have an additional attempt via phone to communicate with the merchant.
      - The employee must provide proof each month that all of the merchants (as defined above) have been engaged within the last 6 months.
  - o Reviewing residuals monthly to indicate if there are issues with payouts with residuals.
    - Following the agent responsibilities checklist in "MPI Agent Residuals Checklist and Best Practices".
    - By the 5th of each month, the employee must provide written proof that the following items were completed
      - Issues with merchants including but not limited to
        - o Merchants who are not generating revenue or have at least 6 months of negatives if on a flat rate.
        - o Merchants who have $0.00 volume as it indicates that they are not processing which impacts revenue.
      - Add/Deduct (One Time or Recurring) Billing
        - o Are the current items correct?
        - o Are the items being billed against split correctly?

o   Does it match the checklist submitted?

Jeremy, there is a need for substantial improvement in all areas above. With the planned growth of the company and your continued success, the need to follow operating procedures and establish proper communication practices is critical. Your ability to communicate, and to remain focused on details and follow-up will be important to meet your role expectations. Immediate and sustained improvement must be demonstrated within the next ninety (90) days. Failure to show such improvement may result in progressive disciplinary action, up to and including termination of at-will employment.

To support you in this process, we will be scheduling monthly meetings with you to discuss your progress on the above outlined areas and to provide guidance and coaching as needed.  As stated, our wish is for you to succeed in this endeavor, so please do not hesitate to utilize the leadership resources available to you.

A follow-up discussion will be scheduled for the week of May 1st to discuss the outcome of this performance action plan.

Your signature below indicates that you understand the objectives and measurements expected.

Acknowledged By:                                    Administered By:


_____                    _____

_____                                _____
Date                                             Date

- *Included attachments: **Performance evaluations, written disciplinary actions, 2023 Quota expectations, MPI Agent residuals Checklist and Best Practices.***

# Exhibit 10



**MERCANTILE PROCESSING INC.**

### Mercantile Processing Inc. (MPI) 1099 Agent Agreement (2023)

**THIS AGREEMENT** dated _3/22/2023_ between **MPI (Mercantile Processing Inc)** and; _Authentic Merchant Solutions_ located at _21379 Treeview Ln  Millsboro DE  19966_ (Hereinafter referred to as **IA**) has been entered into between the parties as follows:

 **WHEREAS MPI** is in the business of providing certain electronic payment services to the business community including but not limited to the electronic capture of transactions utilizing VISA U.S.A., Inc. (hereinafter referred to as VISA), MasterCard International, Inc. (hereinafter referred to as MasterCard), Discover Card, and American Express (including any other credit card or debit card company, collectively referred to herein as "Credit/Debit Card Companies"); the sale of electronic draft capture equipment; and the marketing on behalf of several financial institutions;

 **WHEREAS MPI** is desirous of allowing the independent marketing of its services under a basis limited as specified herein;

 **WHEREAS** the **IA** is an independent sales organization willing to market the services and equipment of **MPI** within the limitations specified herein; and

 **WHEREAS** the parties intend to revoke all previous agreements between the parties unless specifically incorporated herein;

 **NOW THEREFORE**, to evidence the aforementioned intent of the parties and in consideration of the foregoing premises, and of the mutual covenants and conditions hereinafter set forth, the parties hereto intending to be legally bound agree as follows:

1. **Definitions.**

 1-1 Except as provided below; for purposes of interpretation of this agreement the following terms shall be construed as follows:

 A. "Associated Sales Personnel" shall include any and all employees, independent contractors, agents or any other person who acts for or on behalf of the **IA**, or is controlled to any extent whatsoever by the **IA** in the solicitation of merchant applications to be submitted to **MPI** or in any other marketing activity undertaken on behalf of **MPI**.

IA Initials _____     MPI Initials _____



**Mercantile Processing Inc. (MPI) 1099 Agent Agreement (2023)**

B. **MPI** shall include the corporation and its successors, assigns, subsidiaries and affiliates.

C. "Cause" shall mean to be in default or material breach of any term of the agreement.

D. "The **IA**" is the above named entity which may be a corporation, partnership, sole proprietorship doing business under an assumed name, an individual or any other entity.

E. "Merchant Client Accounts" are those accounts, which originate from merchant clients solicited by the **IA** and placed through **MPI**.

F. "Good Standing" shall mean to not be in breach or default of any or all of the terms of this agreement.

G-1 The term "Trade Secrets" shall mean the whole or any portion or phrase of any scientific or technical information, design, process, procedure, formula, or improvement that is valuable and not generally known to competitors of **MPI**. Trade Secrets shall include, without limitation, the specialized information and technology **MPI** may develop or acquire with respect to computer software programs, including without limitations all computer programs, source code, object code, listings, print-outs, flow charts, written algorithms, research materials, programming notes, programming aids, data specifications, test results and related documentation (all of the foregoing hereinafter referred to as "software products").

G-2 The term "Confidential Information" shall mean any data or information, other than Trade Secrets, that is important to **MPI**, and not generally known by the public. To the extent consistent with the foregoing definition, Confidential Information includes without limitation the following: (1) the sales records, profit and performance reports, pricing manuals, sales manuals, training manuals, selling and pricing procedures and financing methods of **MPI**; (2) strategic data, including marketing and development plans, forecasts and forecast assumptions and volumes, and future plans and potential strategies of **MPI**; and (3) customer data, including customer lists, names of customers and their representatives, data provided by or about prospective, existing or past customers, customer service materials, and the type, quantity and specifications of products purchased, leased or licensed by customers of **MPI**.

G-3 Notwithstanding the definitions set forth above, "Trade Secrets" and Confidential Information does not include: (1) that which is or becomes generally known to the public; (2) that which is already known or is developed after termination by the **IA** or Associated Sales Personnel through entirely independent efforts; (3)

IA Initials _____   MPI Initials _____



**MERCANTILE PROCESSING INC.**

### Mercantile Processing Inc. (MPI) 1099 Agent Agreement (2023)

that which the **IA** or Associated Sales Personnel obtains through an entirely independent source having a bona fide right to use and disclose such information; (4) that which is required to be disclosed by law, except to the extent eligible for special treatment under an appropriate protective order; or (5) that which is approved by the company for unrestricted release by express authorization.

## 2. Terms **and Renewal.**

2-1 The term of this Agreement shall be two (2) years. This Agreement shall be renewed upon the expiration of the term hereof for successive one (1) year periods, unless notice of a termination is given (i) by **IA** or **MPI** within (30) days of the expiration of the initial, or any renewal term or (ii) pursuant to Sections 2.2.

2-2 **MPI** may immediately terminate this agreement at any time by giving written notice to the IA for any one of the following reasons:

A. Fraud, or misrepresentation by the **IA** or Associated Sales Personnel to **MPI** clients, potential clients, merchants or any other related parties either prior to the execution of this agreement to induce its execution, or during its term, including attempts to induce **MPI** to execute or continue performance of merchant agreements whether or not in collusion with merchant clients by making false representations.

B. Non-compliance by the **IA** or Associated Sales Personnel with applicable Credit/Debit Card Company bylaws, rules and regulations, state or federal laws and regulations.

C. Impossibility or impracticability of performance by **MPI** due to changes: in Credit/Debit Card Company bylaws, rules and regulations; in bylaws, rules and regulations of any other provider of services to **MPI**; or in federal, state or local laws, regulations, or ordinances which this agreement cannot reasonably be modified to accommodate.

D. The violation, omission, or breach by the IA or Associated Sales Personnel of any provision, duty, or obligation required of it under this agreement.

E. The **IA** makes any attempt to convert any Merchant Client Account relationship from **MPI** to any other entity performing services similar to **MPI**.

F. **MPI** may, within 10 days written notice, terminate this agreement if **MPI,** in its sole and exclusive judgment, determines that its business reputation is negatively affected by the quality of services rendered by

IA Initials _____   MPI Initials _____

Mercantile Processing Inc. | 302-524-8000 | partnersupport@mpiprocessing.com



the **IA**.

G. The **IA** fails to present itself to the marketplace as **MPI** when soliciting **MPI** Merchant Client Accounts.

## 3. Consideration.

3-1 The IA acknowledges that each term of this agreement constitutes adequate consideration for all other terms.

## 4. Force Majeure.

4-1 The performance of **MPI** hereunder is subject to interruption and delay due to causes beyond its control such as acts of God, acts of any government, war or other hostility, civil disorder, weather, fire, power failure, equipment failure, labor dispute, and like causes. Said interruption or delay shall not be deemed to be a breach hereunder.

## 5. Duties and Responsibilities of IA.

5-1 The **IA** shall use its best efforts to solicit merchant client applications and agreements for the credit card transaction processing services of **MPI** and the sale or lease of the related equipment to merchant clients. The **IA** shall assist in the execution and distribution by the merchant client of the appropriate merchant agreement and any modifications thereof. Upon completion of these requirements, the merchant client shall become a Merchant Client Account.

5-2 The **IA** shall be responsible for the initial setup of the equipment used in providing the processing services for Merchant Client Accounts, including but not limited to the installation of the equipment, the initial training of merchant and merchant personnel, and the delivery of operating and training manuals to the merchant.

5-3 The IA shall at **IA's** expense recruit, hire, train, and supervise a staff of sales and customer service representatives to solicit and service the merchant applications in compliance with requirements of **MPI** and its financial institution for establishing new Merchant Client Accounts.

5-4 The **IA** shall be responsible for the collection and disbursement of all applicable sales tax due upon

IA Initials _____            MPI Initials _____



### Mercantile Processing Inc. (MPI) 1099 Agent Agreement (2023)

the sale of equipment to any Merchant Client Accounts and any and all reporting requirements thereof.

5-5 The **IA** and **MPI** shall communicate to all Merchant Client Accounts any and all necessary information including but not limited to changes in pricing and service from **MPI**, its financial institutions, or network providers.

5-6 The **IA** shall ensure that its Associated Sales Personnel are properly trained and supervised so as to act at all times in a professional manner while marketing the services and products of **MPI**.

5-7 The **IA** shall properly adhere to any and all government regulations including but not limited to reporting of any and all appropriate tax, the acquisition of any and all documents of employment insurance including but not limited to workers compensation, unemployment insurance, and state disability insurance.

5-8 The **IA** shall, throughout the term of this agreement, obtain and maintain at its own cost and expense from a qualified insurance company, a comprehensive commercial general liability insurance policy naming **MPI** as an additional insured.

5-9 The **IA** shall ensure that its Associated Sales Personnel have been subject to review for exclusion by **MPI**, both prior to and during their employment or association with the **IA**, from the marketing of MPI services or products for reasons including but not limited to felony convictions, discharge from previous employment for cause, or any other indication of moral turpitude which would render the Associated Sales Personnel to be an unacceptable representative of **MPI** and the **IA**.

5-10 The IA shall be responsible for the initial customer contact concerning maintenance and service (if so contacted by the merchant), the ongoing servicing and replacement of the Merchant Client Accounts' equipment and software, and shall, upon request by **MPI**, act as lialAn between **MPI** and the Merchant Client Accounts in handling equipment maintenance and servicing.

5-11 The **IA** shall submit a resale Tax ID number as well as any tax exempt certificate/resale certificate, etc. required by their respective state of business.

5-12 The IA must have prior written approval before any reproduction of any and all marketing materials including but not limited to any and all of the corporate identities or logos of **MPI**, its processors, and Credit/Debit Card Companies.

IA Initials _____          MPI Initials _____



**MERCANTILE PROCESSING INC.**

### Mercantile Processing Inc. (MPI) 1099 Agent Agreement (2023)

5-13 The **IA** shall provide MPI with a written list of all proposed associated personnel and current Associated Sales Personnel, their social security numbers and the addresses and telephone numbers of the principal office of itself and all Associated Sales Personnel regardless of whether said sales personnel are employees of the IA or independent contractors providing services to the IA. Furthermore the IA shall provide MPI with any other information which is reasonably necessary for the performance of this agreement or compliance with Credit/Debit Card Company bylaws, rules ands regulations, upon request and within a reasonable time thereof.

5-14 The **IA** shall permit **MPI** to check the credit of the **IA** and/or any of its Associated Sales Personnel and shall execute any all documents, consents or authorizations necessary to facilitate the performance of said credit check.

5-15 **IA** represents that it does not have a contractual relationship for the placement of credit card transaction processing services or for the sale or lease of equipment related to said services with any entity providing services similar to those to be performed by **MPI** under the terms of this Agreement which would bar **IA** from entering into this Agreement.

5-16 The **IA** shall be responsible for notifying in writing to MPI any and all residual discrepancies or errors in residual reporting within 60 days of original receipt of such residual report identifying such discrepancy or error. **MPI** will not be responsible to **IA** for any discrepancies or errors in residual reporting which have not been notified to **MPI** and which exceed the 60 day notification period.

6. Duties **and Responsibilities** of MPI.

6-1 **MPI** shall sell equipment, software, supplies and Merchant Client Account leasing services to IA at contract stipulated prices. IA may use alternate suppliers of equipment, software, leasing and supplies at the discretion of the IA.

6-2 **MPI** shall provide pricing of its electronic processing services to **IA**, as specified in your Pricing Addendum Schedule and any addenda thereto, which is annexed hereto and made a part hereof.

6-3 **MPI** shall provide the following to **IA**, including but not limited to, merchant application forms, promotional material, certain technical support and training for its personnel, monthly residual reporting including monthly transactional volume, average ticket information, the discount rate charged, and the

IA Initials _____

MPI Initials _____



### Mercantile Processing Inc. (MPI) 1099 Agent Agreement (2023)

commission earned, by the **IA**, certain on line electronic mail reporting, customer service and support, equipment maintenance, new and innovative value added products and services, merchant status reporting, fully integrated payment capabilities, and electronic ACH products.

## 7. Compensation/Base Commission of **IA**.

7-1 The **IA** shall be entitled to retain fees collected by it in excess of the pricing it obtains from **MPI** for on site inspection, equipment setup, and merchant client applications fees. Pricing may be amended or modified from time to time within the discretion of **MPI** and its financial institutions, and the **IA** shall be bound by such change upon written notice by **MPI**.

7-2 The IA may be entitled to a monthly residual base commission above the price it obtains from **MPI** for the credit card processing of Merchant Client Accounts. This **IA** residual base commission shall be calculated by subtracting the buy rate price the **IA** obtains from **MPI** from the price received from the Merchant Client Accounts multiplied by the monthly Merchant Client Accounts monthly credit card processing volume. The buy rate price **IA** obtains from **MPI** may be amended from time to time within the discretion of **MPI** and its financial institution, and the IA shall be bound by such change upon written notice by **MPI**.

7-3 Residual base commissions shall be payable by **MPI** to the IA approximately one month after the commissions are earned, subject to **MPI's** right to setoff any amount owed to it by the **IA.**

7-4 The **IA** acknowledges that **MPI** may be subject to price changes in its clearing, settlement, interchange and communication transactions that are beyond its control. MPI shall use its best efforts to provide written explanation of any price change to the extent that such price change is the result of changes in the direct costs of **MPI's** processing services. **IA** shall be bound by such change upon written notice by **MPI**

## 8. Ongoing Commissions to IA.

8-1 Upon the expiration of this agreement, if the **IA** is in Good Standing, the **IA** shall be entitled to ongoing commissions from the processing of Merchant Client Account transactions subject to paragraph **8-3.**

8-2 If **IA** defaults in the performance of any of the terms or conditions of this agreement or materially breaches this agreement and said default or breach continues uncured for a period of thirty (30) days from the date **MPI** gives notice to the IA in the manner set forth below of said default or breach, this agreement shall

IA Initials _____   MPI Initials _____



**MERCANTILE PROCESSING INC.**

### Mercantile Processing Inc. (MPI) 1099 Agent Agreement (2023)

automatically terminate, the IA shall forfeit any right to any payment hereunder and **MPI** shall be entitled to all rights, privileges, and interest of IA in Merchant Client Accounts, without further notice to **IA. MPI** in addition shall be entitled to protect and enforce all of its rights, remedies and interest hereunder to the fullest extent permissible at law and in equity.

8-3 Upon the expiration of this agreement, IA agrees and acknowledges that if IA's compensation for any monthly period is less than $200.00 and/or new merchant account have not been submitted, by **IA,** for two consecutive years, **IA** relinquishes any and all right to payment or to the carryover to future periods of such amounts.

## 9. Merchant Client Applications.

9-1 The **IA** agrees to submit all merchant client applications as provided herein. The **IA** shall use the merchant application forms and merchant agreement forms, which **MPI** shall provide from time to time and shall not modify or alter such forms in any way without the express written permission of the president of **MPI**. The parties agree that any application may within the sole discretion of **MPI** be denied for any reason whatsoever. All agreements with Merchant Client Accounts for processing services shall be between the Merchant Client Account and **MPI** its successors or assigns and **MPI's** settling bank. Any failure on the part of the **IA** to perform any or all of the terms and conditions set forth in this Section 9-1 shall constitute a material breach of this agreement.

## 10. Confidential Information and Trade Secrets.

10-1 The **IA** acknowledges that during the performance of this agreement, it may acquire Trade Secrets and Confidential Information of **MPI** and its affiliates, and further that the disclosure of said Trade Secrets and Confidential Information to competitors of **MPI** or the public would be damaging to **MPI** its affiliates, successors, and assigns.

10-2 The **IA** shall not at any time during or after the termination of this agreement disclose to any third party any Trade Secrets or Confidential Information it obtained as a result of this agreement.

10-3 All sales manuals, customer lists, software and other media including trademarks provided to the **IA** by **MPI** shall at all times remain the property of **MPI**. Upon termination or expiration of this agreement, the **IA** shall immediately return all sales manuals, price lists, customer lists, mailing lists, and any and all other

IA Initials _____   MPI Initials _____



**MERCANTILE PROCESSING INC.**

### Mercantile Processing Inc. (MPI) 1099 Agent Agreement (2023)

documents, materials, and media however recorded. The **IA** shall ensure that said proprietary items are properly protected from disclosure, damage, or theft.

### 11. Disclaimer of Warranties.

11-1 The parties acknowledge that **MPI** is not the manufacturer of any equipment provided to the IA for sale or lease. Unless otherwise expressly contained in an extended warranty or maintenance agreement provided by **MPI**, all equipment of any kind is sold "as is", there are no warranties which extend beyond the face of this agreement, and **MPI** expressly disclaims all warranties, express or implied, of any kind including warranties of merchantability and fitness for a particular purpose.

### 12. Covenant not to Compete.

12-1 The **IA** acknowledges that during the performance of this agreement, it will acquire information and contacts which are valuable to **MPI**. The **IA** further acknowledges that it is necessary to protect the interest of **MPI** and its merchant base by entering into the following covenant not to compete, as provided herein.

12-2 The **IA** covenants, represents, acknowledges and agrees that for a period of five (5) years following the termination of this agreement, neither the **IA**, its successors or assigns, any individual owning an equity interest in the **IA** nor its Associated Sales Personnel, either, individually or through any other entity for which he, she, or it works or from which he, she, or it would receive financial remuneration for the placement of Merchant Client Accounts, will not solicit merchant applications anywhere in the United States of America from Merchant Client Accounts. Agent will have 60 days of training during which Agent will have option to opt out of regional non- compete. Regardless of the result the remainder of contract will stay in effect to its term.

12-3 The **IA** acknowledges, agrees and understands that any violation of Section 10, 12-1, or 12-2 herein above shall cause **MPI** immediate and irreparable harm for which there is no adequate remedy at law. **IA** further acknowledges, agrees and understands that in the event **IA** or any of its Associated Sales Personnel breaches any of these covenants, notwithstanding any other remedy at law or equity, **MPI** may protect its right of property and good will by seeking injunctive relief and related damages as well as capturing all residuals that **IA** would otherwise be entitled to.

IA Initials _____

MPI Initials _____



**MERCANTILE PROCESSING INC.**

**Mercantile Processing Inc. (MPI) 1099 Agent Agreement (2023)**

## 13. Transfer of Merchant Client Accounts.

13-1 The parties agree that their relationship is based upon the unique capabilities of the **IA** and its Associated Sales Personnel and therefore the **IA** may not transfer or assign any right, duty, obligation, or interest in Merchant Client Accounts without the written consent of **MPI** which shall not be unreasonably withheld.

13-2 The **IA** shall have the right to solicit offers for the sale of its interest in Merchant Client Accounts. Upon receipt of a written offer to purchase all or a portion of the Merchant Client Accounts ("Written Offer"), **MPI** shall have forty-five (45) days from notice thereof to match the terms and conditions of the Written Offer, by giving notice to the **IA** within the aforementioned forty-five (45) day period. In the event **MPI** does not match the Written Offer, the **IA** may sell the Merchant Client Accounts to the entity making the Written Offer under the same terms and conditions as the Written Offer.

13-3 **MPI** may sell Merchant Client Accounts without the consent of **IA**. If the sale's price for the Merchant Client Accounts is predicated on a multiple of monthly commissions received by **MPI** and at the option of **IA**, **IA** chooses to participate in said sale with **MPI** for its share of Merchant Client Accounts in which said sale terminates the interest of **IA** in the Merchant Client Accounts, the sale's price payable to **IA** from **MPI** for **IA's** interest in said Merchant Client Accounts shall be determined by the same multiple of monthly commissions that **MPI** received for said Merchant Client Accounts. Payment of the sale's price to the **IA** shall be under the same terms and conditions as agreed to by **MPI**.

13-4 If the sale of the Merchant Client Accounts by **MPI** does not terminate the interest of the **IA** in the Merchant Client Accounts, or the sale's price is not based on a multiple of earnings, the **IA** shall have the option of continuing the relationship with the purchaser of the Merchant Client Accounts or forcing said purchaser to pay a one-time fee to **IA** for its interest in the Merchant Client Accounts equal to fifteen (15) times the average monthly commissions earned by the **IA** on the Merchant Client Accounts for the three (3) month period immediately preceding the date of the sale of **MPI's** interest in the Merchant Client Accounts. For purposes of this paragraph, the sale or transfer of Merchant Client Accounts to the spouse, or the lineal descendants or ascendants of a stockholder of **MPI**, or an entity in which a stockholder or **MPI** has an equitable or beneficial interest shall not entitle **IA** to any payment hereunder.

13-5 Payment under this Article "13" shall release and discharge **MPI** from any further payment under

IA Initials _____          MPI Initials _____



**MERCANTILE PROCESSING INC.**

**Mercantile Processing Inc. (MPI) 1099 Agent Agreement (2023)**

any other paragraph of this agreement.

**14. Jurisdiction and Venue of Disputes.**

14-1 The parties agree that with respect to any dispute concerning this agreement, the state or federal court in Delaware shall have exclusive subject matter jurisdiction.

**15. Non-Waiver of Rights and Obligations.**

15-1 Failure on the part of **MPI** to exercise any right or privilege granted to it or to insist upon the full performance of any obligation assumed by the IA shall not be construed as waiving any such right, privilege, obligation, or duty, or as creating any custom contrary thereto. Any waiver of any right, privilege, obligation, or duty by **MPI** must be in writing, and if not in writing shall not be binding in any way and the written waiver of any right, obligation, or duty by **MPI** shall not operate beyond its terms. Any modification to this agreement must be in writing, and this provision may not be modified except in writing.

**16. Governing Law.**

16-1 The parties agree that except insofar as federal law may preempt, the laws of the State of Delaware shall govern this agreement.

**17. Further Assurances and Survival of Covenants.**

17-1 The IA shall execute all additional instruments and other documents, perform all additional acts and cooperate with **MPI** in every other way, which may be requested by **MPI** to carry out this agreement or the intent hereof.

17-2 All covenants of the **IA** shall survive the expiration or termination of this agreement to the extent required for their full observance and performance.

**18. Severance/Savings Clause.**

18-1 Any provision of this agreement held to be void, invalid, or unenforceable in any way shall be deemed to be severed, and the remainder of this agreement shall remain in full force and effect as if the severed portion had never been included.

IA Initials _____    MPI Initials _____



### MERCANTILE PROCESSING INC.

**Mercantile Processing Inc. (MPI) 1099 Agent Agreement (2023)**

19. Merger **and Modification**.

    19-1 This agreement shall supersede and replace any and every existing contract and agreement between the **IA** and **MPI**, which is not specifically incorporated herein.

**20. Written Notice.**

20-1 All notices required by this agreement are to be in writing and shall be deemed to have been properly given, in the absence of rebutting evidence, upon the placing for delivery by certified mail, return receipt requested to the address below within the time period required by this agreement. Notice by facsimile machine must be memorialized by certified mail as provided herein:

MPI address:

        **Mercantile Processing Inc**

        32695 Roxana Rd.

        Millville, DE 19967

IA address:     *Authentic Merchant Solutions*

        *21379 Treeview Ln*

        *Millsboro DE 19966*

**21. Title and Headings.**

    21-1 The title and headings in this agreement exist solely for the convenience of the reader and do not limit the subject matter or effect of any term hereof.

**22. Indemnity for Actions/Omissions.**

    22-1 The IA, its successors and/or assigns agrees to defend, indemnify, and hold harmless **MPI** its successors and/or assigns, its directors, officers, employees, its settling bank, its leasing companies and its

IA Initials _____          MPI Initials _____



**MERCANTILE PROCESSING INC.**

### Mercantile Processing Inc. (MPI) 1099 Agent Agreement (2023)

shareholders (all of whom are hereinafter referred to as "Indemnities") from, for, and against any and all liability, loss, and expense (including reasonable attorney fees) whether or not presently known, discovered or contemplated and regardless of when discovered by anyone, which any Indemnity has incurred or may incur at any time during the performance of this agreement or thereafter which either wholly or partly arises as a result of any actual or alleged act, omission, transaction, or occurrence of the **IA**, its successors and/or assigns, its Associated Sales Personnel, its directors, officers, employees and subcontractors regardless of whether the **IA** is ultimately absolved of any liability.

23. **Setoff.**

23-1 **MPI** may at any time without notice apply any commissions or other credit balance owed to the **IA** by **MPI** to reduce any past due amounts of any kind whatsoever.

24. **Limitations of Claims and Damages**.

24-1 Any claim by IA which arises out of this agreement, or the performance thereof must be brought against **MPI** within one year after the basis for the claim becomes known to **IA**.

24-2 **MPI** shall not be liable to the IA for any consequential damages caused by its failure to perform under this agreement including, but not limited to, lost profits or damage to goodwill regardless of whether the claim arises in contract or in tort.

25. **Construction.**

25-1 Whenever the context so requires, the male gender when used herein shall be deemed to include the female gender, the female gender shall be deemed to include the male gender, the singular shall be deemed to include the plural and the plural shall be deemed to include the singular.

26. **Representation by Counsel**.

26-1 Each party has had the opportunity to have this agreement reviewed by counsel of his choosing prior to signing, and represents that he has reviewed this agreement with counsel, or hereby knowingly waives the right to have counsel review this agreement.

IA Initials _____

MPI Initials _____



**MERCANTILE PROCESSING INC.**

Mercantile Processing Inc. (MPI) 1099 Agent Agreement (2023)

**IN WITNESS WHEREOF, the parties hereto enter into this agreement this 11th day of February, 2023.**

**IA Business Name:** Authentic Merchant Solutions

**Name of Owner:** Jeremy Brown

**Signature of Owner:** Jeremy J Brown

**Title:** Member

**Owner SS#:** 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

**Federal Tax ID:**

**Address:** 21379 Treeview Ln Millsboro DE 19966

**Tel. #:** 302-858-7141

**Email:** JBrown@Authentic merchantsolutions.com

**Fax #:** N/A

***

***MPI Staff Use Only***

**Accepted By:**

**Title:**

**Printed Name:** Kyl Morgan

IA Initials _____

MPI Initials _____

Mercantile Processing Inc. | 302-524-8000 | partnersupport@mpiprocessing.com

# TAB 12

EFiled:  Aug 21 2023 05:10PM EDT
Transaction ID 70683025
Case No. 2023-0859-

# Exhibit 11



Jeremy Brown <jbrown@authenticmerchantsolutions.com>

---

## Tomorrow's Meeting

13 messages

---

**Jeremy Brown** <jbrown@authenticmerchantsolutions.com>                    Mon, Mar 20, 2023 at 10:01 AM
To: Kyle Morgan <kmorgan@mpiprocessing.com>
Cc: Benjamin Gray <bgray@mpiprocessing.com>, Kathryn McMillan <kmcmillan@mpiprocessing.com>

Good Morning Kyle,

I have a board meeting in the morning from 8-10am. I wanted to let you know I am available from 11:00 to 4:00 to finalize our discussions.

Please let me know your availability.



**JEREMY BROWN**
Owner/Member

📞 302-858-7141
✉ jbrown@authenticmerchantsolutions.com
21379 treeview lane Millsboro De 19966

---

**Kyle Morgan** <kmorgan@mpiprocessing.com>                    Mon, Mar 20, 2023 at 2:47 PM
To: Jeremy Brown <jbrown@authenticmerchantsolutions.com>
Cc: Benjamin Gray <bgray@mpiprocessing.com>, Kathryn McMillan <kmcmillan@mpiprocessing.com>

Jeremy -

     I have had time to review and think through next steps and the relationship that will continue for you and MPI. In reviewing the implied intent of the negotiation and other historical items I have decided it would be best if we did not pursue making you an independent sales rep. We would treat our relationship as we do all current past employees. You will receive residuals and can continue to help service and retain the accounts that are personally assigned to you, but we do not want you in the market representing yourself with the ability to sell within the industry. We would like you to honor the employment agreement and honor your non compete, non solicit and non disclosures. I understand that this is a change from the original plan, but I feel that the transition to and supporting you as a 1099 agent will not be in the best interest of our organization.  We do want to get you paid for your February residuals as soon as possible. To make that happen we need a fresh signature for your entity on the IA agreement that you signed when you first started. This makes it clear we are both honoring all original obligations when you started your employment. No redlines by either party. By executing this agreement you understand and agree to honor your non compete, non solicit and non disclosures.

     Just to be clear on these sections. Non compete means you will not represent yourself in the market as a merchant services company or provider to any non-existing clients. You will not work for a competing entity  selling merchant services or similar products. Non solicit; You will not solicit MPI clients you were assigned to for any products or services. Non disclosure; you will not talk to any current employees, former employees, partners, organizations, or the public about any of these agreements, buyouts, or confidential information learned while working at MPI. Any violation of these sections would have financial implications on your residuals.

I am Flying for another 2 hours then I will be traveling home. I can make some time to talk about this tomorrow. Please advise if you are continuing to retain representation as they would need to be on the call.

Best Regards,
Kyle Morgan
CEO and Head of Product
Office: 877-508-2831 ext 100
kmorgan@mpiprocessing.com

**2022 Winner Better Business of Delaware Torch Award For Ethics**



**MPI | More Than Payments**

Did you know that MPI offers more than just an outstanding payments experience?

Our robust suite of business services can help you save time and save money!

Payroll | Gift Cards | Paper Program | POS | Mobile Payments

Shop online or ask our team about special bundles for your business!

877-508-2831, Option 2 | sales@mpiprocessing.com

Need help filing a claim for the Visa & MasterCard settlement? We can help!

https://www.mpiprocessing.com/settle/



*This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the system manager. This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.*

[Quoted text hidden]

---

**Jeremy Brown** <jbrown@authenticmerchantsolutions.com>                    Mon, Mar 20, 2023 at 4:17 PM
To: Chris Dryden <cdryden@attorneygl.com>

Hey man.

Just received this email. It looks like he wants me to sign a new agreement to make my residuals.

[Quoted text hidden]
--



**JEREMY BROWN**
Owner/Member

📞 302-858-7141
✉ jbrown@authenticmerchantsolutions.com
21379 treeview lane Millsboro De 19966

---

**Chris Dryden** <cdryden@attorneygl.com>                    Mon, Mar 20, 2023 at 4:22 PM
To: Jeremy Brown <jbrown@authenticmerchantsolutions.com>

He owes you for January not just February.  Also, if you sign this agreement, he believes it will resurrect your non-compete and non-solicit obligations. If you do decide to sign, I would tell him that you are doing so under duress to get paid what you are owed.  You are not required to sign a new agreement to get paid under the old agreement.  That is horseshit and you can quote me.

Christopher R. Dryden, Esq.



322 Encinitas Blvd., Ste 200

Encinitas, CA 92024

Main Line: 888-846-8901

Direct Line: 858-500-3632

Cell: 858-337-2881

This is an email from Global Legal Resources, LLP, doing business as Global Legal Law Firm. This email and any attachments hereto may contain information that is confidential and/or protected by the attorney-client privilege and attorney work product doctrine. This email is not intended for transmission to, or receipt by, any unauthorized persons. Inadvertent disclosure of the contents of this email or its attachments to unintended recipients is not intended to and does not constitute a waiver of attorney-client privilege or attorney work product protections. If you have received this email in error, immediately notify the sender of the erroneous receipt and destroy this email, any attachments, and all copies of same, either electronic or printed. Any disclosure, copying, distribution, or use of the contents or information received in error is strictly prohibited.

[Quoted text hidden]

---

**Jeremy Brown** <jbrown@authenticmerchantsolutions.com>                    Mon, Mar 20, 2023 at 5:30 PM
To: Chris Dryden <cdryden@attorneygl.com>

Give me a ring when you get a second. I have 3 quick questions.



[Quoted text hidden]

---

**Jeremy Brown** <jbrown@authenticmerchantsolutions.com>                    Tue, Mar 21, 2023 at 8:45 AM
To: Kyle Morgan <kmorgan@mpiprocessing.com>
Cc: Kathryn McMillan <kmcmillan@mpiprocessing.com>, Benjamin Gray <bgray@mpiprocessing.com>

Good Morning Kyle,

Please forgive the delay but your previous email came as a surprise and I needed to sleep on it.

As I have currently gone without pay for over a month (February 15th) this option doesn't leave me a choice given the bill cycle I have set up personally. You have made it clear that I have to sign the original agreement to start and continue receiving my residual income. For the health and well being of myself and my family, that is what I will do.

I'm sorry it has come to this. However, there is one last clarification needed. You stated you want to " get you paid for your February residuals as soon as possible" but, January that is owed as well. Please clarify those payments and provide me with the document.

I will have it signed and returned today!



[Quoted text hidden]

---

**Kyle Morgan** <kmorgan@mpiprocessing.com>                    Tue, Mar 21, 2023 at 9:05 PM
To: Jeremy Brown <jbrown@authenticmerchantsolutions.com>
Cc: Kathryn McMillan <kmcmillan@mpiprocessing.com>, Benjamin Gray <bgray@mpiprocessing.com>

The document was in the 1099 folder, but I have attached it for convenience.

Also attached is your March 1 and Feb 15th pay stubs. These show payment for Jan Residuals and your final paycheck. This matches the reporting. (Actually overpaid your final pay period by mistake after I reviewed this, will leave that alone)

Currently you are owed the money matching the Feb residual reports in IRIS.

I still need you to confirm if you are or are not under representation as he should be included on these emails if you are. Also I need you to confirm you understand the implications of signing and agreeing to the Non Solicit, Nondisclosure and Noncompete which are outlined in both the employment and IA agreements.

Best Regards,
Kyle Morgan
CEO and Head of Product
Office: 877-508-2831 ext 100
kmorgan@mpiprocessing.com

**2022 Winner Better Business of Delaware Torch Award For Ethics**



**MPI | More Than Payments**

Did you know that MPI offers more than just an outstanding payments experience?

Our robust suite of business services can help you save time and save money!

Payroll | Gift Cards | Paper Program | POS | Mobile Payments

Shop online or ask our team about special bundles for your business!

877-508-2831, Option 2 | sales@mpiprocessing.com

Need help filing a claim for the Visa & MasterCard settlement? We can help!

https://www.mpiprocessing.com/settle/



*This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the system manager. This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.*

[Quoted text hidden]

---

**3 attachments**

 **PayStub (75).pdf**
103K

 **PayStub (76).pdf**
103K

📄 **Copy of Independent Agent Agreement - Jeremy Brown 1099 - January 30, 2_54 PM.pdf**
171K

---

**Jeremy Brown** <jbrown@authenticmerchantsolutions.com>                    Wed, Mar 22, 2023 at 8:55 AM
To: Kyle Morgan <kmorgan@mpiprocessing.com>
Cc: Kathryn McMillan <kmcmillan@mpiprocessing.com>, Benjamin Gray <bgray@mpiprocessing.com>
Bcc: Chris Dryden <cdryden@attorneygl.com>

Kyle,

To confirm, with the transition in pay timing February residuals should have been paid on February 28th which I can expect immediately upon signing the IA. March residuals can be expected on the 28th of March.

It's also important to note that the password has been changed on my Surepayroll account for some reason. I will need that to be resolved.

I am handling all communication with my representation accordingly and my signature on the document is all of the confirmation necessary.

Attached is the signed document. Please send me the fully executed document back for my records.



**JEREMY BROWN**
Owner/Member

📞 302-858-7141
✉ jbrown@authenticmerchantsolutions.com
21379 treeview lane Millsboro De 19966

[Quoted text hidden]

📄 **Independent Agent Agreement - New 2023 Signed.pdf**
15492K

---

**Chris Dryden** <cdryden@attorneygl.com>                        Wed, Mar 22, 2023 at 11:27 AM
To: Jeremy Brown <jbrown@authenticmerchantsolutions.com>

Just an FYI, if he failed to timely pay you W2 wages upon the employment termination he was likely in violation of a Delaware employment law which entitles you to penalties and interest. It is likely nominal but you should remember because if things go sideways later you want to hit him with an administrative claim with relevant the labor board and in civil court.

Christopher R. Dryden, Esq.



322 Encinitas Blvd., Ste 200

Encinitas, CA 92024

Main Line: 888-846-8901

Direct Line: 858-500-3632

Cell: 858-337-2881

This is an email from Global Legal Resources, LLP, doing business as Global Legal Law Firm. This email and any attachments hereto may contain information that is confidential and/or protected by the attorney-client privilege and attorney work product doctrine. This email is not intended for transmission to, or receipt by, any unauthorized persons. Inadvertent disclosure of the contents of this email or its attachments to unintended recipients is not intended to and does not constitute a waiver of attorney-client privilege or attorney work product protections. If you have received this email in error, immediately notify the sender of the erroneous receipt and destroy this email, any attachments, and all copies of same, either electronic or printed. Any disclosure, copying, distribution, or use of the contents or information received in error is strictly prohibited.

---

**From:** Jeremy Brown <jbrown@authenticmerchantsolutions.com>
**Sent:** Wednesday, March 22, 2023 5:56 AM
**To:** Kyle Morgan <kmorgan@mpiprocessing.com>

**Cc:** Kathryn McMillan <kmcmillan@mpiprocessing.com>; Benjamin Gray <bgray@mpiprocessing.com>
**Subject:** Re: Tomorrow's Meeting

Kyle,

[Quoted text hidden]
[Quoted text hidden]

---

**Kyle Morgan** <kmorgan@mpiprocessing.com>                                      Wed, Mar 22, 2023 at 2:38 PM
To: Jeremy Brown <jbrown@authenticmerchantsolutions.com>
Cc: Kathryn McMillan <kmcmillan@mpiprocessing.com>, Benjamin Gray <bgray@mpiprocessing.com>

Corect. If IA was signed before Feb 28th residuals would have been paid then. With the attached executed agreement we will be paying this out this week to the checking account on file. All future residuals will be paid by the last business day of the month.

Ben please work with Teresa to resolve the surepayroll issue and to update his email in the system so you can have access.

Best Regards,
Kyle Morgan
CEO and Head of Product
Office: 877-508-2831 ext 100
kmorgan@mpiprocessing.com

**2022 Winner Better Business of Delaware Torch Award For Ethics**



**MPI | More Than Payments**

Did you know that MPI offers more than just an outstanding payments experience?

Our robust suite of business services can help you save time and save money!

Payroll | Gift Cards | Paper Program | POS | Mobile Payments

Shop online or ask our team about special bundles for your business!

877-508-2831, Option 2 | sales@mpiprocessing.com

Need help filing a claim for the Visa & MasterCard settlement? We can help!

https://www.mpiprocessing.com/settle/



*This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the system manager. This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.*

[Quoted text hidden]

---

 **0111_001 (1).pdf**
839K

---

**Benjamin Gray** <bgray@mpiprocessing.com>          Wed, Mar 22, 2023 at 2:39 PM
To: Kyle Morgan <kmorgan@mpiprocessing.com>
Cc: Jeremy Brown <jbrown@authenticmerchantsolutions.com>, Kathryn McMillan <kmcmillan@mpiprocessing.com>

Jeremy,

I'm working with Teresa directly to get you access ASAP.

Benjamin Gray
Chief Operating Officer
Mercantile Processing Inc.
877-508-2831 ext 133| f. 888-406-6926
2022 Winner, Better Business of Delaware Torch Award For Ethics


MPI | More Than Payments

Did you know that MPI offers more than just an outstanding payments experience?

Our robust suite of business services can help you save time and save money!

Payroll | Gift Cards | Paper Program | POS | Mobile Payments

Shop online or ask our team about special bundles for your business!

877-508-2831, Option 2 | sales@mpiprocessing.com

Need help filing a claim for the Visa & MasterCard settlement? We can help!

https://www.mpiprocessing.com/settle/

This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the system manager. This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.
[Quoted text hidden]

---

**Jeremy Brown** <jbrown@authenticmerchantsolutions.com>          Wed, Mar 22, 2023 at 2:54 PM
To: Kyle Morgan <kmorgan@mpiprocessing.com>
Cc: Kathryn McMillan <kmcmillan@mpiprocessing.com>, Benjamin Gray <bgray@mpiprocessing.com>

Thanks,

Please use the AMS checking account on the w9 that was provided on my last day. Last 4 of the account # 5442



JEREMY BROWN
Owner/Member

302-858-7141
jbrown@authenticmerchantsolutions.com
21379 treeview lane Millsboro De 19966

[Quoted text hidden]

---

**Jeremy Brown** <jbrown@authenticmerchantsolutions.com>                    Wed, Mar 22, 2023 at 2:54 PM
To: Benjamin Gray <bgray@mpiprocessing.com>
Cc: Kyle Morgan <kmorgan@mpiprocessing.com>, Kathryn McMillan <kmcmillan@mpiprocessing.com>

Thanks Ben



**JEREMY BROWN**
Owner/Member

302-858-7141
jbrown@authenticmerchantsolutions.com
21379 treeview lane Millsboro De 19966

[Quoted text hidden]

# Exhibit 12



Jeremy Brown <jbrown@authenticmerchantsolutions.com>

---

## Non Compete Violation

6 messages

---

**Kyle Morgan** <kmorgan@mpiprocessing.com>            Wed, May 24, 2023 at 5:08 PM
To: Jeremy Brown <jbrown@authenticmerchantsolutions.com>
Cc: Benjamin Gray <bgray@mpiprocessing.com>

Jeremy -
   I need to review the violation of your non compete (Section 4.2 Head of Bank Partnerships Agreement)  and how it will affect your residuals and relationship to MPI going forward. I am available between 10 and noon on Friday for a call.

Best Regards,



**Kyle Morgan**
CEO

Mercantile Processing Inc
Office: 877-508-2831 ext 100
kmorgan@mpiprocessing.com

 

**Ask us how we can help you save time and money today!**

Our Services | Contact Us | Shop Online

*This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error, please notify the sender immediately by e-mail and delete this e-mail from your system. If you are not the intended recipient, you are hereby notified that disclosing, copying, distributing, or taking any action in reliance on the contents of this information is strictly prohibited.*

---

**Jeremy Brown** <jbrown@authenticmerchantsolutions.com>            Wed, May 24, 2023 at 5:17 PM
To: Kyle Morgan <kmorgan@mpiprocessing.com>
Cc: Benjamin Gray <bgray@mpiprocessing.com>

I am familiar with section 4.2 and just reviewed it again.

I have not violated the agreement in any way. I am not and have not ever worked for a competing entity at any time. I have not and have no intentions to sell any products related to merchant services. I have in fact turned down offers to do so citing this specific non compete. It seems you may have some false information.



**JEREMY BROWN**
Owner/Member

☎ 302-858-7141
✉ jbrown@authenticmerchantsolutions.com
21379 treeview lane Millsboro De 19966

[Quoted text hidden]

---

**Jeremy Brown** <jbrown@authenticmerchantsolutions.com>            Wed, May 24, 2023 at 5:24 PM
To: Kyle Morgan <kmorgan@mpiprocessing.com>
Cc: Benjamin Gray <bgray@mpiprocessing.com>

Kyle,

Please provide specific details.



**JEREMY BROWN**
Owner/Member
_____

📞 302-858-7141
✉ jbrown@authenticmerchantsolutions.com
21379 treeview lane Millsboro De 19966

[Quoted text hidden]

---

**Kyle Morgan** <kmorgan@mpiprocessing.com>                    Thu, May 25, 2023 at 6:36 AM
To: Jeremy Brown <jbrown@authenticmerchantsolutions.com>
Cc: Benjamin Gray <bgray@mpiprocessing.com>

You are actively marketing a merchant services company in clear violation of the non compete. I will discuss it with you tomorrow. Are you available at 10?

Best Regards,



**Kyle Morgan**
CEO

Mercantile Processing Inc
Office: 877-508-2831 ext 100
kmorgan@mpiprocessing.com

On Wed, May 24, 2023 at 5:17 PM Jeremy Brown <jbrown@authenticmerchantsolutions.com> wrote:
[Quoted text hidden]
[Quoted text hidden]

---

**Jeremy Brown** <jbrown@authenticmerchantsolutions.com>          Thu, May 25, 2023 at 9:40 AM
To: Kyle Morgan <kmorgan@mpiprocessing.com>
Cc: Benjamin Gray <bgray@mpiprocessing.com>

Kyle,

I hope you understand that I will not be having any discussions via phone as all things at this point need to be documented. I also want to assure you that I have completely cleared AMS with my legal team to ensure that there are no violations of the non compete.

Authentic Merchant Solutions is not a merchant services company or merchant services provider.

Please review the disclaimer at the bottom of my website in relation to this claim provided in the screenshot below.

www.authenticmerchantsolutions.com



If there is any wording on the site that has led you to believe this is a merchant services company that you would like to recommend I change I am happy to consider it. I also made some updates to the wording on the site already that may help rectify any confusion as to the nature of business AMS is doing.



**JEREMY BROWN**
Owner/Member

📞 302-858-7141
✉️ jbrown@authenticmerchantsolutions.com
21379 treeview lane Millsboro De 19966

[Quoted text hidden]

---

**Kyle Morgan** <kmorgan@mpiprocessing.com>          Thu, May 25, 2023 at 9:45 AM
To: Jeremy Brown <jbrown@authenticmerchantsolutions.com>
Cc: Benjamin Gray <bgray@mpiprocessing.com>

Any operation of a merchant services company of any type is a violation of non compete. The call is to tell you what to expect out of courtesy. We will be pursuing this and seeking remedies for damages to our brand and partnerships. Now that you have referenced a legal team I need all correspondence about this to come from them.

Best Regards,



**Kyle Morgan**
CEO

Mercantile Processing Inc
Office: 877-508-2831 ext 100
kmorgan@mpiprocessing.com

[Quoted text hidden]

# Exhibit 13



Catherine M. Cramer
(302) 327-1100
ccramer@bmbde.com

May 25, 2023

<u>Sent via Email and U.S. Mail</u>
Jeremy Brown
21379 Treeview Lane
Millsboro, DE 19966
*jbrown@authenticmerchantsolutions.com*

RE:  Mercantile Processing, Inc

Dear Mr. Brown:

My firm represents Mercantile Processing, Inc. ("MPI"). It has come to MPI's attention that your company, Authentic Merchant Solutions ("AMS"), is actively marketing the sale of certain products and services that MPI offers.  This is in direct violation of a certain document titled "Head of Bank Partnerships Employment Agreement" that you signed on or about October 1, 2018 (the "Agreement").  I have included the Agreement for your reference.  This letter hereby directs you and AMS to immediately cease and desist competition with MPI.  If you are represented, please provide this letter to your counsel.

You executed the Agreement on or about October 1, 2018.  Section 2.1 of the Agreement identifies your compensation.  It advises that in addition to a salary, you will be entitled to receive residual commissions on accounts obtained as a sales agent and 15% of net residual commissions from subordinate employees and portfolio banks.  It also advises that you may take 50% of direct sales.

The Agreement also contains a series of restrictive covenants.  Indeed, it states that you will forfeit your rights to residuals or compensation under the Agreement and be liable to damages incurred by the company if you violate such covenants.  Section 4.1, titled "Non Solicitation" prohibits, among of things, your solicitation of company merchants within the United States from merchant accounts of MPI, including bank partnerships of MPI for a period of five (5) years.  While AMS's website explicitly states that it cannot do business with any MPI customer, my client is investigating whether AMS has retained MPI clients.

Section 4.2, titled "Non-Compete," states "MPI has a regional advantage" and that you agree "for a term of one year not to work for a competing entity within 100 miles of an MPI Office."  As you are aware, MPI's flagship office is located at 32695 Roxana Road, Millville, Delaware 19967.  AMS, according to its website, is located in Millsboro, Delaware — approximately 11 miles away.  Section 4.2 does not limit the type of services and products subject to the non-compete covenant.

AMS's website articulates its step-by-step process to the services it offers:

Baird Mandalas Brockstedt, LLC
Page 2

First, AMS reviews a merchant's statement and point of sale ("POS") contract to determine if hidden fees are charged to a merchant, or if the POS provider is inflating rates.  Second, AMS negotiates with the POS provider (or gives guidance with the merchant regarding the negotiation process) to reduce the merchant's rates and eliminate certain fees.  Finally, AMS audits the merchant's bills and statements to identify future rate increases or new charges related to unnecessary fees.

The website goes on to state:

> We specialize in the analysis and tracking of credit card processing and point of sale solutions, ensuring that our clients have the most reliable and efficient payment processing systems in place for their respective industry.
> AMS understands the challenges that businesses face in the merchant services industry, and we work closely with our clients to identify their unique needs and goals. By providing guidance with their existing merchant services relationships, we help our clients improve their cash flow, reduce costs, and increase profitability.

A major component of MPI's business is the sale and servicing of POS systems.  It should come as no surprise that MPI actively engages in the same process, in addition to others, for the merchants it serves.  This is clear competition.

On May 16, 2023, you shared a link to AMS's website on Facebook.  Ironically, your Facebook page identified you as the Bank Relationship Manager for MPI. On May 22, 2023, the Greater Millsboro Chamber of Commerce published an advertisement for AMS.  That advertisement similarly articulated AMS's services to merchants.  There are several other posts on social media that confirm your involvement and ownership of AMS.

Pursuant to Section 4 of the Agreement, MPI will immediately cease payment of any residuals owed to you under the Agreement until you come back into compliance with your obligations.  MPI is evaluating other agreements it has with you to assess whether you are in violation of any other duty you agreed to perform and will make an appropriate decision as to those agreements.  Failure to come into compliance with your obligations under the Agreement may result in MPI taking additional action to enforce its rights and seek redress before a court of law or equity.

Very truly yours,


Catherine M. Cramer

# Exhibit 14



**Christopher R. Dryden, Esq.**
cdryden@attorneygl.com
**James C. Huber, Esq.**
jhuber@attorneygl.com

May 31, 2023

<u>**Via Email Only (ccramer@bmbde.com)**</u>
Catherine M. Cramer. Esq.
2711 Centerville Road, Suite #401
Wilmington, DE 19808

   RE: <u>Jeremy Brown and Authentic Merchant Solutions; Response to Claim of Breach of</u>
     <u>Non-Compete and Demand to Restart Residual Payments</u>

Dear Ms. Cramer:

We represent Mr. Jeremy Brown and his company, Authentic Merchant Solutions ("AMS") (collectively, hereafter referred to herein as "Mr. Brown"). We are in receipt of your May 25, 2023, letter to Mr. Brown sent on behalf of your client Mercantile Processing, Inc. ("MPI"), and respond hereby.

It appears from your missive that MPI has taken the position that Mr. Brown has somehow violated restrictive covenants prohibiting Mr. Brown from soliciting MPI merchants or otherwise competing with MPI in the marketplace by offering competing services and/or products. MPI indicates Mr. Brown is in breach of these restrictive covenants and therefore Mr. Brown's residual payments "will immediately cease" until he is "back into compliance" with these covenants.

There appears to be some confusion on MPI's end concerning the services Mr. Brown currently offers and supplies within the merchant services marketplace. Mr. Brown is a consultant to merchants offering consulting services relating to such merchants' processing charges and assists them with recapturing fee overcharges while monitoring ongoing contract compliance by their respective service providers, services which MPI does not offer, nor has it ever offered. Mr. Brown is neither engaged in any business which competes with MPI nor has Mr. Brown attempted to acquire any MPI merchant with replacement processing services by wrongful solicitation.

Mr. Brown provides the following basic services to merchants:

- Review of merchant processing statements.
- Comparison of those statements to the agreements that merchants have entered for processing.
- Identifying overcharges or other improperly charged fees for which merchants should be credited.
- Negotiating payment of the credits for overcharges and/or future reductions in charges so the charges align with the parties' contract terms; and

Catherine M. Cramer. Esq.
May 31, 2023
Page 2

- Oversight of ongoing billing practices and review of future statements to ensure ongoing compliance by processors concerning the merchant fees.

The fee Mr. Brown charges any merchant for his services is derived from the savings produced by his consultation, auditing, negotiation, and oversight duties. Mr. Brown does not acquire merchants (or assist in the process of acquiring merchants) for processing services and Mr. Brown does not sell or provide servicing for any POS equipment. His conduct does not violate any non-compete duty he may owe to MPI, and he is not engaging in any wrongful solicitation of MPI merchants.

We hope this letter will assist in resolving MPI's concerns regarding any potential breach that MPI asserts against Mr. Brown and by which MPI claims an ability to withhold any residual payments from him.

Should any residual payments be withheld due to the alleged breaches as set forth in your recent letter, Mr. Brown will pursue any and all legal remedies against MPI to correct such action. If you wish to discuss this letter or any other issue, please do not hesitate to contact me.

For the Firm,

Christopher Dryden

# Exhibit 15



Mercantile Processing Inc.
32695 Roxana Road, Floor 3
Millville, DE 19967
302-524-8000 | 877-508-2831
www.mpiprocessing.com
sales@mpiprocessing.com

August 7, 2023

**Via EMAIL And U.S. Mail**

Mr. Jeremy Brown

21379 Treeview Lane

Millsboro, DE 19966

jbrown@authenticmerchantsolutions.com

RE:     Servicing of Accounts – Mercantile Processing, Inc.

Dear Mr. Brown:

It has come to our attention that you have now made it clear that you no longer have any interest in servicing Mercantile Processing, Inc. (MPI) accounts.  Accordingly, effective immediately, you should no longer service any MPI accounts and MPI will make no request for you to do so. This notice includes your recent communication regarding Maryland Paving. If you are contacted by a merchant directly, please refer all such inquiries to your counsel who will then pass them on to us.

Very truly yours,

Kyle Morgan

# TAB 13

**EFiled:  Aug 21 2023 05:10PM EDT**
**Transaction ID 70683025**
**Case No. 2023-0859-**

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| JEREMY BROWN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    C.A. No. |
| | ) |
| MERCANTILE PROCESSING, INC., a | ) |
| Delaware corporation, KYLE MORGAN, | ) |
| and KATHRYN McMILLAN, | ) |
| | ) |
| | ) |
| Defendants. | ) |

### AFFIDAVIT OF JEREMY BROWN

| | |
|---|---|
| STATE of DELAWARE | ) |
| | )  SS |
| NEW CASTLE COUNTY | ) |

The undersigned, Jeremy Brown, upon being duly sworn according to law, deposes and says:

1.    I am an individual of sound mind aged 36 years.

2.    I am a resident of Delaware.

3.    I was employed by Mercantile Processing, Inc. (MPI) from 2015 until February 2023 (the "Employment").

4.    Throughout my Employment, I was a W-2 employee paid by paycheck.

5.      Throughout my Employment, I was classified as an exempt employee and was not paid overtime for hours worked in excess of 40 per workweek.

6.      Throughout my Employment, I was not required to track or log my time in any way.

7.      Throughout my Employment, I regularly worked in excess of 40 hours per workweek.

8.      At no time during my Employment was I ever paid for overtime I worked—either at a straight rate or at an overtime rate.

9.      During my Employment, I was guaranteed a "base salary" each year.

10.     However, my salary was subject to deductions throughout my Employment.

11.     If I did not make a particular quota, a set amount was withheld from my base salary.

12.     I formed my entity, Authentic Merchant Solutions, LLC (AMS) for the sole purpose of providing service to my accounts as an MPI employee.

13.     MPI was aware of my formation of AMS and never took any issue with it during my Employment.

2

14.     In January 2023, I complained to MPI's newly hired Chief Operations Officer, Benjamin Gray, that my residuals had been reduced from 15% to 5% on the Woodsboro Bank account.

15.     A few weeks later, MPI paid me the two months of residuals I was owed for the Woodsboro Bank account.

16.     Around the same period of time, I was called into a meeting with COO Gray and Chief Revenue Officer Kathryn McMillan.

17.     At that meeting, much to my shock and dismay, there was nothing close to an apology for having deprived me of a majority of my income for two months.

18.     Instead, they presented me with a Performance Improvement Plan.

19.     After that meeting, I resigned my Employment.

20.     Since leaving MPI, I have continued to service my MPI accounts in order to protect my Residuals.

21.     If an account is not satisfied with the service it receives from MPI, the account is free to leave for a competitor.

22.     If I ignore a request from an account for assistance, or if I ignore a request from MPI to service an account, I am actively pushing that account towards leaving MPI and thereby reducing my Residuals.

3

23.     After leaving my Employment, I tried to expand the services offered by AMS.  Specifically, I wanted to offer consulting services to accounts that either already have or wanted to get merchant-processing services.  Those services would entail me assisting in the negotiating of that account's contract with its merchant-services provider.

24.     To ensure that I did not upset MPI, I put a disclaimer on AMS's website that specifically stated that AMS did not work with MPI accounts.

25.     I have not, through AMS or otherwise, at any time since leaving my Employment, ever competed with MPI.

26.     I have never, through AMS or otherwise, at any time since leaving my Employment, ever sold or attempted to sell any credit-card processing services, point-of-sale systems, or other products or services offered by MPI.

27.     As a result of MPI's continued refusal to pay me my full residuals, I have had to accept a job in roof sales, where I am paid on a commission-only basis.

28.     To date, in my new job, I have earned less than $2,000.  As a result of my lack of income due to MPI's withholding of my wages, I have had to deplete my savings.

_____
Jeremy Brown

Dated:

SWORN TO AND SUBSCRIBED before me this ___20th___ day of

___August_____ 2023.

_____
Notarial Officer

# TAB 14

EFiled: Aug 21 2023 05:10PM EDT
Transaction ID 70683025
Case No. 2023-0857

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JEREMY BROWN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. |
| | ) | |
| MERCANTILE PROCESSING, INC., a | ) | |
| Delaware corporation, KYLE MORGAN, | ) | |
| and KATHRYN McMILLAN, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## [PROPOSED] ORDER GRANTING PLAINTIFF'S
## MOTION FOR TEMPORARY RESTRAINING ORDER

Upon consideration of Plaintiff's Motion for Temporary Restraining Order,

and for good cause shown and of Plaintiff's Motion for Expedited Proceedings,

IT IS HEREBY ORDERED this _____ day of _____, 2023, as follows:

1.     Plaintiff's Motion for Temporary Restraining Order is GRANTED.

2.     Until further Order of this Court, Defendants and those acting on the

behalf of any Defendant are hereby temporarily restrained from:

      a.  Seeking to enforce any restrictive covenant against Plaintiff;

      b.  Interfering or attempting to interfere with Plaintiff's performance

         under his 2018 Employment Agreement; and

      c.  Withholding any residuals from Plaintiff.

_____
[Vice] Chancellor

# TAB 15

EFiled:  Aug 21 2023 05:10PM EDT
Transaction ID 70683025
Case No. 2023-0859-

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| JEREMY BROWN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. |
| | ) |
| MERCANTILE PROCESSING, INC., a | ) |
| Delaware corporation, KYLE MORGAN, | ) |
| and KATHRYN McMILLAN, | ) |
| | ) |
| | ) |
| Defendants. | ) |

## MOTION TO EXPEDITE PROCEEDINGS

Plaintiff Jeremy Brown brings this action against Defendants Mercantile

Processing, Inc. ("MPI"), and Individual Defendants Kyle Morgan and Kathryn

McMillan (Morgan and McMillan, together, the "Individual Defendants" and,

each, an "Individual Defendant") (collectively, MPI and the Individual Defendants,

"Defendants") and respectfully seeks expedited proceedings for the reasons that

follow.

1.      The facts as alleged in Plaintiff's Verified Complaint (the

"Complaint") are incorporated by reference herein.  As set forth in detail in the

Complaint, Defendants are withholding wages owed to Plaintiff under the pretext

that he has breached certain restrictive covenants.

2. Defendants are also preventing Plaintiff from servicing his accounts as he is required to do under his 2018 Employment Agreement (the "2018 EA").

3. By preventing Plaintiff from servicing his accounts, Defendants are directly interfering with his future residuals.

4. Defendants also take the position that Plaintiff is prohibited from performing services for his entity, AMS, which entity he set up *at the direction and insistence of* Defendants even though AMS does not provide any of the services provided by MPI and even though AMS does not compete in any way with MPI.

5. Thus, Defendants refuse to pay Plaintiff for the work he has performed, refuse to let him perform the work he is obligated to do in order to collect future residuals, and are refusing to let him work for another entity, including the one he created at the direction and insistence of Defendants.

6. Defendants' continued threats of litigation are preventing Plaintiff from accepting new employment in his chosen profession and, until the matter is resolved, Plaintiff has been and will be unable to earn a living.

7. "'Delaware courts are always receptive to expediting any type of litigation in the interests of affording justice to the parties . . .' and [t]he Court of Chancery Rules give the court broad discretion to accelerate the pace of proceedings." *Id.* at *4 (quoting *Box v. Box*, 697 A.2d 395, 399 (Del. Super. Ct. 1997)). The Delaware Court of Chancery "traditionally has acted with a certain

solicitude for plaintiffs" and "has followed the practice of erring on the side of more [expedited] hearings rather than fewer." *Giammargo v. Snapple Beverage Corp.*, 1994 WL 672698, *2 (Del. Ch.).  As a result, "[a] party's request to schedule an application for a preliminary injunction, and to expedite the discovery related thereto, is normally routinely granted.  Exceptions to that norm are rare." *In re Int'l Jensen, Inc. S'holders Litig.*, 1996 WL 422345, *1 (Del.  Ch.).

8.     Indeed, this Court routinely expedites matters in which preliminary relief is sought so long as the plaintiff has a colorable claim and demonstrates the risk of imminent, irreparable harm.  *See Sinchareonkul*, 2015 WL 292314, at *4. "'In assessing a motion to expedite, the Court need not-and, indeed, should not-make factual findings.  It is, instead, guided by the well-pled, verified allegations of the Complaint.'  At this procedural stage, the plaintiff receives the benefit of all reasonably conceivable inferences." *Sinchareonkul v. Fahnemann*, 2015 WL 292314, *1 (Del. Ch.) (quoting *Shocking Techs., Inc. v. Michael*, 2012 WL 165561, *1 (Del. Ch.)).

9.     The first requirement for expedited treatment is the existence of a "colorable showing that the hearing is warranted."  *Id.*  "[T]he standard for expedition, colorability, which simply implies a non-frivolous set of issues, is even lower than the 'conceivability' standard applied on a motion to dismiss."  *Id.* at *1,

3

n. l (citing *In re BioClinica, Inc. S'holder Litig.*, 2013 WL 5631233, at *1 n.l (Del. Ch.)).

10.     As set forth in the Verified Complaint, Plaintiff has asserted multiple colorable claims.

11.     First, Plaintiff has established a colorable claim that Defendants are interfering with his ability to perform work for his accounts, as both the CEO of MPI, Individual Defendant Morgan, and Defendants' counsel notified Plaintiff in writing that he was instructed not to service any accounts and to, instead, convey any requests from accounts to his *lawyer*.

12.     Second, Plaintiff has established a colorable claim that Defendants are continuing to withhold his residuals, again, because Defendants have admitted to doing so in writing.

13.     Third, because Defendants continue to threaten him that they will bring suit against him under the unenforceable restrictive covenants, Plaintiff has established a colorable claim that he is and will continue to suffer immediate and irreparable harm because of this baseless threat.

14.     There can be no doubt that Plaintiff has established that he has multiple colorable claims.

15.     The Court typically agrees to set an expedited preliminary injunction hearing where "the plaintiff has articulated a sufficiently colorable claim and

4

shown a sufficient possibility of a threatened irreparable injury, as would justify

imposing on the defendants and the public the extra (and sometimes substantial)

costs of an expedited preliminary injunction proceeding." *Id.* at *4 (citing

*Giammargo*, 1994 WL 672698, *2 (Del. Ch.)) (emphasis added).  Plaintiff will be

subject to imminent, irreparable harm in the event Defendants' wrongful conduct is

not enjoined.

16.     Plaintiff respectfully requests that the Court enter an order in the form

submitted herewith, establishing a prompt hearing on Plaintiff's Motion for a

Preliminary Injunction.

CLARK HILL PLC

*/s/ Margaret M. DiBianca*
Margaret M. DiBianca, Esq. (No. 4539)
824 N. Market Street, Ste. 710
Wilmington, DE  19801
Telephone:  302-250-4748
Email:  mdibianca@clarkhill.com
**WORDS:  843**

Dated:   August 21, 2023          *Attorneys for Plaintiff*

5

# TAB 16

**EFiled:  Aug 21 2023 05:10PM EDT**
**Transaction ID 70683025**
**Case No. 2023-0859-**

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| JEREMY BROWN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. |
| | ) |
| MERCANTILE PROCESSING, INC., a | ) |
| Delaware corporation, KYLE MORGAN, | ) |
| and KATHRYN McMILLAN, | ) |
| | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF'S MOTION TO EXPEDITE

Plaintiff Jeremy Brown brings this action against Defendants Mercantile

Processing, Inc. ("MPI"), and Individual Defendants Kyle Morgan and Kathryn

McMillan (Morgan and Morgan, each an "Individual Defendant" and, together, the

"Individual Defendants") (the Individual Defendants and MPI, each a "Defendant"

and, together, "Defendants"), and respectfully files this Memorandum of Law in

Support of its Motion to Expedite filed contemporaneously herewith.

1.    Mr. Brown was employed by MPI from 2015 to 2023.

2.    Mr. Brown's employment was governed by various agreements,

including, at the time of his separation, an employment agreement dated 2018 (the

"2018 EA").

3.      All of the agreements between MPI and Mr. Brown, including the 2018 EA, provided that Mr. Brown would be compensated with a relatively small salary (less than $50,000 annually) and residual payments that lasted anywhere from one year to the lifetime of the account.

4.      When Mr. Brown suggested that he may resign in late 2022, the Individual Defendants directed MPI to cease paying Mr. Brown's residuals and withheld payments for January, February, and March 2023.

5.      Mr. Brown threatened Mr. Brown that MPI would not release the residuals unless Mr. Brown executed an independent agent agreement (the "2023 IAA").

6.      Mr. Brown executed the 2023 IAA under protest and without receiving consideration in exchange.

7.      Upon receipt of the 2023 IAA signed by Mr. Brown, MPI released some but not all of the owned residual payments.

8.      MPI then began to withhold wages again in June, has withheld the residual payments owed to Mr. Brown for May, June, and July 2023, and has stated that it will not tender any further residual payments.

9.      MPI contends that Mr. Brown has "forfeited" his wages because, MPI contends, Mr. Brown violated certain restrictive covenants in the 2018 EA.

2

10.     There are no valid covenants in the 2018, as they are overly broad and ambiguous to such a degree to render them unenforceable.

11.     Even if there were valid covenants—which there are not—the "noncompete" provision expired in 2019.

12.     Even if there were valid covenants that had not expired, MPI's acknowledged refusal to timely pay the January-March 2023 residual payments and the continued withholding of the May-July 2023 residual payments excuses Mr. Brown's performance as a matter of law.

13.     In Delaware, employees may not "forfeit" or "wave" their rights to timely and full payment of all wages and compensation owed.

14.     Since May 25, 2023, MPI has threatened to sue Mr. Brown to enforce the unenforceable restrictive covenants in the 2018 EA.

15.     And, on August 8, 2023, Individual Defendant Morgan notified Mr. Brown that he was to cease immediately the provision of any and all services even though Mr. Brown's future earnings are wholly dependent on the service provided to these accounts and even though he is obligated to provide such services under the 2018 EA.

## ANALYSIS

16.     "'Delaware courts are always receptive to expediting any type of litigation in the interests of affording justice to the parties . . .' and [t]he Court of

3

Chancery Rules give the court broad discretion to accelerate the pace of proceedings." *Id.* at *4 (quoting *Box v. Box*, 697 A.2d 395, 399 (Del. Super. Ct. 1997)).  The Delaware Court of Chancery "traditionally has acted with a certain solicitude for plaintiffs" and "has followed the practice of erring on the side of more [expedited] hearings rather than fewer." *Giammargo v. Snapple Beverage Corp.*, 1994 WL 672698, *2 (Del. Ch.).  As a result, "[a] party's request to schedule an application for a preliminary injunction, and to expedite the discovery related thereto, is normally routinely granted.  Exceptions to that norm are rare." *In re Int'l Jensen, Inc. S'holders Litig.*, 1996 WL 422345, *1 (Del.  Ch.).

17.    Indeed, this Court routinely expedites matters in which preliminary relief is sought so long as the plaintiff has a colorable claim and demonstrates the risk of imminent, irreparable harm.  *See Sinchareonkul*, 2015 WL 292314, at *4.

18.    "'In assessing a motion to expedite, the Court need not-and, indeed, should not-make factual findings.  It is, instead, guided by the well-pled, verified allegations of the Complaint.'  At this procedural stage, the plaintiff receives the benefit of all reasonably conceivable inferences." *Sinchareonkul v. Fahnemann*, 2015 WL 292314, *1 (Del. Ch.) (quoting *Shocking Techs., Inc. v. Michael*, 2012 WL 165561, *1 (Del. Ch.)).

19.    The first requirement for expedited treatment is the existence of a "colorable showing that the hearing is warranted." *Id.*  "[T]he standard for

expedition, colorability, which simply implies a non-frivolous set of issues, is even lower than the 'conceivability' standard applied on a motion to dismiss." *Id.* at *1, n. l (citing *In re BioClinica, Inc. S'holder Litig.*, 2013 WL 5631233, at *1 n.l (Del. Ch.)).

20.    As set forth in the Verified Complaint and restated above, Plaintiff has demonstrated that there is a non-frivolous set of issues that require expeditious treatment.

21.    Specifically, Defendants are threatening to sue Plaintiff to enforce certain unenforceable restrictive covenants and thereby are preventing him from operating his business and from earning a living in his chosen profession.

22.    Additionally, Defendants are wrongfully withholding Plaintiff's earned wages in violation of Delaware law without justification as an additional way to harm Plaintiff and prevent him from earning a living.

23.    Finally, Defendants are preventing Plaintiff from performing services for his accounts as contemplated under his employment agreement and are thereby directly and intentionally interfering with his future residuals.

24.    The Court typically agrees to set an expedited preliminary injunction hearing where "the plaintiff has articulated a sufficiently colorable claim and shown a sufficient possibility of a threatened irreparable injury, as would justify imposing on the defendants and the public the extra (and sometimes substantial)

costs of an expedited preliminary injunction proceeding." *Id.* at *4 (citing *Giammargo*, 1994 WL 672698, *2 (Del. Ch.)) (emphasis added). Plaintiff will be subject to imminent, irreparable harm in the event Defendants' wrongful conduct is not enjoined.

25.    Here, expedition should be granted to enable Plaintiff to take immediate discovery in order to determine the scope and extent of Defendants' wrongful and unlawful conduct and to do so expeditiously so as to mitigate and prevent further harm by Defendants.

WHEREFORE, Plaintiff respectfully requests that the Court enter an order in the form submitted herewith, granting Plaintiff's Motion to Expedite.

CLARK HILL PLC

*/s/ Margaret M. DiBianca*

Margaret M. DiBianca, Esq. (No. 4539)
824 N. Market Street, Ste. 710
Wilmington, DE  19801
Telephone:  (302) 250-4748
Email:  mdibianca@clarkhill.com
**WORDS:  1,045**

Dated:    August 21, 2023          *Attorneys for Plaintiff*

6

# TAB 17

EFiled:  Aug 21 2023 05:10PM EDT
Transaction ID 70683025
Case No. 2023-0859-

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| JEREMY BROWN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   C.A. No. |
| | ) |
| MERCANTILE PROCESSING, INC., a | ) |
| Delaware corporation, KYLE MORGAN, | ) |
| and KATHRYN McMILLAN, | ) |
| | ) |
| | ) |
| Defendants. | ) |

## [PROPOSED] ORDER TO MOTION TO EXPEDITE PROCEEDINGS

IT IS HEREBY ORDERED, this __ day of _____, 202_,

upon consideration of Plaintiff's Motion to Expedite Proceedings (the "Motion"),

and for good cause shown, that Plaintiff's Motion is GRANTED.

IT IS FURTHER ORDERED that this matter shall proceed according

to the following schedule:

1.    Defendants shall file any responsive pleading within five (5)

business days from the date of this Order.

2.    Fact discovery shall be commenced so as to be completed by

_____.

3.    A hearing on Plaintiff's Motion for Preliminary Injunction

("PI") shall be held on _____, 20__, at _____ _.m.

      4.      The parties shall submit a proposed briefing schedule.

      AND IT IS FURTHER ORDERED that the parties shall respond and/or object to written discovery within five (5) business days of the service of such discovery, and that the parties shall, to the greatest extent practicable, make their witnesses available for deposition on five (5) business days' notice. Moreover, the parties shall make a good-faith effort to cooperate in securing the appearance for depositions of and/or production of documents from non-parties to this litigation without the need for formal commission issued by the Court. Discovery shall be conducted in accordance with the Court's Guidelines for Expedited Proceedings.

 

                                    _____

                                       [Vice Chancellor]

# TAB 18

**EFiled:  Aug 21 2023 05:10PM EDT**
**Transaction ID 70683025**
**Case No. 2023-0859-**

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| JEREMY BROWN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. |
| | ) |
| MERCANTILE PROCESSING, INC., a | ) |
| Delaware corporation, KYLE MORGAN, | ) |
| and KATHRYN McMILLAN, | ) |
| | ) |
| | ) |
| Defendants. | ) |

## MOTION FOR PRELIMINARY INJUNCTION

Plaintiff Jeremy Brown hereby moves, pursuant to Court of Chancery Rule 65, for the entry of an Order enjoining Defendants from: (1) seeking to enforce any restrictive covenant against Plaintiff; (2) interfering with Plaintiff's performance under the 2018 Employment Agreement; and (3) withholding residuals and other earnings based on the claim that Plaintiff "forfeited" such earnings.  The reasons for this Motion will be set forth fully in briefing on a schedule to be determined upon receipt of a hearing date.

Respectfully Submitted,

CLARK HILL PLC

*/s/ Margaret M. DiBianca*

Margaret M. DiBianca, Esq. (No. 4539)
824 N. Market Street, Ste. 710
Wilmington, DE  19801
Telephone:  302-250-4748
Email:  mdibianca@clarkhill.com
**WORDS:  80**

Dated:   August 21, 2023                    *Attorneys for Plaintiff*

2

# TAB 19

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

EFiled: Aug 23 2023 04:00PM EDT
Transaction ID 70683025
Case No. 2023-0859-

| | |
|---|---|
| JEREMY BROWN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. |
| | ) |
| MERCANTILE PROCESSING, INC., a | ) |
| Delaware corporation, KYLE MORGAN, | ) |
| and KATHRYN McMILLAN, | ) |
| | ) |
| Defendants. | ) |

**[PROPOSED] ORDER TO MOTION FOR PRELIMINARY INJUNCTION**

IT IS HEREBY ORDERED, this __ day of _____, 2023, upon

consideration of Plaintiff's Motion for Preliminary Injunction ("Motion"), and any

response thereto, and for reasons set forth on the record on _____, 2023:

IT IS FURTHER ORDERED that:

1.      Plaintiff's Motion is GRANTED.

2.      Pending trial in this action, Defendants, and those acting in concert

with any Defendant, are preliminarily enjoined from:

a.      seeking to enforce any restrictive covenant against Plaintiff;

b.      interfering with Plaintiff's performance of services as provided for in

the 2018 Employment Agreement; and

c.      withholding residuals or other earnings of Plaintiff on the grounds that

Plaintiff "forfeited" such earnings.

_____
[Vice] Chancellor

# TAB 20

EFiled:  Aug 21 2023 05:10PM EDT
Transaction ID 70683025
Case No. 2023-0859-



Margaret M. DiBianca
T (302) 250-4748
F (302) 421-9439
Email: mdibianca@ClarkHill.com

Clark Hill
824 N. Market Street, Suite 710
Wilmington, DE 19801
T (302) 250-4750
F (302) 421-9439

August 21, 2023

**VIA FILE & SERV*EXPRESS***

The Honorable Kathaleen St. Jude McCormick
Court of Chancery, State of Delaware
New Castle County Courthouse
500 North King Street
Wilmington, DE  19801

      Re:  *Jeremy Brown v. Mercantile Processing, Inc.*
             C.A. No. 2023-
             Summons Instruction

Dear Chancellor McCormick:

Enclosed please find two (2) copies of the following documents that were filed in the above-referenced matter today:

1.    Verified Complaint for Injunctive and Declaratory Relief;

2.    Plaintiff's Motion for Expedited Proceedings, Memorandum in Support of the Motion for Expedited Proceedings, and [Proposed] Order;

3.    Plaintiff's Motion for Temporary Restraining Order, and [Proposed] Order;

4.    Plaintiff's Opening Brief in Support of His Motion for Temporary Restraining Order; and

August 21, 2023
Page 2

    5.    Plaintiff's Motion for Preliminary Injunction, and [Proposed] Order.

Plaintiff respectfully requests a telephonic hearing on Plaintiff's Motion for

Expedited Proceedings at the Court's earliest possible convenience.

    Respectfully,

    Margaret M. DiBianca, Esq. (Bar No. 4539)
    **WORDS:  95**

# TAB 21

EFiled: Aug 22 2023 11:18AM EDT
Filed: Aug 21 2023 05:57PM
Transaction ID 70685025
Case No. 2023-0859-



Clark Hill

Margaret M. DiBianca
T (302) 250-4748
F (302) 421-9439
Email:mdibianca@ClarkHill.com

Clark Hill
824 N. Market Street, Suite 710
Wilmington, DE 19801
T (302) 250-4750
F (302) 421-9439

August 21, 2023

**VIA FILE & SERV*EXPRESS***    *[handwritten: 8/22/23 issued (1) 321 summons to special process server (1 copy)]*

Register in Chancery
Delaware Court of Chancery
500 N. King Street
Wilmington, DE 19801

> Re:  *Jeremy Brown v. Mercantile Processing, Inc.*
> C.A. No. 2023-
> Summons Instruction
> _____

Dear Register in Chancery:

A registered process server will be making service of Plaintiffs' Verified

Complaint.  Accordingly, we request that your office prepare the summons at your

earliest convenience as follows:

**Pursuant to 8 *Del. C.* § 321, via Plaintiff's Counsel:**

Mercantile Processing, Inc.
32695 Roxana Rd.
Millville, DE 19967

Please notify my paralegal Felicia Grimes at (302) 250-4784 when the

summons is ready.

clarkhill.com

272917154.v1

August 21, 2023
Page 2

    If you have any questions, please do not hesitate to contact me.  Thank you for your assistance in this matter.

               Respectfully submitted,

               Margaret M. DiBianca, Esq. (Bar No. 4539)
               **WORDS: 80**

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

JEREMY BROWN                              )
                                          )
Plaintiff,                                )
                                          )
            v.                            )
                                          )       C.A. No. 2023-0859-
                                          )
MERCANTILE PROCESSING, INC., a            )
Delaware Corporation, KYLE                )
MORGAN, and KATHRYN                       )
McMILLIAN

Defendants.

**THE STATE OF DELAWARE**

**TO: SPECIAL PROCESS SERVER – Parcels, Inc.**

**YOU ARE COMMANDED:**

To summon the above-named defendant so that, within 20 days after service hereof upon defendant, exclusive of the day of service, defendant shall serve upon Clark Hill to Margaret M. DiBianca, Plaintiff's attorney, whose address is 824 North Market Street, Suite 710 Wilmington, DE 19801, an answer to the complaint.

To serve upon the defendant a copy hereof and of the complaint.

**TO THE ABOVE-NAMED RESPONDENT:**

In case of your failure, within 20 days after service hereof upon you, exclusive of the day of service, to serve on plaintiff's attorney named above an answer to the complaint, judgment by default will be rendered against you for the relief demanded in the complaint.

_____
                                          Register in Chancery

Dated: August 22, 2023

Case # 2023-0859-

JEREMY BROWN

Plaintiff,

v.

MERCANTILE PROCESSING, INC., a
Delaware corporation, KYLE MORGAN,
and KATHRYN McMILLAN,


Defendants.



## SUMMONS

Please effectuate service pursuant to 8 Del. C. sec. 321 upon:

**Mercantile Processing, Inc.**
**32695 Roxana Rd.**
**Millville, DE 19967**


SERVICE TO BE COMPLETED BY SPECIAL PROCESS SERVER: *Parcels, Inc*

*Margaret M. DiBianca, Esq.*
**Plaintiff's Counsel**

# TAB 22

EFiled:  Aug 22 2023 11:53AM EDT
Transaction ID 70689745
Case No. 2023-0859-PAF

# COURT OF CHANCERY
## OF THE
## STATE OF DELAWARE

PAUL A. FIORAVANTI, JR.
  VICE CHANCELLOR

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 11400
WILMINGTON, DELAWARE 19801-3734

August 22, 2023

Margaret M. DiBianca, Esquire
Clark Hill PLC
824 N. Market Street, Suite 710
Wilmington, DE 19801

Re: *Jeremy Brown v. Mercantile Processing, Inc. et al.,*
     C.A. No. 2023-0859-PAF

Dear Counsel:

A telephonic hearing to consider the plaintiff's motion for expedited proceedings (the "Motion") has been scheduled for Thursday, August 24, 2023, at 3:15 p.m.  Any opposition to the Motion is to be served and filed by Wednesday, August 23, 2023, at 2:00 p.m., with courtesy copies delivered to chambers via the Courthouse upon filing.  Any reply is due by Thursday, August 24, 2023, at 9:00 a.m., with courtesy copies delivered immediately to chambers via the Courthouse upon filing.  The parties are requested to include a compendium of key authorities relied upon in their respective submissions, but they need not duplicate authorities already contained in earlier submissions.

Counsel for plaintiff is directed immediately to serve and transmit a copy of this letter and all related suit and motion papers on defendants, notifying defendants

*Jeremy Brown v. Mercantile Processing, Inc. et al.*
C.A. No. 2023-0859-PAF
August 22, 2023
Page 2 of 2

and their counsel of the scheduled hearing.  Additionally, the court requests that

counsel for plaintiff arrange a teleconference for the hearing and provide all parties

and chambers with the dial-in information.

    IT IS SO ORDERED.


                                    Very truly yours,

                                    */s/ Paul A. Fioravanti, Jr.*

                                    Vice Chancellor


PAF/dtw

# TAB 23

**EFiled:  Aug 22 2023 03:49PM EDT**
**Transaction ID 70694157**
**Case No. 2023-0859-PAF**

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| JEREMY BROWN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. |
| | ) |
| MERCANTILE PROCESSING, INC., a | ) |
| Delaware corporation, KYLE MORGAN, | ) |
| and KATHRYN McMILLAN, | ) |
| | ) |
| Defendants. | ) |

## VERIFICATION

I, Jeremy Brown, being duly sworn according to law, depose and say:

I have read the foregoing Verified Complaint and know the contents thereof.

The allegations contained in the Verified Complaint are, of my own personal

knowledge, true and correct, except that, as to those allegations upon information

and belief, I believe them to be true.

_____
JEREMY BROWN

SWORN TO AND SUBSCRIBED before me, a Notary Public, in and for
the State and County below, on this 20th day of August 2023

_____
Notarial Officer
Margaret M. DiBianca
DE ID 4539

Margaret M. DiBianca
Attorney at Law – State of Delaware
Notarial Officer pursuant to
29 Del.C. § 4323(a)(3)

# TAB 24

**EFiled:  Aug 22 2023 03:49PM EDT**
**Transaction ID 70694157**
**Case No. 2023-0859-PAF**

## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| JEREMY BROWN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   C.A. No. |
| | ) |
| MERCANTILE PROCESSING, INC., a | ) |
| Delaware corporation, KYLE MORGAN, | ) |
| and KATHRYN McMILLAN, | ) |
| | ) |
| | ) |
| Defendants. | ) |

## AFFIDAVIT OF JEREMY BROWN

| | |
|---|---|
| STATE of DELAWARE | ) |
| | )  SS |
| NEW CASTLE COUNTY | ) |

The undersigned, Jeremy Brown, upon being duly sworn according to law, deposes and says:

1. I am an individual of sound mind aged 36 years.

2. I am a resident of Delaware.

3. I was employed by Mercantile Processing, Inc. (MPI) from 2015 until February 2023 (the "Employment").

4. Throughout my Employment, I was a W-2 employee paid by paycheck.

5.　　Throughout my Employment, I was classified as an exempt employee and was not paid overtime for hours worked in excess of 40 per workweek.

6.　　Throughout my Employment, I was not required to track or log my time in any way.

7.　　Throughout my Employment, I regularly worked in excess of 40 hours per workweek.

8.　　At no time during my Employment was I ever paid for overtime I worked—either at a straight rate or at an overtime rate.

9.　　During my Employment, I was guaranteed a "base salary" each year.

10.　　However, my salary was subject to deductions throughout my Employment.

11.　　If I did not make a particular quota, a set amount was withheld from my base salary.

12.　　I formed my entity, Authentic Merchant Solutions, LLC (AMS) for the sole purpose of providing service to my accounts as an MPI employee.

13.　　MPI was aware of my formation of AMS and never took any issue with it during my Employment.

14.     In January 2023, I complained to MPI's newly hired Chief Operations Officer, Benjamin Gray, that my residuals had been reduced from 15% to 5% on the Woodsboro Bank account.

15.     A few weeks later, MPI paid me the two months of residuals I was owed for the Woodsboro Bank account.

16.     Around the same period of time, I was called into a meeting with COO Gray and Chief Revenue Officer Kathryn McMillan.

17.     At that meeting, much to my shock and dismay, there was nothing close to an apology for having deprived me of a majority of my income for two months.

18.     Instead, they presented me with a Performance Improvement Plan.

19.     After that meeting, I resigned my Employment.

20.     Since leaving MPI, I have continued to service my MPI accounts in order to protect my Residuals.

21.     If an account is not satisfied with the service it receives from MPI, the account is free to leave for a competitor.

22.     If I ignore a request from an account for assistance, or if I ignore a request from MPI to service an account, I am actively pushing that account towards leaving MPI and thereby reducing my Residuals.

3

23.     After leaving my Employment, I tried to expand the services offered by AMS.  Specifically, I wanted to offer consulting services to accounts that either already have or wanted to get merchant-processing services.  Those services would entail me assisting in the negotiating of that account's contract with its merchant-services provider.

24.     To ensure that I did not upset MPI, I put a disclaimer on AMS's website that specifically stated that AMS did not work with MPI accounts.

25.     I have not, through AMS or otherwise, at any time since leaving my Employment, ever competed with MPI.

26.     I have never, through AMS or otherwise, at any time since leaving my Employment, ever sold or attempted to sell any credit-card processing services, point-of-sale systems, or other products or services offered by MPI.

27.     As a result of MPI's continued refusal to pay me my full residuals, I have had to accept a job in roof sales, where I am paid on a commission-only basis.

28.     To date, in my new job, I have earned less than $2,000.  As a result of my lack of income due to MPI's withholding of my wages, I have had to deplete my savings.

_____
Jeremy Brown

Dated:  August 20, 2023

SWORN TO AND SUBSCRIBED before me this _20th_ day of

_August_ 2023.

_____
Notarial Officer

Margaret M. DiBianca
DE Bar ID 4539

Margaret M. DiBianca
Attorney at Law -- State of Delaware
Notarial Officer pursuant to
29 Del.C. § 4323(a)(3)